No. 13-16071

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

---

WILDEARTH GUARDIANS,

*Plaintiff-Appellant,*

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ANIMAL AND
PLANT HEALTH INSPECTION SERVICE,

*Defendant-Appellee.*

---

On Appeal from the United States District Court for the District of Nevada,
Case No. 2:12-cv-00716-MMD-PAL, Hon. Miranda M. Du, District Judge

---

## APPELLANT'S OPENING BRIEF

---

Ashley D. Wilmes
WildEarth Guardians
680 W. Hickory Street
Louisville, Colorado 80027
Tel. 859-312-4162
awilmes@wildearthguardians.org

Attorney for Plaintiff-Appellant
WildEarth Guardians

**ORAL ARGUMENT REQUESTED**

## **CORPORATE DISCLOSURE STATEMENT**

WildEarth Guardians has no parent companies, subsidiaries, or affiliates that have issued shares to the public.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………...…….……...vi

STATEMENT OF RELATED CASES……………………….……...……..…….x

GLOSSARY……………………………………………………..…..xi

STATEMENT OF JURISDICTION…………………….………..………….1

ISSUES PRESENTED FOR REVIEW…………………….………………2

STATEMENT OF THE CASE..………….……………………….…...…….2

DISPOSITION AND COURSE OF PROCEEDINGS BELOW………..……4

STATEMENT OF FACTS..…………………………………….……..…….5

   I.     LEGAL BACKGROUND..………………………………...……….5

      A.   National Environmental Policy Act..……….…………………...….5

      B.   Motions to Dismiss for Want of Standing..…………………..…….8

   II.    FACTUAL BACKGROUND..………………………………...……10

      A.   Wildlife Services' 1994/1997 PEIS…………….…………...…….10

      B.   Nevada Wildlife Services Program.……….…………………...….12

      C.   The Mayer Letter.………….……………………………………….13

      D.   The District Court's Dismissal of Guardians' NEPA Claims………14

SUMMARY OF THE ARGUMENT …………………………...…….……17

ARGUMENT…………….…………………………………………….18

   I.     STANDARD OF REVIEW.………………………………...………18

II.     GUARDIANS HAS STANDING TO SUE ON ITS NEPA CLAIMS…19

A.    Guardians' Member Don Molde Has Standing…………….…………20

    1.    Guardians' Member Don Molde has an Injury-in-Fact Sufficient to Demonstrate Standing for Guardians' Three and Four (the Nevada EA and Decision Claims) …………………20

    2.    Guardians' Member Don Molde has an Injury-in-Fact Sufficient to Demonstrate Standing for Guardians' Claims One and Two (1994/1997 PEIS Claims) ………...……….………26

    3.    A Sufficient Causal Link Exists Between Mr. Molde's Injuries and Wildlife Services' Actions………….…………28

    4.    The Record Demonstrates that Guardians' NEPA Claims Are Redressable………….……………………………………29

        a.  Mr. Molde's Injuries are Redressable, Because Remedying Wildlife Services' NEPA Violations *Could* Protect Mr. Molde's Concrete Interests in Coyotes and Ravens and His Recreational Enjoyment of the Areas He Uses…..………31

        b.  The Record Demonstrates that Without Federal Assistance Raven Take in Nevada Would Likely Substantially Decrease, Thereby Redressing Mr. Molde's Injury as to Ravens………….……………………………………....…35

      c.    This Court's Unpublished Opinion in Goat Ranchers Does Not Preclude a Finding of Redressability Here ……....…36

B.    The District Court Erred In Finding the Mayer Letter Dispositive on the Issue of Redressability………….………………………....………40

    1.    No Evidence Exists in the Record that Nevada has its Own Predator Damage Management Plan or that it Would Implement Alternative 5 From the Nevada EA Without Federal Assistance………….……………………………………....…41

  2. No Evidence in the Record Exists to Support a Finding that NDOW Could Achieve Comparable Levels of Raven Take Without the Use of DRC-1339..……………………..….………43

  3. The Mayer Letter was Not Dispositive of Whether NDOW Could and Would Take Over Wildlife Services' Entire Program in Nevada Should Federal Assistance Cease………....………45

 C. Guardians' Member George Weurthner Has Standing to Sue on NEPA Claims One and Two...……..…………………………………48

 D. Guardians Has Standing to Sue on Behalf of its Members..…………51

III. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING GUARDIANS AN OPPORTUNITY FOR JURISDICTIONAL DISCOVERY……………………………………….……………..….………52

CONCLUSION…………………………………………………….…………..…57

STATEMENT REGARDING ORAL ARGUMENT…………....…………....…58

FRAP 32(a) CERTIFICATE OF COMPLIANCE..…………….……………59

CERTIFICATE OF SERVICE..………………………...…………….…60

# TABLE OF AUTHORITIES

## Cases

A-1 Ambulance Serv., Inc. v. California, 202 F.3d 1238 (9th Cir. 2000)...............19

Am. W. Airlines v. GPA Grp., Ltd., 877 F.2d 793 (9th Cir. 1989)..................10, 56

Bell v. Hood, 327 U.S. 678 (1946).........................................................................10

Cantrell v. City of Long Beach, 241 F.3d 674 (9th Cir. 2001) ..............................29

Citizens for Better Forestry v. U.S. Dep't of Agric., 341 F.3d 961
    (9th Cir. 2003)..........................................................................21, 26, 28, 37, 51

City of Carmel-By-The-Sea v. U.S. Dep't of Transp., 123 F.3d 1142
    (9th Cir. 1997)...............................................................................................39

City of Davis v. Coleman, 521 F.2d 661 (9th Cir. 1975) ........................................32

City of Sausalito v. O'Neill, 386 F.3d 1186 (9th Cir. 2004)...................................21

Ctr. for Food Safety v. Vilsack, 636 F.3d 1166 (9th Cir. 2011).................21, 25, 26

Daniels–Hall v. Nat'l. Educ. Ass'n., 629 F.3d 992 (9th Cir. 2010) .......................48

Desert Citizens Against Pollution v. Bisson, 231 F.3d 1172 (9th Cir. 2000) .........39

Dreier v. United States, 106 F.3d 844 (9th Cir. 1996) .............................................9

Ecological Rights Found. v. Pac. Lumber Co., 230 F.3d 1141 (9th Cir. 2000) ......26

Farr v. United States, 990 F.2d 451 (9th Cir. 1993).................................................56

Friends of the Clearwater v. Dombeck, 222 F.3d 552 (9th Cir. 2000).....................7

Goat Ranchers of Or. v. Williams, 379 F. App'x 662 (9th Cir. 2010)........ 36, 37-39

Graham v. FEMA, 149 F.3d 997, 1003 (9th Cir.1998).........................................38

Greene v. United States, 207 F. Supp. 2d 1113 (E.D. Cal. 2002) ...........................9

Hall v. Norton, 266 F.3d 969 (9th Cir. 2001).......................................................35

Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333 (1977) ............19, 51, 52

In re ATM Fee Antitrust Litig., 686 F.3d 741 (9th Cir. 2012)................................19

In re Facebook, 791 F.Supp.2d 705, 710 (N.D. Cal. 2011)......................................9

Kamen v. Am. Tel. & Tel. Co., 791 F.2d 1006 (2d Cir. 1986) ...............................55

Kingman Reef Atoll Inv., L.L.C. v. United States, 541 F.3d 1189 ........................10

Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094 (9th Cir. 2002). ...................52

Landwatch Lane Cnty. v. U.S. Fish & Wildlife Serv., No. 6:12-CV-958-AA,
    2012 WL 5198457 (D. Or. Oct. 19, 2012)..........................................................38

Laub v. U.S. Dep't of Interior, 342 F.3d 1080 (9th Cir. 2003) .............19, 54, 55, 57

Levitt v. Yelp! Inc., Nos. C–10–1321 EMC, C–10–2351 EMC,
    2011 WL 5079526 (N.D. Cal. Oct. 26, 2011)......................................................9

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992).................................8, 20, 22

Marsh v. Or. Natural Res. Council, 490 U.S. 360 (1989) ........................................7

Martin v. Morgan Drive Away, Inc., 665 F.2d 598 (5th Cir. 1982)........................54

Massachusetts v. EPA, 549 U.S. 497 (2007)..........................................................35

Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846 (9th Cir. 2005)....37

Or. Natural Res. Council Action v. U.S. Forest Serv., 293 F. Supp. 2d 1200
    (D. Or. 2003)........................................................................................................5

Pac. Rivers Council v. U.S. Forest Serv., 689 F.3d 1012 (9th Cir. 2012)................7

Pride v. Correa, 719 F.3d 1130 (9th Cir. 2013).....................................................18

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989) ......5, 6, 21, 39

Safe Air for Everyone v. Meyer, 373 F.3d 1035 (9th Cir. 2004) .......................9, 10

Sahni v. Am. Diversified Partners, 83 F.3d 1054 (9th Cir. 1996)..........................18

Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346 (9th Cir. 1994).....21

Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220
    (9th Cir. 2008)...........................................................................30

Sears v. Gila River Indian Cmty., No. CV–12–02203–PHX–ROS,
    2013 WL 5352990 (D. Ariz. Sept. 25, 2013)...........................................9

Seattle Audubon Soc'y v. Espy, 998 F.2d 699 (9th Cir. 1993)................................7

Summers v. Earth Island Inst., 555 U.S. 488 (2009).......................21, 22, 26, 29, 50

Tandy v. City of Wichita, 380 F.3d 1277 (10th Cir. 2004)....................................23

United States v. Reyes-Bonilla, 671 F.3d 1036 (9th Cir. 2012).............................42

Warth v. Seldin, 422 U.S. 490 (1975) ........................................................9

Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406 (9th Cir. 1977)......55

Western Watersheds Project v. Abbey, 719 F.3d 1035 (9th Cir. 2013) .................33

Williams v. Boeing Co., 517 F.3d 1120 (9th Cir. 2008) .........................................46

Wolf Recovery Found. v. U.S. Forest Serv., No. 4:CV-09-686-BLW,
    2011 WL 219986 (D. Idaho Jan. 20, 2011) ............................................38

## Statutes

5 U.S.C. §§ 701-706 .......................................................................1

5 U.S.C. § 706 ..............................................................................3

5 U.S.C. § 706(1).........................................................................7

5 U.S.C. § 706(2)(A), (D)................................................................7

28 U.S.C. § 1291 ..........................................................................2

28 U.S.C. § 1331 ..........................................................................1

28 U.S.C. § 1346(a)(2) ...................................................................1

42 U.S.C. § 4332(2)(C) ..................................................................5

Nev. Rev. Stat. § 503.595 ...............................................................43

## Other Authorities

46 Fed. Reg. 18,026 (Mar. 23, 1981) ...................................................6

## Rules

Fed. R. App. P. 4(a)(1)(B)..............................................................1

Fed. R. Civ. P. 12(b)(1) ...............................................................18

Fed. R. Civ. P. 15(a)(2) .............................................................1, 4

Fed. R. Evid. 201(b) ..................................................................48

## Regulations

40 C.F.R. § 1501.4(a)(1) ..............................................................5

40 C.F.R. § 1501.4(b).................................................................6

40 C.F.R. § 1501.4(e).................................................................6

40 C.F.R. § 1502.1...................................................................6

40 C.F.R. § 1502.9(c)(1) .............................................................6

40 C.F.R. § 1508.9...................................................................6

40 C.F.R. § 1508.9(a)................................................................6

40 C.F.R. § 1508.11..................................................................6

## **STATEMENT OF RELATED CASES**

There are no prior or related appeals.

# GLOSSARY

| | |
|---|---|
| Agency | USDA-APHIS Wildlife Services |
| APA | Administrative Procedures Act |
| APHIS | Animal and Plant Health Inspection Service |
| CR | Court's Record |
| Decision | Finding of No Significant Impact and Decision for Predator Damage Management in Nevada |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ER | Excerpts of Record |
| FONSI | Finding of No Significant Impact |
| Guardians | Plaintiff-Appellant WildEarth Guardians |
| Mayer Letter | October 28, 2010 letter to Wildlife Services from Kenneth Mayer, Appendix C to the Nevada Environmental Assessment |
| Molde | Declaration of Don Molde |
| NDOW | Nevada Department of Wildlife |
| NEPA | National Environmental Policy Act |
| Nevada EA | June 2011 Final Environmental Assessment for Predator Damage Management in Nevada |
| NWSP | Nevada Wildlife Services Program |
| PDM | Predator Damage Management |
| PEIS | Programmatic Environmental Impact Statement |
| USDA | United States Department of Agriculture |
| USFS | United States Fish and Wildlife Service |
| Weurthner | Declaration of George Weurthner |
| Wildlife Services | USDA-APHIS Wildlife Services |
| WS | USDA-APHIS Wildlife Services |
| 1994/1997 PEIS | Final programmatic environmental impact statement for USDA-APHIS Animal Damage Control Program (now "Wildlife Services") |

## STATEMENT OF JURISDICTION

Plaintiff-Appellant WildEarth Guardians ("Guardians") filed its Complaint against the Defendant, United States Department of Agriculture ("USDA"), Animal and Plant Health Inspection Service ("APHIS") for declaratory and injunctive relief challenging the agency's continuing failure to comply with the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4347, and the Wilderness Act, 16 U.S.C. §§ 1131-1136  (Excerpts of Record, "ER" 212).  The United States district court for the District of Nevada had subject matter jurisdiction over Guardians' claims pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346(a)(2) (United States as defendant), and 5 U.S.C. §§ 701-706 (Administrative Procedures Act) ("APA").

On March 14, 2013, the district court granted, in part, Defendant's Motion to Dismiss and dismissed Guardians' First, Second, Third, and Fourth Claims for Relief without prejudice.  (ER 5).  On March 29, 2013, the court entered an Order granting Guardians' motion for leave to amend its complaint to dismiss the remaining Fifth Claim for Relief pursuant to FED. R. CIV. P. 15(a)(2) and closing the case.  (Court's Record, "CR" 34).  Final Judgment was entered on September 16, 2013.  (ER 4).  Guardians' Amended Notice of Appeal was filed on September 17, 2013.  (ER 1). The Amended Notice of Appeal was timely filed within 60 days pursuant to FED. R. APP. P. 4(a)(1)(B).  This Court therefore has jurisdiction

pursuant to 28 U.S.C. § 1291.

## ISSUES PRESENTED FOR REVIEW

**I.     DOES GUARDIANS HAVE ARTICLE III STANDING TO SUE BASED ON THE DECLARATIONS OF ITS MEMBERS AND UNCONTROVERED EVIDENCE IN THE RECORD THAT THE  STATE OF NEVADA COULD NOT TAKE OVER WILDLIFE SERVICES' ENTIRE NEVADA PROGRAM?**

**II.    DID THE DISTRICT COURT ERR IN DETERMINING GUARDIANS LACKED STANDING WHEN THE COURT IGNORED CONTROLLING CASELAW REGARDING RELAXED REDRESSABILITY IN NEPA CASES?**

**III.   DID THE DISTRICT COURT ERR IN FINDING THERE WERE NO DISPUTED ISSUES OF FACT ON WHETHER THE STATE COULD  AND WOULD TAKE OVER WILDLIFE SERVICES' PROGRAM IN  NEVADA AND DENYING GUARDIANS AN OPPORTUNITY FOR JURISDCTIONAL DISCOVERY  BEFORE DISMISSING ITS NEPA CLAIMS FOR LACK OF SUBJECT MATTER JURISDICTION?**

## STATEMENT OF THE CASE

## I.     INTRODUCTION AND NATURE OF THE CASE

Every year, our nation's most majestic animals, including wolves, coyotes,

and mountain lions, are poisoned, trapped, and gunned downed by Wildlife

Services, a program within USDA-APHIS. [1]   In 1994, Wildlife Services issued a

programmatic environmental impact statement ("PEIS") under NEPA for its

---

[1]     Defendant-Appellee is hereinafter referred to as "Wildlife Services" (also "WS," "Defendant," or the "agency") as allegations in Guardians' Complaint concern the Wildlife Services program, which functions as a semi-autonomous agency.  Compl. ¶1 n.1 (ER 215).

2

ongoing "wildlife damage management" program, which was much smaller in size and scope than the national program is today. This environmental analysis is now woefully outdated and inadequate. However, Wildlife Services continues to rely on this nearly twenty-year-old PEIS in implementing its activities nationwide, including killing native carnivores and other wildlife in the State of Nevada.

In 2011, pursuant to its duty under NEPA, Wildlife Services issued an environmental assessment ("EA") for its program in Nevada ("Nevada EA"). Instead of taking a hard look at new information and doing its own analysis on issues such as the environmental impacts of Wildlife Services' use of toxicants and traps, the EA simply incorporated by reference the analysis in the PEIS. Wildlife Services concluded that no significant impact to the environment existed and that it did not need to prepare an environmental impact statement ("EIS").

In Guardians' Complaint for Declaratory and Injunctive Relief, Claims One and Two allege that Wildlife Services' failure to supplement its PEIS and the Nevada EA's reliance on its outdated environmental analysis violates NEPA.[2] Compl. ¶¶ 155-69 (ER 246-48). Claim Three alleges violations of NEPA based on the agency's failure to adequately disclose and analyze environmental impacts in the Nevada EA. Id. ¶¶ 170-80 (ER 248-50). Claim Four alleges that Wildlife Services' failure to prepare an EIS for its Nevada program violates NEPA. Id. ¶¶

---

[2] Guardians Claims One through Four allege that Wildlife Services violated NEPA within the meaning of the APA, 5 U.S.C. § 706.

183-86 (ER 248). Finally, Claim Five alleges a violation of the Wilderness Act. (ER 250-51).

## II.  DISPOSITION AND COURSE OF PROCEEDINGS BELOW

In lieu of filing an Answer, Wildlife Services filed a Motion to Dismiss Guardians' Complaint for lack of standing. (CR 12).  On March 14, 2013, although relevant facts were in dispute and Guardians was given no opportunity for discovery, the district court granted in part Defendant's Motion to Dismiss and dismissed without prejudice Guardians' First, Second, Third, and Fourth Claims for Relief (NEPA claims) for lack of standing. (ER 5).

Because Guardians' Fifth and final Claim for Relief (Wilderness Act claim) related to a very small part of Wildlife Services' activities in Nevada, litigating that claim would have been an inefficient use of the time and resources of the Court and the parties.  Therefore, Guardians sought leave from the district court to amend its Complaint to dismiss this claim under FED. R. CIV. P. 15(a)(2). (CR 32).  On March 29, 2013, the district court granted Guardians' unopposed motion. (CR 34). Since no claims remained, the district court ordered the clerk to close the case.  Id.

On April 11, 2013, pursuant to FED. R. CIV. P. 58(d), Guardians filed a motion requesting judgment as a separate document. (CR 35).  On May 24, 2013, Guardians filed its Notice of Appeal, to protect its right to appeal the district court's order granting Defendant's Motion to Dismiss. (CR 36).  On September

16, 2013, the district court granted Guardians' motion and the clerk entered the Judgment, ordering "that Plaintiff's first through fourth claims of relief are dismissed without prejudice for lack of subject matter jurisdiction." (CR 40). On September 17, 2013, Guardians filed its Amended Notice of Appeal. (ER 1).

## STATEMENT OF FACTS

### I.     LEGAL BACKGROUND

#### A.     National Environmental Policy Act

"The purpose of NEPA is to foster better decision making and informed public participation for actions that affect the environment." Or. Natural Res. Council Action v. U.S. Forest Serv., 293 F. Supp. 2d 1200, 1204 (D. Or. 2003). NEPA "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts . . ." Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989).

To that end, NEPA requires federal agencies to assess and publicly disclose the environmental impacts of proposed federal actions. 42 U.S.C. §§ 4321-4347. When environmental impacts could be significant, the agency must prepare an EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4(a)(1). An EIS is a "detailed written statement" that "provide[s] full and fair discussion of significant environmental impacts and shall inform decisionmakers and the public of the reasonable

alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment."  40 C.F.R. §§ 1508.11, 1502.1.

When it is unclear whether agency action will significantly affect the environment, the agency must prepare an EA.  Id. §§ 1501.4(b), 1508.9.  An EA is a "concise public document" that "[b]riefly provide[s] sufficient evidence and analysis for determining whether to prepare an [EIS]."  Id. § 1508.9(a).  If the agency concludes on the basis of the EA that an EIS is not needed, it must issue a Finding of No Significant Impact ("FONSI").  Id. § 1501.4(e).

When agencies continue to implement ongoing federal programs, their NEPA obligations also continue.  See Robertson, 490 U.S. at 348.  NEPA requires agencies to prepare supplements to an EIS for an ongoing program if "the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1).  The Counsel on Environmental Quality, which promulgated the NEPA regulations, has explained: "[a]s a rule of thumb . . . if the EIS concerns an ongoing program, EISs that are more than 5 years old should be carefully reexamined to determine if the criteria in Section 1502.9 compel preparation of an EIS supplement."  46 Fed. Reg. 18,026, 18,036 (Mar. 23, 1981).

Accordingly, the Supreme Court held: "[i]f there remains major Federal

action to occur, and the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, *a supplemental EIS must be prepared*." Marsh v. Or. Natural Res. Council, 490 U.S. 360, 374 (1989) (emphasis added).  Furthermore, "[t]he agency must be alert to new information that may alter the results of its original environmental analysis, and continue to take a 'hard look at the environmental effects of its planned action, even after a proposal has received initial approval.'" Friends of the Clearwater v. Dombeck, 222 F.3d 552, 557 (9th Cir. 2000) (quoting Marsh, 490 U.S. at 374).  An agency must also re-examine its decision when the EIS "rests on stale scientific evidence . . . and false assumptions." Seattle Audubon Soc'y v. Espy, 998 F.2d 699, 704 (9th Cir. 1993).

Judicial review of an agency's compliance with NEPA is governed by the APA, 5 U.S.C. §§ 701-706.  See Pac. Rivers Council v. U.S. Forest Serv., 689 F.3d 1012, 1020 (9th Cir. 2012).  Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions found to be – arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or "without observance of procedure required by law."  5 U.S.C. §§ 706(2)(A), (D).  The court shall also "compel agency action unlawfully withheld or unreasonably delayed." Id. § 706(1).

**B.    Motions to Dismiss for Want of Standing**

To establish standing, a party must show that it has suffered an injury-in-fact, *i.e.,* a concrete and particularized, actual or imminent invasion of a legally protected interest; that the injury is fairly traceable to the challenged action of the defendant; and that a favorable decision will likely redress the injury.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992).  The Supreme Court has not imposed special burdens at the pleading stage with respect to demonstrating standing.  In Lujan, the Court described the sequence of pleading and proving jurisdiction as follows:

> Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation. ***At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim.*** In response to a summary judgment motion, however, the plaintiff can no longer rest on such "mere allegations," but must "set forth" by affidavit or other evidence "specific facts," Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true. And at the final stage, those facts (if controverted) must be supported adequately by the evidence adduced at trial.

Id. at 561 (emphasis added) (citations, brackets, and internal quotation marks omitted).  Moreover, "[f]or purposes of ruling on a motion to dismiss for want of standing," the court "must accept as true all material allegations of the complaint,

and must construe the complaint in favor of the [plaintiff]." Warth v. Seldin, 422 U.S. 490, 501 (1975).

However, courts have carved out an exception when the Rule 12(b)(1) attack is "factual," *i.e.*, when "the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004). This Court has explained:

> In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. The court need not presume the truthfulness of the plaintiff's allegations. Once the moving party has converted the motion to dismiss into a factual motion by presenting affidavits or other evidence properly brought before the court, the party opposing the motion must furnish affidavits or other evidence necessary to satisfy its burden of establishing subject matter jurisdiction.

Id. (internal citations and quotation marks omitted). However, in the absence of a full-fledged evidentiary hearing, factual disputes pertinent to subject matter jurisdiction are viewed in the light most favorable to the opposing party. Greene v. United States, 207 F. Supp. 2d 1113, 1119 (E.D. Cal. 2002) (citing Dreier v. United States, 106 F.3d 844, 847 (9th Cir. 1996)).[3]

"In general, a district court is permitted to resolve disputed factual issues bearing upon subject matter jurisdiction in the context of a Rule 12(b)(1) motion

---

[3]    See also In re Facebook, 791 F.Supp.2d 705, 710 (N.D. Cal. 2011) (same); Levitt v. Yelp! Inc., Nos. C–10–1321 EMC, C–10–2351 EMC, 2011 WL 5079526, *2 (N.D. Cal. Oct. 26, 2011) (same); Sears v. Gila River Indian Cmty., No. CV–12–02203–PHX–ROS, 2013 WL 5352990, *1 (D. Ariz. Sept. 25, 2013) (same).

unless the jurisdictional issue and the substantive issues are so intermeshed that the

question of jurisdiction is dependent on decision of the merits." Kingman Reef

Atoll Inv., L.L.C. v. United States, 541 F.3d 1189, 1196-97 (9th Cir. 2008)

(internal quotation omitted).  However, "where pertinent facts bearing on the

question of jurisdiction are in dispute, discovery should be allowed." Am. W.

Airlines v. GPA Grp., Ltd., 877 F.2d 793, 801 (9th Cir. 1989).  Furthermore,

"jurisdictional dismissals in cases premised on federal-question jurisdiction are

exceptional, and must satisfy the requirements specified in Bell v. Hood, 327 U.S.

678 (1946)," wherein "the Supreme Court determined that jurisdictional dismissals

are warranted 'where the alleged claim under the constitution or federal statutes

clearly appears to be immaterial and made solely for the purpose of obtaining

federal jurisdiction or where such claim is wholly insubstantial and frivolous.'"

Safe Air, 373 F.3d at 1040 (citing Bell, 327 U.S. at 682-83) (other citations and

quotations omitted).

## II.    FACTUAL BACKGROUND

### A.    Wildlife Services' 1994/1997 PEIS

In 1994, Wildlife Services, then called "Animal Damage Control," issued a

PEIS ("1994/1997 PEIS") under NEPA for its ongoing "wildlife damage

management" program.[4]  See Compl. ¶ 2 (ER 215).  The 1994/1997 PEIS analyzed

the biological and environmental impacts of Wildlife Services' wildlife killing

activities on only 17 target species, based on kill data for fiscal year 1988.  Id.  Fast

forward to 2010, when Wildlife Services killed over 5 million animals,

representing a total of approximately 300 species.  Id.  The agency also now

spends approximately $126 million annually to kill millions of animals, in contrast

to the $26 million spent in 1988.  Id.

The data, science, and analysis in Wildlife Services' 1994/1997 PEIS,

including its risk assessment for deadly chemical toxicants, are now very outdated.

For example the livestock loss and value data used for its cost-benefit analysis is

from 1990.  Id. ¶ 66 (ER 231).  The analysis of impacts in the 1994/1997 PEIS is

based primarily on studies from the 1970's and 1980's. Id. ¶ 4 (ER 216).

Significant new information and scientific studies bearing on the biological,

ecological, and economic impacts of Wildlife Services' national program and

activities have been published in the past two decades, which must be considered

by the agency.  Id.  This includes new research and scientific analysis on the

critical ecological role of carnivores, the proven ineffectiveness of trapping, and

the availability and efficacy of nonlethal alternatives.  Id. ¶ 74 (ER 233).

---

[4]      In 1997, APHIS revised and reissued its 1994 PEIS to correct certain errors, but the 1997 PEIS did not contain new environmental analysis.  Compl. ¶¶ 52, 53 (ER 229).

Nevertheless, Wildlife Services continues to rely on the 1994/1997 PEIS for its activities, including killing native carnivores, such as coyotes and mountain lions, and other wildlife in Nevada.  Id. ¶ 161 (ER 247).

**B.**     **Nevada Wildlife Services Program**

Wildlife Services supervises the Nevada Division of Resource Protection, which is a division of the Nevada Department of Agriculture.  (ER 69).  The two entities form the Nevada Wildlife Services Program ("NWSP").  Id.  In June of 2011, pursuant to its duty under NEPA, Wildlife Services issued its final EA for NWSP's ongoing predator damage management ("PDM") program in the State of Nevada, which evaluated five alternatives for using various PDM methods "to resolve conflicts with predators throughout Nevada."  (ER 6, 68, 69, 108).  However, instead of taking a hard look at new information and doing its own analysis on issues such as trapping, toxicants, and the environmental impacts of carnivore removal, the Nevada EA relied on and incorporated by reference the stale environmental analysis in the 1994/1997 PEIS.  Compl. ¶¶ 175-76 (ER 249).

On June 22, 2011, Wildlife Services issued a FONSI and Decision for PDM in Nevada ("Decision").  Id. ¶ 87, 89 (ER 234).  In its Decision on the Nevada EA, Wildlife Services chose Alternative 5, the proposed action, which was a "continuation of the current NWSP PDM activities in Nevada . . . with a greater emphasis on protection of game species," including sage-grouse, Rocky mountain

bighorn sheep, Rocky mountain elk, and mule deer.  (ER 6, 70).  Alternative 5 also

allowed the use of all legal methods for killing native carnivores and ravens,

including shooting, aerial hunting, trapping, and M-44s.[5]  (ER 71).  In making its

FONSI, Wildlife Services concluded that there will not be a significant impact on

the quality of the human environment as a result of its implementation of

Alternative 5, and that an EIS need not be prepared.  (ER 6).

## C.    The Mayer Letter

Appendix C to the Nevada EA is an October 28, 2010 letter to Wildlife

Services from Kenneth Mayer ("Mayer Letter"), the then-Director of the Nevada

Department of Wildlife ("NDOW"), stating, in material part:

> NDOW is responsible by State statute (NRS 503.595) for controlling
> wildlife causing damage to personal property or endangering personal
> safety. . . .
>
> In order to comply with this responsibility, NDOW utilizes WS to
> control offending wildlife which are causing, or about to cause,
> damage to livestock, wildlife resources, agriculture crops, or personal
> property and to protect the public from dangerous animals when it is
> warranted and as authorized by Nevada Administrative Code . . .
>
> Without WS participation, NDOW would, by statute, carry out the
> management of wildlife with existing personnel or contract the work
> to other capable entities.

---

[5]      M-44s are lethal spring-loaded devices, topped with smelly baits that lure
carnivores.  When a carnivore tugs on the M-44, a spring shoots a pellet of sodium
cyanide into the animal's mouth, which turns into a deadly vapor.  Compl. ¶ 16 n.3
(ER 220).

(ER 213). Wildlife Services cited the Mayer Letter in the Nevada EA to explain that under a "no federal PDM" alternative "if NWSP was not conducting the work, NDOW, by Nevada Revised Statute and Nevada Administrative Codes would still be required to perform PDM." (ER 182).

A central question in this case is what effect an injunction on the federal Nevada PDM program would have. Wildlife Services answered this question in evaluating a "No Federal PDM" alternative in the EA, wherein there would be no federal involvement in PDM activities in Nevada, stating:

> Under this [no federal PDM] alternative, wildlife damage conflicts would be addressed by NDOW, private resource owners and managers, private contractors, or other government agencies. If WS chooses to not provide the PDM services that NWSP feels are necessary, the State would likely rescind the federal management of that program, and the Nevada Department of Agriculture would probably handle agriculture related PDM complaints . . .
>
> The avicide DRC-1339 is a special restricted use pesticide and can only be used under direct supervision by WS employees. Consequentially, this technique would not be available under this alternative.

(ER 115). Wildlife Services concluded that without federal assistance, levels of PDM (*i.e.*, the killing of wildlife) would decrease and the number of ravens killed would likely "decrease substantially." (ER 181-82).

### D.     The District Court's Dismissal of Guardians' NEPA Claims

In the district court, Guardians challenged the Nevada EA and Decision,

based on multiple violations of NEPA.  For example, Wildlife Services failed to

adequately consider and analyze the environmental impacts caused both by the

removal of carnivores and by the methods used to kill wildlife in Nevada,

including leghold traps, aerial hunting, and the use of toxic chemicals, in violation

of NEPA.  Id. ¶ 175 (ER 249).  Because the widespread killing of native carnivores

in Nevada may have a significant impact on the environment, Wildlife Services

also violated NEPA by failing to prepare a full EIS for its Nevada PDM program.

Id. ¶ 182 (ER 250).

Guardians also brought suit based on Wildlife Services' failure to

supplement its 1994/1997 PEIS.  Because the scope of Wildlife Services' work has

changed substantially in the nearly two decades since the 1994/1997 PEIS was first

issued and because significant new highly relevant information exists bearing on

the environmental impacts of its wildlife killing activities and its use of deadly

toxicants, NEPA mandates that Wildlife Services prepare a supplemental PEIS for

its ongoing national program.  Id. ¶¶ 156, 157, 165, 166 (ER 246-48).  Instead,

Wildlife Services refused to supplement its 1994/1997 PEIS, and unlawfully relied

on it in making its Nevada Decision.  Id. ¶¶ 161, 168, 176 (ER 248-49).

Instead of answering Guardians' Complaint, Wildlife Services filed a

Motion to Dismiss, relying on the Mayer Letter to argue that the district court

could not grant effective relief in this case because NDOW "is authorized to carry

out predator damage management activities and has stated its intention to do so if the federal program ceases." (CR 12 at 3). In response, Guardians submitted declarations from two of its members demonstrating standing. (ER 25-1, 25-2). The district court found that Guardians' member Don Molde had standing on Guardians' claims Three and Four, challenging the Nevada EA and Decision. (ER 7). Although the Nevada EA and Decision relied on analysis from the 1994/1997 PEIS, the court found that Mr. Molde did not have standing on Guardians' claims One and Two, challenging Wildlife Services' failure to supplement the PEIS, because his declaration only concerned his activities in Nevada. (ER 7 n.2).

However, based on the Mayer Letter, the district court dismissed Guardians' NEPA claims for lack of standing, holding that Guardians' members' injuries could not be redressed by the court enjoining Wildlife Services from implementing the Nevada EA and Decision. (ER 15). The court district found, without factual support, that NDOW has its own PDM plan for coyotes, mountain lions, and ravens, and that it would implement this same plan absent federal involvement. (ER 13). The district court also denied Guardians' Motion for Leave to Conduct Jurisdictional Discovery (CR 27), concluding that "NDOW (in the Mayer letter) has undisputedly expressed a clear intent to implement the predator management program absent federal involvement." (ER 15, 17).

# SUMMARY OF THE ARGUMENT

The issues in this appeal all relate to whether Guardians' has standing to bring this suit. The district court found that member Don Molde had injury-in-fact for Guardians' NEPA claims related to the Nevada EA and Decision. The court then incorrectly concluded that Mr. Molde did not have standing to challenge Wildlife Services' failure to supplement the 1994/1997 PEIS, even though the Nevada EA relied on environmental analyses from the PEIS, which still governs the agency's ongoing activities nationwide. The district court also erred in finding that member George Weurthner had not suffered injury-in-fact sufficient for the PEIS supplementation claims, based upon a misapplication of Summers v. Earth Island Inst., 555 U.S. 488, 496 (2009). Because both Mr. Weurthner and Mr. Molde clearly demonstrated that they suffered concrete harm from deprivation of a procedural right under NEPA, both members have injury-in-fact sufficient for standing.

Guardians has standing under controlling caselaw because its members have a procedural right that, if exercised, could protect their concrete interests in recreation and wildlife in the areas where Wildlife Services conducts its activities. Despite NDOW's vague assertions in the Mayer Letter, Guardians' members' injuries are redressable. First, the requested relief could influence Wildlife Services' ultimate decision, prompting environmental mitigation measures that

would redress the members' injuries (such as banning traps or changing its strategies on managing coyotes), even if NDOW conducted some PDM in the interim. Second, the Nevada EA states that PDM would decrease in Nevada without federal involvement, particularly for ravens, since NDOW cannot use DRC-1339, a restricted-use avicide, to kill ravens.

The district court also erred in finding there were no disputed issues of fact as to whether NDOW could and would carry out all the activities that cause harm to Guardians' members. The Mayer Letter was not dispositive of this issue, and the district court ignored uncontroverted evidence in the Nevada EA in reaching its conclusion that Guardians' claims were not redressable. Finally, the district court caused Guardians substantial prejudice by denying its NEPA claims without first allowing an opportunity for jurisdictional discovery.

For the foregoing reasons, Guardians has standing and the district court erred in dismissing Guardians' NEPA claims for lack of subject matter jurisdiction.

## **ARGUMENT**

## I. **STANDARD OF REVIEW**

This Court undertakes *de novo* review of the district court's dismissal of Guardians' claims for lack of subject matter jurisdiction under FED. R. CIV. P. 12(b)(1). Pride v. Correa, 719 F.3d 1130, 1133 (9th Cir. 2013); see also Sahni v. Am. Diversified Partners, 83 F.3d 1054, 1056 (9th Cir. 1996) ("Standing is a

question of law that we review de novo."). However, any factual findings made by a district court relevant to its determination of standing are reviewed under the "clearly erroneous" standard. See In re ATM Fee Antitrust Litig., 686 F.3d 741, 747 (9th Cir. 2012). Mixed questions of law and fact are also reviewed *de novo*. See A-1 Ambulance Serv., Inc. v. California, 202 F.3d 1238, 1243 (9th Cir. 2000).

The district court's decision denying Guardians' motion for jurisdictional discovery is reviewed for abuse of discretion. See Laub v. U.S. Dep't of Interior, 342 F.3d 1080, 1084 (9th Cir. 2003).

## II.     GUARDIANS HAS STANDING TO SUE ON ITS NEPA CLAIMS

Guardians has standing to bring this suit on behalf of its members because: its members have standing to sue in their own right; the interests at stake are germane to the organization's purpose; and neither the claims asserted, nor the relief sought requires Guardians' members to participate directly in this lawsuit. See Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). In response to Defendant's Motion to Dismiss, Guardians submitted declarations from two of its members demonstrating standing. See Declaration of Don Molde ("Molde") (CR 25-1; ER 21); Declaration of George Weurthner ("Weurthner") (CR 25-2; ER 31). Guardians' member Don Molde, who is injured by Wildlife Services' activities in Nevada, has standing on all of Guardians' NEPA claims. Furthermore, Guardians' member George Weurthner, who is injured by Wildlife

Services' activities in Montana, among other places, has standing to sue on

Guardians' Claims One and Two (Failure to Supplement the 1994/1997 PEIS).

### A.   Guardians' Member Don Molde Has Standing

As set forth below, Guardians' member Don Molde has standing on all of

Guardians' NEPA claims because (1) he has suffered an injury-in-fact, (2) there

exists a causal connection between that injury and the conduct complained of, and

(3) a favorable decision on the merits will likely redress the injury.  See Lujan, 504

U.S. at 560-61.

### 1.   Guardians' Member Don Molde has an Injury-in-Fact Sufficient to Demonstrate Standing for Guardians' Claims Three and Four (the Nevada EA and Decision Claims)

The district court found that, for the purposes of Claims Three and Four,

Wildlife Services conceded that Mr. Molde had standing.  (ER 11).  The court

described the injury that "Mr. Molde will allegedly suffer" as "viewing fewer

coyotes, mountain lions, and ravens in Nevada's wild as a result of WS's Nevada

EA and Decision."  (ER 11 n.3).  However, since this Court reviews standing *de

novo*, and the district court made no factual findings as to injury-in-fact in this

case, Guardians states as follows:

In NEPA cases such as this one, a cognizable injury-in-fact exists when a

plaintiff alleges that a proper NEPA analysis was not prepared and when the

plaintiff also alleges a "concrete interest" – such as an aesthetic or recreational

interest – that is threatened by the agency's actions.  See Summers, 555 U.S. at

496; City of Sausalito v. O'Neill, 386 F.3d 1186, 1197 (9th Cir. 2004).  Here, Mr.

Molde has a cognizable "injury-in-fact" because (1) Wildlife Services "violated

certain procedural rules" under NEPA; (2) these rules protect Mr. Molde's

"concrete interests;" and (3) "it is reasonably probable that the challenged action

will threaten [his] concrete interests."  Ctr. for Food Safety v. Vilsack, 636 F.3d

1166, 1171 (9th Cir. 2011) (citing Citizens for Better Forestry v. U.S. Dep't of

Agric., 341 F.3d 961, 969–70 (9th Cir. 2003)).

NEPA is a procedural statute, intended to "ensure[] that the agency, in

reaching its decision, will have available, and will carefully consider, detailed

information concerning significant environmental impacts . . ."  Robertson, 490

U.S. at 349.  Because Wildlife Services failed to comply with NEPA as alleged in

Guardians' Complaint, the environmental consequences of its PDM actions

authorized by the Nevada Decision – including its killing of large numbers of

coyotes and ravens and its use of traps and toxicants – might be overlooked and

Mr. Molde was deprived of his procedural rights under NEPA.  See Salmon River

Concerned Citizens v. Robertson, 32 F.3d 1346, 1355 (9th Cir. 1994) (finding

injury where "environmental consequences might be overlooked" in the absence of

NEPA compliance).

Mr. Molde has standing because he also has concrete interests that are tied to

this procedural harm.  See Summers, 555 U.S. at 496 (confirming that a "person who has been accorded a procedural right to protect *his concrete interests* can assert that right . . .") (quoting Lujan, 504 U.S. at 573 n.7) (emphasis in original).

Mr. Molde lives in Nevada and regularly uses and enjoys areas impacted by Wildlife Services' activities, including the Humboldt-Toiyabe National Forest and areas near Reno where he resides.  Molde ¶¶ 2, 4 (ER 21, 24).  Mr. Molde states: "I am a wildlife enthusiast, birder, photographer and a particular fan of native carnivores . . .  Ravens, beavers, foxes, raccoons, skunks, and the like, are all fondly regarded by me . . . " Id. ¶ 5 (ER 22).  He derives recreational and aesthetic benefits from the existence and observation of coyotes and ravens, and enjoys looking for them on his trips in and around the Humboldt National Forest in Nevada.  Id. ¶ 6, 8, 12, 18, and 20 (ER 22-26).  Mr. Molde has "a special affinity for coyotes," stating: "When I am out on the public lands, I consider it a good day if I can see a coyote, and a great day if I can see two or three."  Id. ¶ 6 (ER 22).  "Of course, the desire to . . . observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purpose of standing." Lujan, 504 U.S. at 562-63.

Mr. Molde takes a family trip to Wild Horse Reservoir north of Elko, Nevada for his birthday each year, where he camps with his trailer.  Molde ¶ 5 (ER 23).  On these annual trips, Mr. Molde visits nearby Humboldt National Forest for

recreation, wildlife observation, and walks, usually entering near the Gold Creek

Ranger Station and exploring along the road to Jarbidge.  Id. ¶ 12 (ER 24).

Wildlife Services kills coyotes in this area.  See, e.g., Nevada EA ("During

summer, the majority of direct PDM is done on the Humboldt [National Forest] in

Elko County.").  (ER 111).  Because Mr. Molde's chances of seeing coyotes,

mountain lions, and ravens in this area are diminished by Wildlife Services'

activities, his enjoyment of the Humboldt National Forest area is lessened.[6]  Molde

¶ 12 (ER 24).

Mr. Molde also enjoys looking for and observing ravens as he travels

Nevada's scenic roads and highways, and his declaration describes several of his

routes where Wildlife Services conducts its activities.  See id. ¶¶ 20-23 (ER 26-

27).  One such route is the 65-mile stretch of Highway 225 in route to Wild Horse

Reservoir.  Id. ¶ 20 (ER 26).  Mr. Molde looks for ravens and other birds on these

trips.  Id. (ER 26-27).  Wildlife Services' use of DRC-1339, a deadly avian toxin

frequently used by Wildlife Services to kill ravens in Nevada, reduces Mr. Molde's

---

[6]    Mr. Molde's declaration described his concrete plans to return to the
Humboldt National Forest on or about August 19, 2013 for his annual birthday trip.
Molde Dec. ¶ 11 (ER 23).  For the other areas described in his affidavit, his
repeated past usage of the affected area and plans to continue that usage
established his intent to return.  See id. ¶¶ 19-23 (ER 26-28); Tandy v. City of
Wichita, 380 F.3d 1277, 1284-85 (10th Cir. 2004)) (finding a party had standing
where she had established repeated past usage of the bus system and testified that
she would continue to use the routes "several times per year").

chances of seeing ravens and other birds on these trips in and around Humboldt

and Elko counties.  Id. ¶¶ 21-23 (ER 26-27); see also Nevada EA (ER 118) (DRC-

1339 used to protect sage grouse in Elko County); 133 (ravens killed in Elko and

Humboldt counties).  Wildlife Services' use of DRC-1339 and killing of ravens

therefore reduces Mr. Molde's enjoyment of the scenic drives along the routes

described in his declaration, and his recreational enjoyment of his destinations.

Furthermore, Mr. Molde has a concrete injury based on harm to his

recreational interests caused by Wildlife Services' use of traps and M-44s in areas

in which he recreates.  Mr. Molde takes walks with his dog in areas where Wildlife

Services conducts its activities and where he has seen Wildlife Services' warning

signs, including near the Gold Creek Guard Station in the Humboldt National

Forest and areas in Reno around the Lemmon Valley water treatment plant where

he goes bird-watching.  Molde ¶¶ 14, 17 (ER 24-25); see also Nevada EA

("Conspicuous, bilingual warning signs alerting people to the presence of traps,

snares and M-44s are placed at major access points when they are set in the field.")

(ER 128).  Because of Wildlife Services' activities in these areas and its use of

traps and M-44s, he is always concerned about his dog's safety on these walks and

he restricts their activities accordingly.  Molde ¶¶ 14, 17 (ER 24, 25).  His

enjoyment of these areas and his walks with his dog are therefore diminished by

Wildlife Services' implementation of its Nevada Decision and its NEPA

violations.[7]

Mr. Molde also meets this Circuit's "concrete interest" test because he has "a geographic nexus" with "the location suffering an environmental impact" due to Wildlife Services' uninformed decisionmaking.  See Vilsack, 636 F.3d at 1172. As described specifically in his declaration, Mr. Molde recreates in the Humboldt National Forest and areas around Reno and Elko that are subject to Wildlife Services' PDM activities, as authorized by the Nevada Decision.  The specificity required to satisfy the "geographic nexus" test is not a high bar.  See, e.g., Ctr. For Biological Diversity v. Kempthorne, 588 F.3d 701, 707-08 (9th Cir. 2009) (holding, after Summers, that the plaintiff suffered a "geographically specific" injury where the plaintiff's members alleged "that they have viewed polar bears and walrus *in the Beaufort Sea region*, enjoy doing so, and have plans to return.") (emphasis added); see also W. Watersheds Project v. Kraayenbrink, 632 F.3d 472, 485 (9th Cir. 2011) (holding that plaintiff "established a concrete interest sufficient to pursue [its] NEPA claim" where its members' declarations established a "geographic nexus between [plaintiff's] members and the locations subject to the 2006 [nationwide grazing] Regulations.").

---

[7]    Guardians' Complaint includes allegations that Wildlife Services violated NEPA by failing to analyze and take a hard look at the direct, indirect, and site-specific environmental impacts of leghold traps in the Nevada EA.  Compl. ¶¶ 121, 143 (ER 241, 244).

Finally, Mr. Molde's injuries are sufficient for standing because it is at least "reasonably probable" that implementation of Wildlife Services' Nevada Decision, including its lethal removal of coyotes and ravens; its use of traps, M-44s, and DRC-1339; and its failure to take a hard look at the environmental consequences of its actions, threaten Mr. Molde's concrete interests, as described above. See Vilsack, 636 F.3d at 1171 n.6 (stating that Summers left the "reasonable probability" standard unchanged) (citation omitted). An increased risk of environmental harm to a plaintiff's concrete interests is also sufficient for standing. See Ecological Rights Found. v. Pac. Lumber Co., 230 F.3d 1141, 1151 (9th Cir. 2000).[8] Therefore, Mr. Molde has an injury-in-fact sufficient to challenge the Nevada EA and Decision.

### 2. Guardians' Member Don Molde has an Injury-in-Fact Sufficient to Demonstrate Standing for Guardians' Claims One and Two (1994/1997 PEIS Claims)

Mr. Molde's injuries described above also demonstrate injury-in-fact sufficient for standing for Guardians' Claims One and Two, which allege violations of NEPA based on Wildlife Services' failure to supplement the 1994/1997 PEIS and the agency's continued reliance on this outdated analysis for its ongoing work nationwide. Compl. ¶¶ 155-69 (ER 246-47). Information and environmental analysis from the 1994/1997 PEIS was incorporated by reference

---

[8] Where injury resulting from a violation of a procedural right is alleged, the standard for "immediacy" is relaxed. See Citizens, 341 F.3d at 969.

and relied upon in the Nevada EA. See, e.g., Nevada EA (ER 94) ("Pertinent information available in the [1994/1997 PEIS] has been incorporated by reference into this EA."). For example, instead of doing an assessment of the effects on public safety and the environment from the use of M-44s (sodium cyanide ejecting devices) and DRC-1339 (the avicide used to kill ravens, but which also unintentionally poisons birds and other species, see Compl. ¶ 26 (ER 26)), the Nevada EA relied on its outdated analysis in the 1994/1997 PEIS to conclude that "such use has negligible impacts on the environment and do (sic) not represent a risk to the public." (ER 172-73). The Nevada EA also relied on the analysis in the PEIS instead of doing an assessment of the environmental impacts of and risks associated with its PDM methods, including Wildlife Services' use of traps. (ER 127, 131, 172).

However, in a puzzling footnote, the district court held that, although Mr. Molde had standing to challenge the Nevada EA and Decision, he did not have standing to bring the nationwide claims:

> Plaintiff also cannot bring a failure-to-supplement challenge to the 1994/1997 PEIS based on member Don Molde's declaration. Mr. Molde's declaration regards Plaintiff's members' activities in Nevada only. While Mr. Molde's declaration satisfies the injury-in-fact requirement for claims [three and four], claims one and two concern WS's failure to supplement the PEIS in general, not specifically in relation to the Nevada EA and Decision. Therefore, Mr. Molde cannot demonstrate that he has suffered injury-in-fact for claims one or two.

(ER 11 n.2). The district court's reasoning is flawed and unsupported by any caselaw. In <u>Citizens</u>, this Court reaffirmed "as [it has] repeatedly done in the face of [] arguments to the contrary, that environmental plaintiffs have standing to challenge not only site-specific plans, but also higher-level, programmatic rules that impose or remove requirements on site-specific plans." 341 F.3d at 975. Mr. Molde's site-specific injuries are caused by Wildlife Services' ongoing PDM activities in Nevada, which are authorized by its Nevada EA and Decision and the 1994/1997 PEIS. Therefore, he has standing to challenge Wildlife Services' failure to supplement the 1994/1997 PEIS as well.

### 3. A Sufficient Causal Link Exists Between Mr. Molde's Injuries and Wildlife Services' Actions

Because Mr. Molde seeks to enforce a procedural right, the deprivation of which causes him to suffer concrete injuries-in-fact, the causation requirement is relaxed. <u>Citizens</u>, 341 F.3d at 975. As in <u>Citizens</u>, there can be "no dispute about causation in this case, because this requirement is only implicated where the concern is that an injury caused by a third party is too tenuously connected to the acts of the defendant." <u>Id.</u> Here, there is a causal connection between Mr. Molde's injuries and Wildlife Services' PDM activities in Nevada that is not attenuated. Wildlife Services kills coyotes, ravens, and mountain lions and it sets traps and M-44s in areas in which Mr. Molde recreates. The agency's failure to properly study the environmental consequences of its actions causes harm to his recreational and

28

aesthetic interests in the places described with specificity in his declaration. His injuries are therefore fairly traceable to Wildlife Services' PDM activities in Nevada and the agency's uninformed decisionmaking.

### 4. The Record Demonstrates that Guardians' NEPA Claims Are Redressable

Because the district court may order Wildlife Services to conduct the proper NEPA analysis, which may change the agency's ultimate decision, and it may also enjoin Wildlife Services from implementing the Nevada Decision until the agency complies with NEPA, Mr. Molde's injuries are redressable. "Once a plaintiff has established an injury-in-fact under NEPA the causation and redressability requirements are relaxed. The members must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." Kraayenbrink, 632 F.3d at 485 (emphasis in original) (citations and quotation omitted); see also Summers, 555 U.S. at 496 (reaffirming that "a 'person who has been accorded a procedural right to protect his concrete interests can assert that right *without meeting all the normal standards for redressability and immediacy*.'") (quoting Lujan, 504 U.S. at 572 n.7) (emphasis added).

Guardians "need not demonstrate that the ultimate outcome following proper procedures will benefit" Mr. Molde. See Cantrell v. City of Long Beach, 241 F.3d 674, 682 (9th Cir. 2001). Instead, Guardians "need[s] to show only that the relief requested – that the agency follow the correct procedures – may influence the

agency's ultimate decision of whether to take or refrain from taking a certain action."  Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220, 1226-27 (9th Cir. 2008).  Although "the redressability requirement is not toothless in procedural injury cases," it is "not a high bar to meet."  Id. at 1227.

In its Motion to Dismiss, Wildlife Services argued that, no matter the outcome of the litigation, Guardians' members' injuries could not be redressed because "NDOW is authorized to carry out predator damage management activities and has stated its intention to do so if the federal program ceases."  (CR 12 at 3). The *only* evidence produced by Wildlife Services in support of this argument was the Mayer Letter in the 2011 Nevada EA, stating:

> NDOW is responsible by State statute (NRS 503.595)[9] for controlling wildlife causing damage to personal property or endangering personal safety. . . .
>
> Without WS participation, NDOW would, by statute, carry out the management of wildlife with existing personnel or contract the work to other capable entities.

(ER 213; ER 255).

Despite NDOW's vague assertions in the Mayer Letter, Mr. Molde's injuries are redressable.  Mr. Molde's declaration and evidence in the Nevada EA sufficiently demonstrate Guardians' standing to sue.  First, even if the Court

---

[9]     NEV. REV. STAT. § 503.595 provides that NDOW may control wildlife "as it may deem necessary, desirable and practical" to prevent or alleviate landowner complaints regarding damage or threatened damage to land or property.

enjoined the federal program until Wildlife Services complied with NEPA, and

NDOW continued to implement PDM until that new environmental analysis was

complete, Mr. Molde's injuries could ultimately be redressed because this is an

ongoing program in Nevada. The requested relief *could* influence Wildlife

Services' ultimate decision, prompting environmental mitigation measures that

would redress Mr. Molde's injuries (such as banning traps or changing its

strategies on managing coyotes), even if NDOW conducted PDM in the interim.[10]

Second, the Nevada EA concludes that "[r]aven take would be likely to

decrease substantially" without federal involvement, since the State of Nevada is

not authorized to kill ravens with DRC-1339, a restricted-use avicide. (ER 181).

Because Mr. Molde demonstrated a concrete injury with respect to his enjoyment

of ravens that is redressable by this decrease in raven take, he has standing.

> **a.** **Mr. Molde's Injuries are Redressable, Because Remedying Wildlife Services' NEPA Violations *Could* Protect Mr. Molde's Concrete Interests in Coyotes and Ravens and His Recreational Enjoyment of the Areas He Uses**

Mr. Molde's declaration demonstrates injury-in-fact based upon his

enjoyment of native carnivores and ravens in areas impacted by Wildlife Services'

activities. Mr. Molde also demonstrated an injury-in-fact because Wildlife

---

[10] However, as explained in the Nevada EA, without federal involvement it is unlikely that Nevada would conduct PDM at the same levels, so fewer animals would be killed. (ER 181).

Services' use of traps and M-44s in areas where he recreates with his dog makes him concerned about the dog's safety and thus reduces his recreational enjoyment of those areas. Furthermore, because Mr. Molde has a geographical nexus to the areas where Wildlife Services conducts its work, "the creation of a risk that serious environmental impacts will be overlooked . . . is itself a sufficient 'injury-in-fact' to support standing . . ." City of Davis v. Coleman, 521 F.2d 661, 671 (9th Cir. 1975) (internal quotation marks omitted).

The relief Guardians seeks includes a declaratory judgment that Wildlife Services violated NEPA by failing to analyze the environmental impacts of the Nevada Wildlife Services program in an EIS and by failing to supplement its PEIS for its national program, which includes the agency's activities in Nevada. (ER 251). If Wildlife Services takes a hard look at new information concerning, for example, the direct and indirect effects of killing coyotes, a nonlethal before lethal alternative,[11] or its use of traps, its ultimate decision regarding its carnivore killing

---

[11]    As alleged in Guardians' Complaint, new scientific information shows that the most expedient, economical, and long-term solution to the small number of livestock depredation problems in Nevada is to employ non-lethal methods such as guard animals and night sheds. Compl. ¶¶ 110, 119, 132 (ER 239, 241, 243). Taking a hard look at this new information could change Wildlife Services' opinion as to the effectiveness of nonlethal control techniques. Furthermore, when these nonlethal control techniques proved effective at avoiding depredation of livestock, as Guardians claims they will, then private individuals and NDOW would not be called on to kill as many coyotes and mountain lions, because the number of complaints from ranchers and other landowners would decrease.

activities could be influenced by new environmental considerations. Wildlife Services could decide to ban the use of traps or M-44s in favor of using other methods to manage coyotes on public lands. See, e.g., Compl. ¶ 74 (alleging that revised environmental analysis must consider new information concerning "the proven ineffectiveness and growing unacceptability of trapping") (ER 233). The requested relief would also ensure that Wildlife Services took a hard look at the environmental consequences of its actions, in areas in which Mr. Molde has demonstrated a geographic nexus.

The Mayer Letter states only that NDOW would continue to control depredating wildlife, not that the State would allow no change to the Nevada Wildlife Services program or implementation of environmental mitigation in exchange for significant federal funding and assistance. (ER 213). Even if the Court enjoined the federal program until Wildlife Services complied with NEPA, and NDOW continued to implement PDM until that new environmental analysis was complete, Mr. Molde's injuries could ultimately be redressed.[12] This is an ongoing program in Nevada, not a one-time project, and the requested relief could prompt Wildlife Services to reconsider its decision and to include environmental

_____

[12]     However, a court may also order an agency to conduct new NEPA analysis without issuing an injunction. See, e.g., Western Watersheds Project v. Abbey, 719 F.3d 1035, 1054 (9th Cir. 2013).

mitigation measures that would redress Mr. Molde's injuries, regardless of whether NDOW killed coyotes or set traps in the interim.

Moreover, if Wildlife Services prepared an EIS for its Nevada activities based on current scientific information on issues such as the impacts of carnivore removal on carnivore populations, prey populations, non-target species, and their habitat, it would also inform the ***State of Nevada*** regarding the environmental impacts of PDM. If, upon further environmental analysis regarding the need for PDM activities in Nevada, Wildlife Services chooses an alternative for its PDM program that it not acceptable to the State, that analysis could cause the State to change its own strategies for managing coyotes[13] and livestock losses. The State may decide to implement more nonlethal alternatives, for example, based upon information showing that it is more economically efficient to compensate livestock producers for their losses, when most livestock producers lose few sheep or cattle to carnivores, than to implement a PDM program utilizing highly expensive methods such as aerial gunning. See, e.g., Compl. ¶¶ 117-19 (ER 240-41).

---

[13]  As alleged in Guardians' Complaint, killing coyotes results in significant environmental impacts in the short-term, including causing coyotes to compensate for their losses by changing breeding and immigration strategies and causing a decline in biological diversity in the areas in which coyotes are removed. See Compl. ¶ 101 (ER 238). Also, in addition to these negative environmental impacts, killing coyotes does not work as a long-term strategy to benefit domestic livestock because of coyote repopulation of removal areas and new migrants moving into unoccupied territory. Id. ¶ 102 (ER 238). Wildlife Services failed to take a hard look at whether its program is effective regarding coyotes. Id.

Because new environmental analyses could protect Mr. Molde's concrete interests, his injuries are redressable and he has standing to bring Guardians' NEPA claims. See Kraayenbrink, 632 F.3d at 485; see also Hall v. Norton, 266 F.3d 969, 977 (9th Cir. 2001) (finding redressability where, as "NEPA contemplates, the [agency's] decision could be influenced by the environmental considerations that NEPA requires an agency to study."). As the Supreme Court explained in Massachusetts v. EPA, 549 U.S. 497, 517-18 (2007), "[w]hen a litigant is vested with a procedural right, that litigant has standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant."

> **b.** **The Record Demonstrates that Without Federal Assistance Raven Take in Nevada Would Likely Substantially Decrease, Thereby Redressing Mr. Molde's Injury as to Ravens**

Mr. Molde asserted a concrete injury based on his aesthetic enjoyment of ravens. The Nevada EA states: "[t]he majority of ravens are taken by use of avicide (DRC-1339) treated egg-baits." (ER 145). However, NDOW cannot legally take over the killing of ravens using DRC-1339 because it "is a special restricted use pesticide and can only be used under direct supervision by WS employees." (ER 115). Consequently, in evaluating the alternative consisting of "no federal involvement in PDM activities in Nevada," Wildlife Services stated: "this technique would not be available under this alternative." Id. Wildlife

Services explained that other methods, such as shooting, "are likely to be more time consuming and expensive to implement and considerably fewer birds are likely to be taken and, ***based on WS experience, considerably less success would be realized in raven damage management***." (ER 181-82) (emphasis added). It concluded that without Wildlife Services and DRC-1339, *"[r]aven take would be likely to decrease substantially*." (ER 181) (emphasis added). Wildlife Services made this determination despite the contentions in the Mayer Letter. Therefore, because Mr. Molde's injuries regarding ravens are redressable, he has standing.

> **c.** **This Court's Unpublished Opinion in <u>Goat Ranchers</u> Does Not Preclude a Finding of Redressability Here**

In finding the Mayer Letter dispositive on the issue of redressability, the district court was persuaded by this Court's reasoning in the unpublished opinion <u>Goat Ranchers of Or. v. Williams</u>, 379 F. App'x 662, 663 (9th Cir. 2010). However, because the <u>Goat Ranchers</u> opinion is not binding, the facts are distinguishable, and it conflicts with well-settled Ninth Circuit precedent, this Court should reach a different conclusion here and find that Mr. Molde's injuries are redressable.

In <u>Goat Ranchers</u>, Oregon had a state-run and state-funded Cougar Management Plan. <u>Id.</u> at 663. The State killed 26 cougars in the 2006-2007 winter. <u>Id.</u> at 665 (Judge Bea, dissenting). The following winter, the State enlisted the help of Wildlife Services and the number of cougars killed increased by 50%,

to 39 cougars, with Wildlife Services killing 16 of them.  Id.  Wildlife Services

prepared a NEPA document for its limited participation in Oregon's Cougar

Management Plan, which was challenged as insufficient by the plaintiffs.  Id. at

663.

The Oregon Department of Fish and Wildlife stated that, without the federal

government's assistance, it would continue to trap and kill cougars as part of the

State's own Cougar Management Plan.  Id.  The Court found no redressability

where, based on the evidence at the summary judgment stage, the agency had

stated that "[w]hether or not the federal government assists Oregon, Oregon will

continue to kill and trap cougars."  Id.  The Court explained that, "[w]ith each

cougar killed, the likelihood of appellants seeing a cougar in the wild is decreased.

Nothing that could happen in this case would change that."  Id.

Goat Ranchers is in direct conflict with a long and established line of Ninth

Circuit cases finding that the standard for redressability is relaxed in NEPA cases.

See, e.g., Citizens, 341 F.3d at 976 ("It suffices that the agency's decision *could be

influenced* by the environmental considerations that the relevant statute requires an

agency to study.") (citations and quotations omitted, emphasis in original); Ocean

Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 860-61 (9th Cir. 2005)

(finding redressability even though construction of project was complete, as

agency could impose conditions on operation which could mitigate harms to the

environment); Kraayenbrink, 632 F.3d at 484 ("[M]embers must show only that they have a procedural right that, if exercised, *could* protect their concrete interests . . . [I]t is enough that a revised EIS may redress plaintiffs' alleged injuries . . .") (citations and quotations omitted, emphasis in original);

Although it is an unpublished opinion, <u>Goat Ranchers</u> has now been cited by at least three district courts in dismissing NEPA cases for want of standing based upon "if we don't do it someone else will" arguments by federal agencies.[14] This rationale creates a loophole that would shield a broad swath of federal agencies' NEPA decisions from judicial review. Few federal actions take place in a vacuum. Under the <u>Goat Ranchers</u> opinion, federal agency decisions such as withholding emergency aid, constructing a highway, or disposing of public lands, or authorizing a cut in benefits to needy families could evade judicial review with no more than a plausible pledge of State or third party action. Such a standard would cast doubt upon this Court's settled case law. <u>See</u>, <u>e.g.</u>, <u>Graham v. FEMA</u>, 149 F.3d 997, 1003 (9th Cir.1998) (Micronesian government's potential decision to withhold emergency aid did not defeat standing to challenge federal agency's withholding of that funding); <u>City of Carmel-By-The-Sea v. U.S. Dep't of</u>

---

[14]  <u>See</u> <u>WildEarth Guardians v. U.S. Dept. of Agriculture, APHIS</u>, No. 2:12-CV-00716-MMD, 2013 WL 1088700, *5 (D. Nev. March 14, 2013); <u>Wolf Recovery Found. v. U.S. Forest Serv.</u>, No. 4:CV-09-686-BLW, 2011 WL 219986, at *1 (D. Idaho Jan. 20, 2011); <u>Landwatch Lane Cnty. v. U.S. Fish & Wildlife Serv.</u>, No. 6:12-CV-958-AA, 2012 WL 5198457, at *7 (D. Or. Oct. 19, 2012).

Transp., 123 F.3d 1142, 1160 (9th Cir. 1997) (remanding agency decision where EIS failed "to provide any useful analysis of the cumulative impact of past, present and future projects" associated with proposed freeway); Desert Citizens Against Pollution v. Bisson, 231 F.3d 1172, 1178 (9th Cir. 2000)(rejecting argument that agency's undervaluation of public land for sale was not redressable because private party would pay higher price if necessary); Beno v. Shalala, 30 F.3d 1057, 1065 (9th Cir. 1994) (upholding standing to challenge federal agency approval of work incentive program even though "California might elect to continue the experiment at the risk of losing federal Medicaid funding."). Goat Ranchers and its progeny also overlook the fundamental purpose of NEPA, requiring informed decisionmaking by government actors. See Robertson, 490 U.S. at 349.

This Court's reasoning in Goat Ranchers – where Oregon's killing of cougars increased by 13 cougars the year that Wildlife Services assisted the State with a Cougar Management Plan that had been both developed and funded by the State – was also isolated to the facts of that case and should not influence the Court's decision here. The Nevada EA and Decision, which authorizes *all* of Wildlife Services' ongoing activities in Nevada, including the 6,083 coyotes taken per year on average by Wildlife Services in Nevada, is far different from the 16 cougars killed by Wildlife Services in Goat Ranchers. (ER 137). Moreover, the undisputed evidence in this case is that without federal assistance, levels of PDM

would decrease and that the levels of raven take would likely "substantially" decrease. (ER 181). Therefore, the district court's reliance on <u>Goat Ranchers</u> in dismissing Guardians' claims was in error.

**B.      The District Court Erred In Finding the Mayer Letter Dispositive on the Issue of Redressability**

Based on the Mayer Letter, the district court concluded: "NDOW has its own predator damage management plan for coyotes, mountain lions, and ravens, and would conduct PDM without WS's assistance." (ER 13) (citing CR 12-1 at 55 (ER 115)). "Such evidence demonstrates that NDOW would implement the same plan absent federal involvement." (ER 13). Therefore, the district court dismissed Guardians' NEPA claims, finding that Guardians' injury could not be redressed by an order from the court enjoining Wildlife Services from implementing the Nevada EA and Decision.

The district court's decision was wrong for several reasons: (1) no evidence exists in the record that Nevada has its own PDM plan or that it would implement Alternative 5 from the Nevada EA without federal assistance; (2) no evidence exists in the record to support a finding that NDOW could achieve comparable levels of raven take without the use of DRC-1339, a restricted-use avicide; and (3) the Mayer Letter is not dispositive of the issue of whether NDOW could, and would, carry out all the wildlife killing activities that form the basis of Guardians' Complaint, and thus whether Guardians' claims are redressable.

The district court construed the Motion to Dismiss as a factual attack on Guardians' Complaint. (ER 8). The district court's legal conclusion that Guardians' injury could not be redressed should be reviewed *de novo*. At the very least, redressability in this case is a mixed question of law and fact entitled to *de novo* review. However, if this Court finds that the district court made "factual" findings in reaching its legal conclusion, those findings were clearly erroneous, as explained below.

      **1.**     **No Evidence Exists in the Record that Nevada has its Own Predator Damage Management Plan or that it Would Implement Alternative 5 From the Nevada EA Without Federal Assistance**

First, *no evidence* exists in the record to show that NDOW has its own predator damage management plan for coyotes, mountain lions, or ravens. Wildlife Services made this unsupported statement in its Motion to Dismiss. (ER 59-60). However, the citation to the EA cited by both the attorney for Wildlife Services and the district court does not support this statement. See (ER 115). Instead, that page of the EA states that without a federal program in Nevada:

> [W]ildlife damage conflicts would be addressed by NDOW, private resource owners and managers, private contractors, or other government agencies. If WS chooses to not provide the PDM services that NWSP feels are necessary, the State would likely rescind the federal management of that program, and the Nevada Department of Agriculture would probably handle agriculture related PDM complaints.

(ER 115).

If an independent "state plan" does exist, there is no evidence in the record as to what this plan entails, what PDM methods may be used, or whether it authorizes the same level of take for coyotes and mountain lions as set out in the federal plan authorized by the Nevada Decision. To the extent this is a factual finding by the district court, it is unsupported by the record and "clearly erroneous." See, e.g., United States v. Reyes-Bonilla, 671 F.3d 1036, 1044 (9th Cir. 2012) (district court's finding of fact was "clearly erroneous" because it was "unsupported by the record"). Likewise, no evidence in the record exists showing that NDOW would implement Alternative 5, as described in the Nevada EA, only that NDOW would continue to "control[] wildlife causing damage to personal property or endangering personal safety." (ER 213).

For example, under Alternative 5, part of the work that Wildlife Services conducts in Nevada is not to protect property or the public, but to increase game species, a purpose outside of NDOW's statutory authority. See (ER 71, 83); Nev. Rev. Stat. § 503.595. Furthermore, although NDOW has the general authority to control wildlife that is *causing damage* to land or property, whether it takes such action is discretionary:

> After the owner or tenant of any land or property has made a report to [NDOW] indicating that such land or property is being damaged or destroyed, or is in danger of being damaged or destroyed, by wildlife, [NDOW] *may*, after thorough investigation and pursuant to such regulations as the Commission may promulgate, cause such action to be taken *as it may deem necessary, desirable and practical* to prevent

or alleviate such damage or threatened damage to such land or property.

See Nev. Rev. Stat. § 503.595 (Prevention or alleviation of damage caused by wildlife) (in full, emphasis added). Therefore, the district court's finding "that NDOW would implement the same plan absent federal involvement" is unsupported by the record. (ER 13).

### 2. No Evidence in the Record Exists to Support a Finding that NDOW Could Achieve Comparable Levels of Raven Take Without the Use of DRC-1339

The district court's inquiry should have ended when Mr. Molde demonstrated a concrete interest with respect to his enjoyment of ravens sufficient for injury-in-fact that is also redressable. Instead, the district court ignored Wildlife Services' own conclusions in the EA and found:

> [B]ecause NDOW is authorized to manage raven populations by virtue of its Migratory Bird Depredation Permit from the United States Fish and Wildlife Service, NDOW determines the level of take for ravens. The fact that NDOW does not have one particular tool for raven management or that it may not achieve the same level of take as WS does not demonstrate that Plaintiff's injury — observing fewer ravens in Nevada's wilderness — is redressable. Moreover, as WS's program implements PDM at NDOW's behest, it would be pure conjecture to assume that NDOW will not achieve comparable levels of raven management through another avenue should NDOW not receive assistance from the federal program.

(ER 14). The district court's opinion is contradicted by the record in this case, wherein Wildlife Services admitted that the raven take in Nevada would likely "decrease substantially" without federal assistance. (ER 181).

This was not a factual dispute.  Wildlife Services did not present any evidence apart from the Mayer Letter to support its contention that the State of Nevada could kill similar numbers of ravens.  No evidence in the record exists to support a finding that NDOW could achieve comparable levels of raven take without the use of DRC-1339.  In fact, there is ***no evidence*** in the record that NDOW is authorized to manage raven populations by virtue of its Migratory Bird Depredation Permit from the United States Fish and Wildlife Service ("USFWS") or that NDOW determines the level of take for ravens.  This was a statement made by Wildlife Services in its reply brief, which was wholly unsupported by any evidence, and to which Guardians had no opportunity to respond.  (ER 20).

In fact, the EA contains a list of species targeted by Wildlife Services' PDM activities and states that "[w]ith the ***exception of*** feral dogs, feral cats, and ***common ravens***, the above species are managed by [NDOW]."  (ER 68-69).  The EA also explains that:

> [R]avens, as with all migratory birds, are managed by [USFWS].  Under [a Memorandum of Understanding] with USFWS, WS has the responsibility of responding to migratory bird depredation complaints and provides USFWS with reports on activities involving ravens.

(ER 69).  Therefore, the district court's assumption that NDOW could achieve comparable levels of raven take is "pure conjecture" and unsupported by the record.  Because Mr. Molde's injury concerning ravens is redressable, he has standing to bring Guardians' NEPA claims.

44

### 3. The Mayer Letter was Not Dispositive of Whether NDOW Could and Would Take Over Wildlife Services' Entire Program in Nevada Should Federal Assistance Cease

In response to the Motion to Dismiss, Guardians also argued that whether NDOW could and would take over the entire federal program in Nevada and carry out the same work as Wildlife Services presented a ***factual dispute*** for which jurisdictional discovery and resolution was necessary. (CR 25 at 27). The district court disagreed, finding no disputed issue of fact as to redressability and therefore no need for jurisdictional discovery. (ER 14-15). Because the Mayer Letter is not dispositive of the redressability issue (and, in fact, Guardians' claims are redressable despite the Mayer Letter), the district court erred.

In explaining why jurisdictional discovery was warranted, Guardians pointed to evidence that Nevada does not have the financial resources to take over or contract out all of Wildlife Services' activities in Nevada. According to Wildlife Services' own website, the federal government contributed $1,530,024 in fiscal year 2010 towards its predator damage management activities in Nevada. Molde ¶ 28 ER 29). [15] Given Nevada's budget cuts and estimated $2.7 billion deficit, whether the State could afford to take over ***any*** of Wildlife Services' activities was

---

[15] This fact was set forth in Mr. Molde's declaration, citing "Wildlife Services' Report, Fiscal Year 2010 Federal And Cooperative Funding By Resource," available at http://www.aphis.usda.gov/wildlife_damage/prog_data/2010_prog_data/PDR_A/Basic_Tables_P DR_A/PDR_Table_A.pdf.

doubtful, much less its entire Nevada program. Molde ¶ 29 (ER 30).[16] Therefore, Guardians argued, whether NDOW would – and could afford to – carry out the same work as Wildlife Services presented a ***factual dispute*** for which discovery and resolution was necessary.[17]

The district court did not resolve this dispute, instead finding that data concerning Nevada's budget cuts and deficit was "not relevant evidence about whether or not NDOW will conduct its PDM services absent federal participation." (ER 14). The Court held that the Mayer Letter and Defendant's unsupported assertions in its reply brief were dispositive of the redressability issue, stating:

---

[16]    In Mr. Molde's declaration, he testified: "I am aware that the Las Vegas Sun newspaper reported on Nevada Assembly Speaker John Oceguera's presentation to city councils regarding Nevada's 'gloomy' financial picture. Oceguera told the city council 'that the deficit is 54 percent of Nevada's budget — the largest percentage of any state in the nation . . . estimated at $2.7 billion.' 'The 10 percent cuts Gov. Brian Sandoval has suggested won't come close to closing the budget hole, Oceguera said.'" (Molde ¶ 29; ER 30) (citing "Biggest spending cuts, tax increases in Nevada history won't close budget gap, Assembly speaker says" (January 5, 2011)).

[17]    In its Response to Defendant's Motion to Dismiss, Guardians argued that it was entitled to discovery on this and other issues where there was a factual dispute. Subsequently, Guardians filed a Motion for Jurisdictional Discovery, requesting discovery if the Court determined that a more satisfactory showing of the facts is necessary in order to rule on the Motion to Dismiss. (CR 27). Guardians anticipated conducting discovery in order to support the factual demonstration necessary for Guardians to prove standing at the motion for summary judgment stage. See Williams v. Boeing Co., 517 F.3d 1120, 1128 (9th Cir. 2008)) (In moving for summary judgment or responding to "a summary judgment motion challenging standing a plaintiff may not rest on 'mere allegations, but must set forth by affidavit or other evidence specific facts' that demonstrate standing.") (quoting Lujan, 504 U.S. at 561).

> Plaintiff asserts that jurisdictional discovery may result in facts
> supporting Mr. Molde's research, but the Court disagrees. Nevada
> has the authority to implement [PDM], and has indicated it will do so,
> with or without federal participation.

(ER 14-15).

The district court erred in determining that jurisdictional discovery

concerning Nevada's budget cuts and deficit could not result in relevant evidence.

If the State cannot afford to take over the approximately 1.5 million dollars a year

that the federal government contributes to PDM in Nevada, that is certainly

relevant to whether or not NDOW would and *could* take over all federal PDM

services absent federal funding.

The district court also erred in finding that no disputed issue of fact existed

as to whether or not NDOW would continue to kill large numbers of predators

without federal funding. For example, if the federal funding is not available,

whether NDOW would continue to kill large numbers of coyotes to increase mule

deer populations when it is not required, or arguably even authorized, to do so by

statute is a factual dispute. Moreover, Wildlife Services admitted in the EA that

levels of PDM would decrease in Nevada without federal assistance. (ER 181).

The Mayer Letter was not dispositive on this issue. To the contrary, Guardians

demonstrated standing notwithstanding the Mayer Letter.

## C. Guardians' Member George Weurthner Has Standing to Sue on NEPA Claims One and Two

Guardians' member George Weurthner is an avid outdoorsman and wildlife photographer. See Weurthner ¶¶ 3, 6, 18 (ER 31, 32). Mr. Weurthner has a concrete interest in wildlife and recreation in areas where Wildlife Services conducts its activities. See id. ¶ 8, 9, 20, 22, 24, 26 (ER 32, 34, 35, 36). For example, Mr. Weurthner visits McDonald Pass in the Helena National Forest in Montana about a dozen times a year for trail running and cross-country skiing and plans to continue doing so into the future.[18] Id. ¶ 27 (ER 36). In early 2012, he visited McDonald Pass and saw Wildlife Services' warning signs. Id. ¶ 26 (ER 36). His girlfriend and her dog were with him. Id. Because of the signs and the agency's trapping activity in the area, he was concerned about the dog's safety, and his activities in McDonald Pass were restricted. Id. Because he is concerned about Wildlife Services' activities and its use of indiscriminate traps in the area, his enjoyment of the McDonald Pass area in the Helena National Forest, an area in which he recreates, is therefore diminished. Id. ¶¶ 16, 26, 28 (ER 34, 36-37).

---

[18] According to the U.S. Forest Service, the McDonald (also called "Mac Donald") Pass Cross-Country Ski Trails are 10.1 miles long. They begin at a trailhead located north and east of McDonald Pass (Hwy 12 West). See http://www.fs.usda.gov/recarea/helena/recreation/wintersports/recarea/?recid=63085&actid=91. The Court may take judicial notice of this fact. See Daniels–Hall v. Nat'l. Educ. Ass'n., 629 F.3d 992, 998–99 (9th Cir. 2010) (taking judicial notice of official information posted on a governmental website); Fed. R. Evid. 201(b).

The district court found that "Mr. Weurthner presents no evidence about how the 1994/1997 PEIS is implemented in the McDonald Pass or any other areas he has traversed so as to tie his aesthetic injury – viewing fewer predators in the wild – to WS's activities outside of Nevada." (ER 10-11). However, the court misunderstood both the scope of the 1994/1997 PEIS and the nature of Mr. Weurthner's injury.

The 1994/1997 PEIS addresses Wildlife Services' "ongoing program of wildlife damage management" throughout the United States. (ER 41). The PEIS analyzed "the impacts associated with the full range of wildlife damage control activities" and included a risk assessment of the killing methods used by the agency, such as traps and DRC-1339. (ER 41, 115). Guardians' Complaint includes allegations that Wildlife Services must supplement its 1994/1997 PEIS with new environmental analysis, including "the proven ineffectiveness and growing unacceptability of trapping" and "[n]ew information and data [that] are available regarding the harm to non-target species caused by Wildlife Services' program, including harm and death to domestic pets . . ." (ER 233). Wildlife Services continues to rely on its 1994/1997 PEIS for its PDM activities, in Nevada and nationwide. This is the NEPA document that is still in effect for all of Wildlife Services' PDM activities across the United States. Compl. ¶¶ 160-62 (ER 247).

Mr. Weurther's injury is his reduced enjoyment of the McDonald Pass area,

due to his reasonable concerns about his canine companion being injured or killed by Wildlife Services' traps in that area, and due to Wildlife Services' failure to properly study the environmental consequences of its PDM activities. Weurthner at ¶¶ 26, 28 (36-37). Therefore, Mr. Weurthner has demonstrated a concrete injury-in-fact. Id. ¶ 26 (36). Mr. Weurthner has also shown a "geographic nexus" to areas where Wildlife Services conducts its activities, including McDonald Pass, sufficient to demonstrate the concrete interest required for standing. See Vilsack, 636 F.3d at 1171.

Despite these facts clearly showing injury, the district court found that "Weurthner's declaration suffers from deficiencies similar to Bensman's in Summers." (ER 10) (citing 555 U.S. at 494-96). However, Summers is distinguishable. In Kempthorne, 588 F.3d at 707, this Court characterized Bensman's injury in Summers as one "that was unattached to any particular site in the National Forests, unrelated to the challenged regulations, and a past injury rather than the imminent injury the plaintiffs sought to enjoin." (citation omitted) Conversely, as set forth in Guardians' Complaint and Mr. Weurthner's declaration: Wildlife Services conducts trapping in McDonald Pass; the agency continues to rely on its 1994/1997 PEIS, which contains outdated information and analysis regarding trapping, in order to justify its trapping in McDonald Pass; and Mr. Weurthner has suffered and continues to suffer a concrete recreational injury

because of the agency's trapping activities there and his continued use of the area for recreation.

The causation and redressability requirements are also met here, as demonstrated above in relation to Mr. Molde's interests. If Wildlife Services updated its NEPA analysis on trapping, the agency could ban traps, or make them safer for non-target species, such as pets. Because updated environmental analysis could protect Mr. Weurthner's concrete interests in the McDonald Pass area, his injuries are redressable. See Kraayenbrink, 632 F.3d at 485. Therefore, Mr. Weurthner has standing on Guardians' NEPA Claims One and Two.

### D.    Guardians Has Standing to Sue on Behalf of its Members

Because Guardians' members Don Molde and George Weurthner have standing to bring this action in their own right, the organization satisfies the first element of the Supreme Court's Hunt test. See 432 U.S. at 343. Guardians also satisfies the second Hunt requirement, because the interests of Guardians' members at stake are germane to the organization's purpose. See id. Guardians is a nonprofit environmental organization, whose purpose includes protecting wildlife and wild places throughout the American West. Molde ¶ 3 (ER 21). This lawsuit is germane to that purpose. See, e.g., Citizens, 341 F.3d at 976. Finally, none of the claims Guardians asserts in its Complaint requires its members to participate as

individuals in this litigation.  See Hunt, 432 U.S. at 343.  Accordingly, Guardians

has Article III standing.[19]

## III. THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING GUARDIANS AN OPPORTUNITY FOR JURISDICTIONAL DISCOVERY

In its Response to Defendant's Motion to Dismiss, Guardians argued that

"whether NDOW would – and could – carry out the same work as Wildlife

Services is disputed by Guardians and presents a ***factual dispute*** for which

discovery and resolution is necessary.  This NDOW letter of intent is not

dispositive of this issue." (CR 25 at 19).  Guardians argued that jurisdictional

discovery was necessary to the resolution of certain issues, including whether

NDOW could and would continue to kill large numbers of coyotes and whether the

State of Nevada could afford to take over the entire federal program.  (CR 25 at 19-

20).

On November 16, 2013, after the parties' briefing on the Motion to Dismiss

was complete, Guardians formally filed a Motion for Jurisdictional Discovery.

---

[19]     Guardians' NEPA claims also fall within NEPA's "zone of interest."  See Kootenai Tribe of Idaho v. Veneman, 313 F.3d 1094, 1111-12 (9th Cir. 2002). Guardians, a nonprofit conservation group, and its members have a direct interest in seeing that Wildlife Services adequately considers the environmental impacts of the agency's wildlife killing decisions.  See Kraayenbrink, 632 F.3d at 485-86 (conservation group met zone of interest test where it had "a direct interest in seeing that the [Bureau of Land Management] adequately considers the environmental consequences of its planned action [regarding public grasslands] as required by NEPA").

(CR 27).  Therein, Guardians requested the opportunity to conduct jurisdictional

discovery if the Court converted Defendant's Motion to Dismiss into a motion for

summary judgment, determined that a more satisfactory showing of the facts is

necessary in order to rule on the Motion to Dismiss, or granted Defendant's

Motion to Dismiss with leave to amend.  (CR 27 at 1-2).  In response, Wildlife

Services argued that the jurisdictional facts identified by Guardians in its motion

did not raise any genuine fact issues, and would do nothing to facilitate the Court's

resolution of Defendant's Motion to Dismiss.  (CR 28 at 1).  The district court

agreed and denied Guardians' motion to conduct jurisdictional discovery.  (ER 17).

The court held:

> NDOW (in the Mayer letter) has undisputedly expressed a clear intent
> to implement the predator management program absent federal
> involvement.  Finally, because Plaintiff and Defendant have requested
> lengthy extensions of deadlines in this case (see dkt. no. 17), yet
> Plaintiff has never indicated its intent to seek jurisdictional discovery
> before this point, Defendant would be unduly prejudiced were the
> Court to allow Plaintiff to engage in jurisdictional discovery when no
> disputed issue of fact on this point exists.

(ER 15).

As explained above, the district court erred in finding that no disputed issue

of fact existed regarding whether NDOW would and could take over all federal

PDM activities.  In its Response to the Motion to Dismiss, Guardians explained

why jurisdictional discovery was relevant and necessary to the court's resolution of

standing.  Furthermore, both parties were granted extensions in this case due to the

maternity and paternity leave taken by counsel for Guardians and counsel for Wildlife Services respectively.  <u>See</u> Joint Motion for Extension of Time (CR 21 at 2; 23).  Neither party was prejudiced by these delays.

However, the district court's refusal to allow jurisdictional discovery in this case substantially prejudiced Guardians.  For example, in its Reply in support of its Motion to Dismiss, Wildlife Services argued that "NDOW is authorized to manage raven populations by virtue of its Migratory Bird Depredation Permit from [USFWS].  Within that permit the level of take for ravens is determined by NDOW."  (ER 20). Wildlife Services did not produce any evidence regarding this alleged fact, yet Guardians was not given an opportunity to question the truth of this allegation.

Denying the plaintiff an opportunity to develop a factual record to establish jurisdiction is an abuse of discretion if the plaintiff is prejudiced.[20]  <u>See, e.g.</u>, <u>Laub</u>, 342 F.3d at 1093.  Prejudice is present where "pertinent facts bearing on the question of jurisdiction are controverted . . . or where a more satisfactory showing

---

[20]  Also, other courts have held that dismissal of a plaintiff's case on a motion to dismiss was error without conducting an evidentiary hearing on the issue of standing where there are disputed issues of fact.  <u>See</u> <u>Martin v. Morgan Drive Away, Inc.</u>, 665 F.2d 598, 602 (5th Cir. 1982); <u>Munoz–Mendoza v. Pierce</u>, 711 F.2d 421, 425-26 (1st Cir. 1983).  <u>See also</u> <u>Amidax Trading Grp. v. S.W.I.F.T. SCRL</u>, 671 F.3d 140, 149 (2d Cir. 2011) ("Although a plaintiff bears the burden of alleging facts that demonstrate its standing, a court should take care to give the plaintiff ample opportunity to secure and present evidence relevant to the existence of jurisdiction.") (internal citations and quotation marks omitted).

of the facts is necessary." <u>Wells Fargo & Co. v. Wells Fargo Express Co.</u>, 556

F.2d 406, 430 n.24 (9th Cir. 1977) (quotation and citation omitted).  Limited

discovery is especially appropriate where the facts regarding jurisdiction are

peculiarly within the knowledge of the opposing party.  <u>See</u> <u>Kamen v. Am. Tel. &</u>

<u>Tel. Co.</u>, 791 F.2d 1006, 1011 (2d Cir. 1986).

Because jurisdictional facts were contested, the district court abused its

discretion by dismissing Guardians' NEPA claims on a factually undeveloped

record without giving Guardians an opportunity for jurisdictional discovery,

particularly as the facts regarding jurisdiction are peculiarly within the knowledge

of Wildlife Services and NDOW.  As explained in <u>Laub</u>:

> [D]iscovery should ordinarily be granted where pertinent facts bearing
> on the question of jurisdiction are controverted or where a more
> satisfactory showing of the facts is necessary.  Although a refusal to
> grant discovery to establish jurisdiction is not an abuse of discretion
> when it is clear that further discovery would not demonstrate facts
> sufficient to constitute a basis for jurisdiction, ***discovery should be
> granted when . . . the jurisdictional facts are contested or more facts
> are    needed***.

342 F.3d at 1093 (internal quotations and citations omitted, emphasis added).  In

this case, many jurisdictional facts were contested.  Although the Court did not

resolve these facts because it found the Mayer Letter dispositive of the

redressability issue, it also did not permit Guardians discovery on matters that were

likely to have contradicted NDOW's unsupported contentions in the Mayer Letter.

"[W]here pertinent facts bearing on the question of jurisdiction are in dispute,

discovery should be allowed." <u>Am. W. Airlines</u>, 877 F.2d at 801; <u>see also</u> <u>Farr v.</u> <u>United States</u>, 990 F.2d 451, 454 (9th Cir. 1993).

As explained in Guardians' Response to Defendant's Motion to Dismiss and Guardians' Motion for Jurisdictional Discovery, discovery would have likely shown that there is a budget shortfall in Nevada and NDOW would have neither the money nor the manpower to take over the entirety of Wildlife Services' activities in Nevada. Molde ¶ 28 (ER 29). Discovery would have also likely shown that ravens and coyotes would not be killed at levels obtained by Wildlife Services without DC-1339 (which only Wildlife Services is allowed to use) and aerial gunning (which is expensive and would be unlikely to continue under NDOW's PDM program). (ER 83, 110, 181-82). These were matters relevant to the redressability prong of standing, which Wildlife Services disputed and made an issue of fact in this case.

"Since they are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." <u>Lujan</u>, 504 U.S. at 561. Guardians' standing was challenged at the Motion to Dismiss stage. As with any other aspect of a case, Guardians should have been provided the opportunity to develop the factual record

through discovery or other means to support jurisdiction.  See Laub, 342 F.3d at 1093.  Instead, by taking the Mayer Letter on its face and dismissing Guardians' case at the Motion to Dismiss stage without allowing an opportunity for discovery, the district court substantially prejudiced Guardians and abused its discretion.

## CONCLUSION

For the reasons set forth above, Guardians respectfully requests this Court to reverse the district court and to conclude that Guardians, on behalf of its members, has standing to pursue its NEPA claims against Wildlife Services.  However, should the Court remand the issue of standing to the district court, this Court should direct the district court to first allow an opportunity for jurisdictional discovery and an evidentiary hearing.

Respectfully submitted October 3, 2013.

*/s/ Ashley D. Wilmes*
Ashley D. Wilmes
WildEarth Guardians
680 W. Hickory Street
Louisville, CO 80047
Tel. 859-312-4162
awilmes@wildearthguardians.org
Attorney for Plaintiff-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellant respectfully requests oral argument, due to the importance of the Article III standing issues in this case and the impact of the district court's opinion in shielding federal agencies' NEPA decisions from judicial review.

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.      I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,902 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.      I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

*/s/ Ashley D. Wilmes*
Ashley D. Wilmes
WildEarth Guardians
680 W. Hickory Street
Louisville, CO 80047
Tel. 859-312-4162
awilmes@wildearthguardians.org
Attorney for Plaintiff-Appellant

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2013, I electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification

of this filing to all attorneys of record.

By: */s/ Ashley D. Wilmes*
Ashley D. Wilmes