No. 13-16071

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

WILDEARTH GUARDIANS,
Plaintiff-Appellant,

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ANIMAL AND
PLANT HEALTH INSPECTION SERVICE,
Defendant-Appellee.

On Appeal from the United States District Court
for the District of Nevada

**AMICUS BRIEF IN SUPPORT OF REVERSAL**

REBECCA J. RILEY
Natural Resources Defense Council
20 N. Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 651-7913
rriley@nrdc.org

Counsel for Amici:
Natural Resources Defense Council
Defenders of Wildlife
Predator Defense
TrailSafe Nevada
Northeast Oregon Ecosystems
Center for Biological Diversity
Southwest Environmental Center
Friends of Animals
Mark E. Smith Foundation
Western Watersheds Project
Boulder-White Clouds Council

Conservation Congress
Cascadia Wildlands
In Defense of Animals
Western Wildlife Conservancy
The Animal Legal Defense Fund
Friends of the Clearwater
Project Coyote

JASON C. RYLANDER
Defenders of Wildlife
1130 17th Street, N.W.
Washington, D.C. 20036
Telephone: (202) 682-9400
jrylander@defenders.org

Counsel for Amicus Defenders of Wildlife

# CORPORATE DISCLOSURE STATEMENT

All amici are either:

(1)      nongovernmental corporations that do not have any parent corporation or any publicly held corporation that owns 10% or more of its stock; or

(2)      not corporate entities.

**SOURCE OF AUTHORITY TO FILE**

Counsel Rebecca J. Riley authored this brief in whole. Natural Resources Defense Council provided funding for the preparation and submission of this brief. No other party, party's counsel, or individual contributed money that was intended to fund the brief.

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND .....................................................................................................3

   A. General Factual Background ......................................................................3

   B. Procedural Background .............................................................................5

ARGUMENT ..........................................................................................................6

   A. The Court Failed to Apply the Relaxed Redressability Standard for
      Procedural Violations ..............................................................................10

   B. Even if Wildlife Services Were to Halt Its Predator Control Program,
      NDOW Might Kill Fewer Predators, Which Would Redress Guardians'
      Injuries ...................................................................................................13

   C. *Goat Ranchers* Does Not Change the Analysis .......................................15

   D. Plaintiff Was Entitled to Jurisdictional Discovery ..................................16

CONCLUSION .....................................................................................................17

# TABLE OF AUTHORITIES

## CASES

*Cantrell v. City of Long Beach*
  241 F.3d 674 (9th Cir. 2001) ..........................................................................11

*Center for Food Safety v. Vilsack*
  636 F.3d 1166 (9th Cir. 2011) ........................................................................11

*Citizens for Better Forestry v. U.S. Dep't of Agric.*
  341 F.3d 961 (9th Cir. 2003) ....................................................................10, 11

*Defenders of Wildlife v. EPA*
  420 F.3d 946 (9th Cir. 2005) ..........................................................................11

*Friends of the Earth v. Laidlaw Envtl. Servs.*
  528 U.S. 167 (2000) ...........................................................................................6

*Goat Ranchers of Oregon v. Williams*
  379 Fed. Appx. 662 (9th Cir. 2010) ...................................................15, 16, 17

*Hall v. Norton*
  266 F.3d 969 (9th Cir. 2001) ............................................................................6

*Larson v. Valente*
  456 U.S. 228 (1982) .........................................................................................13

*Laub v. U.S. Dep't of Interior*
  342 F.3d 1080 (9th Cir. 2003) ....................................................................9, 16

*Lujan v. Defenders of Wildlife*
  504 U.S. 555 (1992) ...........................................................................................7

*Massachusetts v. EPA*
  549 U.S. 497 (2007) ..............................................................6, 7, 10, 13, 14, 15

*Rachford v. Air Line Pilots Ass'n*
  No. C03-3618PJH, 2006 WL 1699578 (N.D. Cal. June 16, 2006) ...............17

*Safe Air for Everyone v. Meyer*
     373 F.3d 1035 (9th Cir. 2004) ........................................................................7

*Salmon Spawning Alliance & Recovery Alliance v. Gutierrez*
     545 F.3d 1220 (9th Cir. 2008) ......................................................................11

*Western Watersheds Project v. Kraayenbrink*
     632 F.3d 472 (9th Cir. 2011) ........................................................................11

*WildEarth Guardians v. U.S. Dep't of Agric.*
     No. 2:12-cv-00716-MMD-PAL, 2013 WL 1088700
     (D. Nev. Mar. 14, 2013) ...................................................5, 6, 7, 8, 12, 14, 15

## **RULES**

Ninth Circuit Rule 36-3...........................................................................................15

## **ARTICLES**

Sonner, Scott. *9th Circuit Asked to Stop USDA Predator Killing*. The Sacramento
Bee (4 Oct, 2013) ...........................................................................................4, 9, 17

**INTRODUCTION**

On behalf of the Natural Resources Defense Council, Defenders of Wildlife, Predator Defense, TrailSafe Nevada, Northeast Oregon Ecosystems, Center for Biological Diversity, Southwest Environmental Center, Friends of Animals, Mark E. Smith Foundation, Western Watersheds Project, Boulder-White Clouds Council, Conservation Congress, Cascadia Wildlands, In Defense of Animals, Western Wildlife Conservancy, The Animal Legal Defense Fund, Friends of the Clearwater, and Project Coyote,[1] we urge this Court to reverse the ruling that Wildlife Services' National Environmental Policy Act (NEPA) analysis of predator damage management in Nevada is unreviewable. All parties have consented to the filing of this amicus brief.

Across the State of Nevada, Wildlife Services, a branch of the federal Animal and Plant Health Inspection Service, provides "predator control services," largely by killing wildlife such as coyotes, wolves, and ravens. This program hurts not only the wildlife directly targeted, but also animals that are accidentally caught in Wildlife Services' traps, killed by its poisons, or hurt by ingesting the fragments of its lead bullets. Wildlife Services' activities also damage the ecosystem as a

---

[1] Amici are conservation and animal welfare organizations that seek wildlife conservation and/or the humane treatment of animals. All amici are working to reform Wildlife Services' predator damage management practices.

whole, which is a delicate web, by removing top-level predators. The conservation and animal welfare amici are working to reform this agency and its practices.

Consistent with this goal, WildEarth Guardians (Guardians) filed a lawsuit challenging the environmental review of Wildlife Services' predator control efforts in Nevada. The district court dismissed the case, holding that Guardians' injuries were not redressable because the state of Nevada intended to take over Wildlife Services' program if Wildlife Services halted its entire predator damage management program.

This ruling ignores the "relaxed" standard for redressability in cases alleging a procedural injury, like a violation of NEPA. Under this standard, Guardians was required only to show that further NEPA review *could* cause the agency to change its program in a way that would redress the alleged injuries. The NEPA document itself contained five alternatives that Wildlife Services could adopt, many of which included non-lethal measures that would redress Guardians' injuries.

Moreover, even if Nevada took over Wildlife Services' predator management program, Guardians still could establish standing because Nevada might kill predators at a slower rate. Nevada lacks the funding, the capability, and even access to some of the poisons used by Wildlife Services. It is therefore possible, perhaps even likely, that its program would result in fewer predator deaths, which also would redress at least some of Guardians' injuries.

Finally, to the extent that Guardians' standing turns on Nevada's ability to kill predators, Guardians is entitled to jurisdictional discovery in order to rebut Nevada's claim that, if Wildlife Services halts its program, the state would carry out the same exact predator damage management.

This case has important implications for the ability of parties to challenge Wildlife Services' decisions. If the district court's ruling stands, it would bar all future plaintiffs from challenging Wildlife Services' actions in any state that makes a promise to conduct its own program. This Court must reverse.

## BACKGROUND

### A. General Factual Background

Wildlife Services, a branch of the U.S. Department of Agriculture's Animal and Plant Health Inspection Service, is a federal program charged with controlling wildlife across the United States. Excerpts of the Record (ER) 68. The program spends over one-hundred million dollars a year to kill wildlife. ER 215.

As part of its program, Wildlife Services targets predators such as wolves, coyotes, ravens, and mountain lions. ER 68. The core purpose of Wildlife Services' predator control activities is to prevent commercial livestock losses. ER 72-82 (describing importance of livestock to demonstrate "need" for management). To achieve this goal, Wildlife Services uses a combination of lethal control methods like "neck snares, firearms, aerial hunting, . . . M-44's (sodium cyanide

ejector mechanisms), gas cartridges and DRC-1339 (avian toxicant) . . . leghold and cagetraps, footsnares, dogs, and denning." ER 115. The agency also sometimes facilitates or requires use of non-lethal control measures such as "guard dogs, frightening devices, chemical repellents, harassment, fencing, exclusion, animal husbandry, modification of human behavior, habitat modification, and . . . cage traps and immobilization where relocation is an option." *Id.*

Removing predators from the landscape, however, has consequences for the environment. For example, Wildlife Services kills what it calls "non-target" animals as part of its program. *See* ER 155. These species include "badgers, striped skunks, bobcats, kit fox, mule deer, gray fox, raccoons, red fox, feral dogs, beaver, pronghorn antelope, porcupines and feral cats." *Id.* In addition, animals such as the critically endangered California condor can be exposed to toxic lead from Wildlife Services' bullet fragments. ER-155-56. Perhaps most importantly, removal of predators affects the predator/prey balance, which, in turn, affects the entire ecosystem. For example, removal of coyotes can lead to an overabundance of rodents and rabbits, which can affect vegetation. ER 179-80.

In Nevada, Wildlife Services funds and carries out predator control efforts. According to the spokesman for the Nevada Department of Wildlife, the state "wouldn't have the manpower" to carry out this program without Wildlife Services' assistance. Scott Sonner, *9th Circuit Asked to Stop USDA Predator*

*Killing*, The Sacramento Bee (Oct. 4, 2013, 1:01 pm),

http://www.sacbee.com/2013/10/04/5794713/nv-suit-over-usda-predator-

killing.html#storylink=cpy.

## B. Procedural Background

WildEarth Guardians (Guardians) filed a lawsuit challenging Wildlife

Services' compliance with the National Environmental Policy Act (NEPA) for its

predator control activities in Nevada. *WildEarth Guardians v. U.S. Dep't of Agric.*,

No. 2:12-cv-00716-MMD-PAL, 2013 WL 1088700, at *1 (D. Nev. Mar. 14, 2013).

Guardians alleged that the Environmental Assessment (EA) that Wildlife Services

prepared for its "Predator Damage Management" program in Nevada failed to

adequately analyze the environmental impacts of removing predators from the

landscape and how the agency's methods for killing wildlife affects the quality of

the environment. *Id.* It also argued that Wildlife Services was required to prepare

an Environmental Impact Statement (EIS) and that it improperly relied on an

outdated programmatic EIS. *Id.*

Wildlife Services filed a motion to dismiss, arguing that Guardians failed to

establish that their injuries were redressable. *Id.* To support this claim, Wildlife

Services cited a letter from the Director of the Nevada Department of Wildlife

(NDOW) stating that NDOW would carry out predator management on its own if

Wildlife Services' halted its predator damage management program. ER 213.

In response, Guardians argued that NDOW would not, in fact, carry out the same wildlife management activities due to limits on its legal authority, funding, and other constraints. *Guardians*, 2013 WL 1088700 at *6. Specifically, Guardians noted that NDOW is not legally authorized to use the avicide Wildlife Services uses to kill ravens and that Nevada lacks financial resources to actually carry out all of Wildlife Services' activities. *Id.*

Guardians also argued that they were entitled to jurisdictional discovery to rebut Wildlife Services' claims. *Id.*

The court granted Wildlife Services' motion to dismiss, holding that NDOW's letter demonstrated that Guardians' injuries were not redressable. *Id.* at *6-7. The court denied the request for jurisdictional discovery, holding that there was no disputed issue of fact because NDOW "undisputedly expressed a clear intent to implement the predator management program absent federal involvement." *Id.* at *6.

This appeal followed.

**ARGUMENT**

Contrary to the district court's ruling, Guardians established standing in this case. To demonstrate standing, a plaintiff must show an "injury in fact" that is "fairly traceable" to the defendant's challenged conduct and that would "likely" be redressed by a favorable decision. *Friends of the Earth v. Laidlaw Envtl. Servs.*,

528 U.S. 167, 180-81 (2000). Where, as here, a plaintiff demonstrates a concrete

harm from the deprivation of a procedural right such as NEPA, the redressability

requirement is relaxed. A plaintiff need not show that information from the process

would redress the injury; only that increased information could influence the

decisionmaker. *Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001); *see also*

*Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) ("When a litigant is vested with a

procedural right, that litigant has standing if there is *some possibility* that the

requested relief will prompt the injury-causing party to reconsider the decision that

allegedly harmed the litigant.") (emphasis added); *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 572 n.7 (1992) (stating that the "person who has been accorded a

procedural right to protect his concrete interests can assert that right without

meeting all the normal standards for redressability and immediacy.").

Generally, on a motion to dismiss for lack of standing, a plaintiff must show

only that the allegations in the complaint are sufficient to support standing. *Lujan*,

504 U.S. at 561. However, a party can challenge the court's subject matter

jurisdiction at the motion to dismiss phase in a "factual attack." *Safe Air for*

*Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In a factual attack, the

challenger disputes the truth of the allegations the Plaintiff has made to support

jurisdiction. *Id.* A factual attack does not convert a motion to dismiss into a motion

for summary judgment. *Id.*

In this case, Declarant Don Molde alleged that his ability to view coyotes, mountain lions, and ravens in Nevada would be harmed by Wildlife Services' predator control program. *Guardians*, 2013 WL 1088700 at *4 n.3; *see also* ER 22-30 (describing interest in wildlife viewing, photography, and study). Wildlife Services conceded that this was sufficient to establish injury in fact. *Guardians*, 2013 WL 1088700 at *4. Wildlife Services argued, however, that Guardians' injuries were not redressable because the State of Nevada will carry out Wildlife Services' predator damage management activities if Wildlife Services does not. *Id.* The court characterized this argument as a "factual attack" because Wildlife Services cited evidence from the state in support. *Id.* That evidence consisted of a letter from the director of the NDOW stating: "Without WS participation, NDOW would, by statue [sic], carry out the management of wildlife with existing personnel or contract the work to other capable entities." ER 213.

The court granted Wildlife Services' motion to dismiss, holding that the State of Nevada's letter alone was sufficient to defeat Guardians' standing because it evidenced intent to carry out the predator management program if Wildlife Services halted its effort. *Guardians*, 2013 WL 1088700 at *6-7. This decision was wrong for several reasons.

First, this holding ignores the relaxed redressability standard in procedural injury cases. Under this standard, it is enough that Wildlife Services *could* change

8

its program in a way that would remedy Guardians' injuries in response to a revised NEPA analysis. In this case, increased information regarding the effects of predator damage management activities on ecosystems could change how Wildlife Services carries out its program. For example, Wildlife Services could elect to require more non-lethal measures, halt the use of poisons, or decrease the number of predators it kills. All of these changes would redress at least part of Guardians' injuries and there is no evidence in the record showing that if Wildlife Services used different methods to manage wildlife rather than halted its wildlife management efforts all together, Nevada would step in to carry out any additional lethal control.

Second, even if Wildlife Services were to abandon predator control in Nevada entirely and NDOW attempted to assume Wildlife Services' predator management activities, Guardians' injuries might still be redressed because NDOW lacks the ability, funding, or intent to kill predators at the same rate as Wildlife Services. Indeed, NDOW has now conceded this very fact. In an *Associated Press* story, an NDOW spokesman admitted: "We wouldn't have the manpower [to carry out Wildlife Services' program in Nevada] . . . [Wildlife Services is] in some wild places in Nevada doing that kind of predator work where we have zero personnel. We already have a full plate." Sonner, cited supra page 4.

Third, even if this case did turn on whether and how NDOW would carry out predator control, Guardians was entitled to jurisdictional discovery. The Ninth Circuit has held that "discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003) (internal citation omitted). The district court's refusal to permit jurisdictional discovery was unreasonable and highly prejudicial to Guardians, who needed to take discovery in order to more effectively dispute NDOW's assertion that it could and would carry out the same activities as Wildlife Services. Indeed, NDOW's subsequent statement concerning their lack of resources, is exactly the kind of evidence Guardians was entitled to discover in response to Wildlife Services attack on Guardians' standing.

This Court should reverse.

## A. The Court Failed to Apply the Relaxed Redressability Standard for Procedural Violations

Although the district court cited the proper standard for redressability in cases alleging a procedural violation like a violation of NEPA, it failed to properly apply the standard in this case. It is well-established that when evaluating redressability for an injury caused by a procedural violation, a plaintiff must demonstrate only that an agency's decision "*could be influenced* by the environmental considerations that [the relevant statute] requires an agency to

study." *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 976 (9th Cir. 2003) (emphasis in original). As the Supreme Court stated in *Massachusetts v. EPA*, "[w]hen a litigant is vested with a procedural right, that litigant has standing if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." 549 U.S. at 518 (emphasis added).

Where, as here, the underlying statute requires the agency to evaluate the environmental effects of its proposed actions, this is "a relatively easy burden to meet." *Citizens*, 341 F.3d at 976 (concluding that plaintiffs' claims were redressable because proper environmental review "could have influenced [the agency's] decision"); *see also Salmon Spawning Alliance & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir. 2008) ("Plaintiffs alleging procedural injury can often establish redressability with little difficulty . . ."). And, indeed, the Ninth Circuit has routinely found that environmental injuries are redressable in cases alleging procedural violations on the theory that proper procedure could cause the agency to reconsider its decision. *See, e.g.*, *Center for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th Cir. 2011) (finding NEPA claim redressable); *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011) (finding NEPA and Endangered Species Act claims redressable); *Defenders of Wildlife v. EPA*, 420 F.3d 946, 957 (9th Cir. 2005) (finding Endangered Species

11

Act claims redressable), *rev'd on other grounds sub nom, Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007); *Cantrell v. City of Long Beach*, 241 F.3d 674, 682 (9th Cir. 2001) (finding NEPA claims redressable).

The facts of this case meet this relaxed redressability standard because Wildlife Services could change its predator management plan in a way that redresses Guardians' injuries after conducting further NEPA review. The court did not consider this possibility, assuming that Wildlife Services would either carry out the preferred alternative or cease providing predator control services, in which case NDOW would carry out the predator damage control program. *See Guardians*, 2013 WL 1088700 at *4 ("even were the Court to order WS to engage in further NEPA analysis, *and in turn decide not to implement alternative 5*, Plaintiff's injuries would continue to occur because the Nevada Department of Wildlife ("NDOW") would carry out the activities Plaintiff cites as its source of injury") (emphasis added). But there are a number of alternative predator control methods that Wildlife Services could use that would redress the harm alleged by Guardians. In the challenged EA alone, Wildlife Services examined five alternatives in detail. These alternatives included continuing the current management program, conducting no predator management, using only non-lethal methods, requiring use of non-lethal methods before deploying lethal methods, and the preferred alternative, which reflects a combination of approaches. EA at 41. Several of these

alternatives would decrease the number of predators killed, thereby redressing Guardians' injuries. And that assumes that Wildlife Services considers the same alternatives on remand. The agency could change the alternatives in response to the court's ruling, creating even more ways in which Guardians' injuries could be redressed. In short, further NEPA review could persuade Wildlife Services to alter its program in a way that redresses Guardians' injuries. Guardians' claim thus easily met the relaxed redressability standard that applies here.

**B. Even if Wildlife Services Were to Halt Its Predator Control Program, NDOW Might Kill Fewer Predators, Which Would Redress Guardians' Injuries**

As noted above, the court assumed that if Guardians prevailed in their case, Wildlife Services would cease providing any predator control in Nevada and that Nevada would step in to assume these activities. This assumption is not supported by the record. But even if this assumption were true, it would not be enough to defeat Guardians' standing. "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury." *Larson v. Valente*, 456 U.S. 228, 243, n.15 (1982). Therefore, because Nevada's theoretical predator control program might kill predators at a slower rate than Wildlife Services' program, Guardians would have standing.

In *Massachusetts v. EPA*, the Supreme Court held that the Plaintiffs' claims were redressable because there was "some possibility" that EPA would take action to regulate greenhouse gases in a way that could "slow or reduce" climate change. *Mass. v. EPA*, 549 U.S. at 518, 525. In that case, the plaintiff did not have to show that EPA's action would solve the problem of climate change; it was enough that EPA could decrease the rate at which greenhouse gas emissions accumulated in the atmosphere, thereby decreasing the harm caused by climate change. *Id.* at 525 ("While it may be true that regulating motor-vehicle emissions will not by itself *reverse* global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to *slow* or *reduce* it.") (emphasis in original).

Here, similarly, it is enough that Nevada's program might decrease the rate of predator killing, thus decreasing the harm to the Plaintiff. Guardians, in fact, introduced evidence that this would likely be the case. For example, Guardians introduced evidence that Nevada lacked the financial resources to fund a predator control program. *Guardians*, 2013 WL 1088700 at *6. Guardians also presented evidence showing that NDOW could not use the avicide Wildlife Services uses to kill ravens due to legal restrictions. *Id.* The court acknowledged these use restrictions and the fact that they could result in a lower rate of raven deaths. *Id.* Despite making this finding, however, the court rejected any argument that this lower rate of killings could redress Guardians' injuries, stating: "[t]he fact that

NDOW does not have one particular tool for raven management or that it may not achieve the same level of take as WS does not demonstrate that Plaintiff's injury – observing fewer ravens in Nevada's wilderness – is redressable." *Id.* This holding is plainly contrary to the Supreme Court's ruling in *Massachusetts v. EPA*, which did find redressability where it was possible that the harm would be reduced based on a decrease in the rate of the source of injury. It is enough that further environmental review has "some possibility" of decreasing the rate at which the harm occurs, whether that harm is a decrease in ravens or the consequences of widespread climate change. Accordingly, even if Wildlife Services ceased predator control activities and NDOW took over, Guardians' injuries are redressable.

## C. *Goat Ranchers* Does Not Change the Analysis

In its opinion, the district court heavily relied on *Goat Ranchers of Oregon v. Williams*, 379 Fed. Appx. 662 (9th Cir. 2010), to support its decision. This case does not change the analysis above. First, this decision is not precedent. Ninth Circuit Rule 36-3. More importantly, the case was not properly decided. In *Goat Ranchers*, the plaintiffs challenged Wildlife Services' management of cougars in the State of Oregon under NEPA. *Goat Ranchers*, 379 Fed. Appx. at 663. The Court, citing the general standard for redressability, dismissed the case on standing grounds, because the State of Oregon stated an intent to trap and kill cougars if Wildlife Services halted its program. *Id*.

The panel made several significant errors that parallel the errors in this case. First, the Court cited and applied the wrong standard for redressability. The Court stated that the plaintiff needed to demonstrate that it is "likely" that the Court could redress the injuries rather than "some possibility" that further environmental review could cause Wildlife Services to changes its program. *Id.* at 663. Moreover, as in this case, the Court ignored the range of alternative outcomes that Wildlife Services could have selected that would have redressed the plaintiffs' injuries. If, for example, Wildlife Services had elected to manage cougars using non-lethal methods or decided to kill fewer cougars, plaintiffs' injuries would have been redressed. Finally, the Court ignored the fact that state management of cougars might result in fewer cougar deaths or a rate of killing that is lower than Wildlife Services' management. In short, *Goat Ranchers* was wrongly decided and should carry no weight in this case.

### D. Plaintiff Was Entitled to Jurisdictional Discovery

Finally, Guardians was entitled to jurisdictional discovery. The Ninth Circuit has held that "discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Laub*, 342 F.3d at 1093 (citation omitted). Here, as explained above, because the standard for establishing redressability is relaxed, Plaintiff has met its burden by demonstrating that Wildlife Services could

alter its program in a way that redresses its injuries. But, if the Court finds that Guardians' standing turns on the question of whether and how NDOW will conduct predator control management, it must allow Guardians to take discovery on that issue. As another court has said, "it would be unfair for the court to find that plaintiffs lacked standing based on defendants' declarations, but without allowing plaintiffs an opportunity to obtain information in discovery to oppose defendants' evidence." *Rachford v. Air Line Pilots Ass'n*, No. C03-3618PJH, 2006 WL 1699578, at *11 (N.D. Cal. June 16, 2006).

There are a number of ways in which discovery might allow Guardians to rebut Nevada's assertion that it will conduct the same predator control activities as Wildlife Services, including by discovering sources of funding, personnel, ability, and resources of the agency. NDOW's own statements illustrate why discovery is critical in this case. As noted above, NDOW's spokesman recently admitted that NDOW lacked the capacity to undertake Wildlife Services' predator control activities in Nevada, stating that they "lack the manpower" and that the predators are "in some wild places in Nevada . . . where we have zero personnel." Sonner, cited supra, page 4. Guardians was entitled to discovery to establish those facts.

## CONCLUSION

For the reasons stated above, the district court's decision should be *reversed*.

Respectfully submitted,

/s/ Rebecca J. Riley
REBECCA J. RILEY
Natural Resources Defense Council
20 N. Wacker Drive, Suite 1600
Chicago, IL 60606
(312) 651-7913
rriley@nrdc.org

Counsel for Amici

JASON C. RYLANDER
Defenders of Wildlife
1130 17th Street, N.W.
Washington, D.C. 20036
Telephone: (202) 682-9400
jrylander@defenders.org

Counsel for Amicus Defenders of Wildlife

October 10, 2013

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 3,851 words. I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface in 14-point Times New Roman font.

s/ Rebecca J. Riley
Rebecca J. Riley

Dated: October 10, 2013

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of October 2013, I filed the foregoing with this Court and served the foregoing upon counsel by causing copies to be sent via this Court's ECF system to all counsel of record.

/s/ Rebecca J. Riley
Rebecca J. Riley

Dated:  October 10, 2013