No. 13-16071

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

WILDEARTH GUARDIANS
*Plaintiff-Appellant*

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ANIMAL, AND
PLANT HEALTH INSPECTION SERVICE,
*Defendants-Appellees*,

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEVADA
CIVIL ACTION NO. 2:12-cv-00716-MMD-PAL

**BRIEF OF AMICI CURIAE PROFESSORS OF ENVIRONMENTAL
LAW IN SUPPORT OF PLAINTIFF-APPELLANT'S APPEAL**

THOMAS M. GREMILLION
HOPE M. BABCOCK
Institute for Public Representation
600 New Jersey Avenue, NW
Washington, D.C.  20001
Telephone: (202) 662-9535
*Attorneys for Amici Curiae*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. ii

IDENTITIES AND INTERESTS OF THE AMICI ....................................... 1

ARGUMENT ................................................................................................ 3

I.   Background............................................................................................ 3

II.  The District Court's ruling misstates the law on standing to bring a procedural injury claim under NEPA.......................................................... 5

   A.  Redress of procedural injury need only be plausible, yet the District Court held that redress must be certain ................................................... 6

   B.  The hypothetical state action here has no bearing on the other two elements required for standing.............................................................. 10

III. The District Court mistakenly relied on *Goat Ranchers of Oregon v. Williams*................................................................................................ 14

IV. The District Court's ruling undermines the information disclosure purpose of NEPA ...................................................................................... 16

V.  CONCLUSION ................................................................................. 20

CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P. 32(a)(7) .................................................................................................... 21

# TABLE OF AUTHORITIES

Cases

*Alaska Ctr. for Env't v. Brown*,
    20 F.3d 981 (9th Cir. 1994)................................................................. 5, 9
*Beno v. Shalala*,
    30 F.3d 1057 (9th Cir.1994)................................................................. 13
*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
    341 F.3d 961 (9th Cir. 2003)................................................................ 11
*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
    123 F.3d 1142 (9th Cir. 1997)............................................................. 13
*Ctr. For Biological Diversity v. Kempthorne*,
    588 F.3d 701 (9th Cir. 2009) ................................................................. 5
*Defenders of Wildlife v. EPA*,
    420 F.3d 946 (9th Cir. 2005) ................................................................. 7
*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*,
    528 U.S. 167 (2000)............................................................................. 10
*Goat Ranchers of Oregon v. Williams*,
    379 Fed. App'x 662 (9th Cir. 2010)................................................. 14, 15
*Lands Council v. Powell*,
    395 F.3d 1019 (9th Cir. 2005) ............................................................. 17
*Levine v. Vilsack*,
    587 F.3d 986 (9th Cir. 2009)............................................................... 7, 8
*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)........................................................ 5, 7, 8, 9, 10
*Marsh v. Oregon Natural Res. Council*,
    490 U.S. 360 (1989)............................................................................... 4
*Massachusetts v. E.P.A.*, 549 U.S. 497 (2007)...................................... 15, 16
*Nat'l Ass'n of Home Builders v. Defenders of Wildlife*,
    551 U.S. 644 (2007)............................................................................... 7
*Neighbors of Cuddy Mountain v. Alexander*,
    303 F.3d 1059 (9th Cir. 2002)............................................................. 17
*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989)............................................................................. 17
*Seattle Audubon Soc'y v. Espy*,
    998 F.2d 699 (9th Cir.1993)................................................................... 9
*Simon v. Eastern Kentucky Welfare Rights Organization*,
    426 U.S. 26 (1976)............................................................................... 15

*Tyler v. Cuomo*,
    236 F.3d 1124 (9th Cir. 2000) ................................................................ 12
*Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*,
    435 U.S. 519 (1978) .............................................................................. 16
*West v. Sec'y of Dep't of Transp.*,
    206 F.3d 920 (9th Cir. 2000) .................................................................. 9
*Western Watersheds Project v. Kraayenbrink*,
    632 F.3d 472 (9th Cir. 2011) .................................................................. 6

<u>Statutes</u>

42 U.S.C. § 4332(2)(C) .......................................................................... 4
42 U.S.C.A. § 4321 ................................................................................ 16
42 U.S.C.A. § 4331 ................................................................................ 3

<u>Other Authorities</u>

Mary O'Brien, 40 Envtl. L. Rep. News & Analysis 11183, 11188-89 (2010)
    .................................................................................................... 18
Robert Dreher, *NEPA Under Siege*, 4-7 (2005) ........................................ 17
*See* Bradley C. Karkkainen, *Toward A Smarter NEPA: Monitoring and
    Managing Government's Environmental Performance*, 102 Colum. L.
    Rev. 903, 915-16 (2002) ........................................................................ 18
Senator Henry M. Jackson, Senate Committee on Interior and Insular Affairs
    18 (July 9, 1969) ................................................................................ 3, 18
William L. Andreen, *Environmental Law and International Assistance: The
    Challenge of Strengthening Environmental Law in the Developing World*,
    25 Colum. J. Envtl. L. 17, 40 (2000) ...................................................... 19

<u>Regulations</u>

40 C.F.R. § 1502.1 ................................................................................ 17

# IDENTITIES AND INTERESTS OF THE AMICI[1]

Amici are professors of environmental law. Amici's expertise includes environmental standing, court access issues, environmental regulation, and NEPA. Combined, amici have decades of experience practicing, teaching and researching these issues and have written more than 500 books and articles on relevant topics. Amici have an interest in ensuring that federal agencies comply with NEPA's requirements, and they thus seek judicial clarity.

- **Robert Adler**, Interim Dean, James I. Farr Chair and Professor of Law, University of Utah S.J. Quinney College of Law

- **Eric Biber**, Professor of Law, UC Berkeley School of Law

- **Michael Blumm**, Jeffrey Bain Faculty Scholar and Professor of Law, Lewis and Clark Law School

- **Holly Doremus**, James H. House and Hiram H. Hurd Professor of Environmental Regulation, UC Berkeley School of Law

- **Amanda Leiter**, Associate Professor, American University Washington College of Law

- **Patrick Parenteau**, Professor of Law and Senior Counsel to the Environmental and Natural Resources Law Clinic, Vermont Law School

---

[1] Pursuant to Federal Rule of Appellate Procedure 29(c)(5), no party's counsel authored this brief in whole or in part. No party, nor any party's counsel, nor any person other than the amici curiae or their counsel contributed money intended to fund preparing or submitting this brief.

- **Dan Tarlock**, Director of the Program in Environmental and Energy Law and Distinguished Professor of Law, Chicago-Kent College of Law

- **Sandra Zellmer**, Robert B. Daugherty Professor Law, University of Nebraska College of Law

This brief is filed with all parties' consent. Circuit Rule 29-2(a).

**ARGUMENT**

This case involves standing to seek judicial review of a federal agency's compliance with the National Environmental Policy Act ("NEPA"), 42 U.S.C.A. § 4331. Among other holdings, the District Court ruled that a State's expression of intent to carry out a federal action, if necessary, raises a constitutional bar to litigants seeking to challenge that action under NEPA. This holding conflicts with well-established law and undermines environmental protection.

Amici concur with the arguments raised in Appellant's brief and supplement those arguments, focusing on three points. First, the District Court's holding introduces an unworkable standing test that would render constitutionally invalid a broad category of claims seeking to vindicate procedural rights. Second, it extends a line of unpublished cases that brings a similarly erroneous logic to bear on constitutional standing. Finally, it clashes with Congress' intent in NEPA to promote information disclosure and public participation in actions that affect the environment.

## I.     Background

In 1969, Congress passed NEPA to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." Senator Henry M. Jackson, Senate Committee on Interior and Insular Affairs 18 (July 9, 1969). NEPA requires agencies to draft a detailed Environmental Impact Statement ("EIS") for every major federal action "significantly

affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

The EIS requirement "ensures that the agency will not act on incomplete
information, only to regret its decision after it is too late to correct." *Marsh
v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989).

In 2011, Appellee United States Department of Agriculture, Animal
and Plant Health Inspection Service, Wildlife Services program ("Wildlife
Services") announced the agency's intention not to issue an EIS for its
Nevada predator damage management program ("PDM"). FINAL
ENVIRONMENTAL ASSESSMENT, PREDATOR DAMAGE MANAGEMENT IN
NEVADA 126 (U.S.D.A. June 2011)("EA"). The Nevada PDM program
targets predatory species that prey on livestock and game species. EA at 1-2.
Wildlife Services partners with state, local and other federal agencies to
conduct the program, but the agency "has primary responsibility to respond
to complaints involving coyotes, mountain lions, bobcats, skunks, weasels,
badgers, raccoons, and ringtails," as well as to migratory bird depredation
complaints, including those involving ravens. *Id.* The agency's decision
document, the Environmental Assessment, references an EIS issued in 1994
and last revised in 1997. *See* EA at 49 (noting that the "preferred
alternative," continuing the existing PDM program, "is analyzed and
discussed in the [1994/1997 PEIS].") EA at 49. Among other claims, the
Appellant WildEarth Guardians ("Guardians") challenged the adequacy of
Wildlife Services' Environmental Assessment, and the agency's failure to
issue an EIS. *See* Compl. ¶¶ 170-180. The District Court held that Guardians

lacked standing to pursue these NEPA claims because they are not redressable. *WildEarth Guardians v. U.S. Dep't of Agric., Animal, & Plant Health Inspection Serv.,* No. 2:12-cv-00716-MMD-PAL, 2013 WL 1088700, at *6-7 (D. Nev. Mar. 14, 2013) (hereinafter "Order").

## II. The District Court's ruling misstates the law on standing to bring a procedural injury claim under NEPA

"Procedural rights are special." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n. 7 (1992). A person whose "concrete interests" are threatened by a proposed agency action has standing to challenge the "agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause [the agency's action] to be withheld or altered." *Id.* Guardians has demonstrated that it has concrete, geographically specific, recreational and aesthetic interests in the areas where Wildlife Services traps, poisons, and shoots wildlife. *See* Order at 7; *Ctr. For Biological Diversity v. Kempthorne*, 588 F.3d 701, 707 (9th Cir. 2009) *citing Lujan*, 555 U.S. at 582 ("The interest that individuals have in observing a species or its habitat . . . is sufficient to confer standing."). Guardians has shown how the PDM program threatens these interests, and Congress, in passing NEPA, determined that the relief Guardians seeks is the "appropriate means" of protecting against the threats posed by federal actions like the PDM program. *Alaska Ctr. for Env't v. Brown*, 20 F.3d 981, 984 (9th Cir. 1994). While Guardians cannot establish

with any certainty that an adequate EIS would cause Wildlife Services to alter its program, that showing is not required for standing. Rather, Guardians "must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." *Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011) (court's emphasis). Invoking a hypothetical third party action, the District Court's opinion turns this standard on its head and clashes with two decades of Ninth Circuit case law in the wake of *Lujan*.

### A. Redress of procedural injury need only be plausible, yet the District Court held that redress must be certain

The District Court reasoned that "Plaintiff's injury cannot be redressed" because "Nevada has the authority to implement predator damage management, and has indicated it will do so, with or without federal participation." Order at 11. This holding misconstrues the meaning of redress under a procedural statute such as NEPA. Guardians has alleged substantive harms that an independent Nevada extermination program might perpetuate. However, Guardians' alleged *injury* is procedural. That injury arose when Wildlife Services failed to adequately disclose the environmental impacts of its Nevada extermination program in an Environmental Impact Statement. An order enjoining Wildlife Services from implementing the Nevada EA would redress this injury by prompting Wildlife Services to issue an adequate EIS prior to authorizing the continuation of its program.

For a litigant seeking such procedural relief, no additional showing of redressability is needed: "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. Just as a plaintiff need not establish "with any certainty" that an EIS will cause the agency to alter the underlying action, *id.,* neither must a plaintiff prove that a third-party will not intervene and continue harming his concrete interests. Such a rule would impose an absurd and impossible burden on plaintiffs seeking to vindicate procedural rights. The law instead holds that plaintiffs alleging a procedural injury "must show only that they have a procedural right that, if exercised, *could* protect their concrete interests." *Defenders of Wildlife v. EPA*, 420 F.3d 946, 957 (9th Cir. 2005) (court's emphasis), *overruled on other grounds by Nat'l Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007).

The District Court opinion recites this rule but does not follow it. The opinion concedes that Plaintiff's desired remedy could put an end to Wildlife Services' killing of predators in Nevada. However, it maintains that curtailing the federal program would not necessarily stop the killing of these predators, because Nevada's Department of Wildlife would alter its present conduct to take up the slack left by Wildlife Services. Consequently, according to the court, Guardian's injury is not redressable. Order at 3.

To justify its more stringent redressability standard, the opinion cites

*Levine v. Vilsack*, 587 F.3d 986 (9th Cir. 2009), in which the plaintiffs alleged substantive statutory violations related to the federal Department of Agriculture's decision to exclude chickens and other birds from the definition of "livestock" under the Humane Methods of Slaughter Acts of 1958 and 1978. Reclassifying the animals as livestock, according to the *Levine* plaintiffs, would cause the Department of Agriculture to revise standards for slaughter, which in turn would cause slaughterhouses to alter their conduct to redress the harms underlying plaintiff's claims. The *Levine* court, however, determined that the plaintiffs lacked standing to bring these substantive claims, because the alleged connection between the remedy sought and redress of plaintiffs' harms relied too much on the "unfettered choices made by independent actors not before the courts," that is, the slaughterhouses. *Id.* at 992.

Here, the District Court's reliance on *Levine* is misplaced. Guardians alleges a violation of its procedural rights under NEPA, and therefore does not have to meet the redressability and immediacy standards applied in *Levine. See Lujan*, 504 U.S. at 572 n.7. Moreover, in this case, Wildlife Services itself, rather than a state agency or a private third party, currently does the killing; the only speculative claim about a third party's conduct is the *court's* assertion that the state would step into the federal agency's shoes if WildEarth Guardians were to prevail. *See* Order at 8. Finally, this Court has held that even where a State's actions (or inaction) could continue to harm a plaintiff's interest after a court enforces a procedural right against a

federal agency, that fact "does not render the relief sought completely speculative." *Alaska Ctr. for Env't*, 20 F.3d at 985.

Under the appropriate criteria for standing, the State of Nevada's future conduct is irrelevant to assessing the redressability of Guardian's procedural injuries. A procedural injury "results from the violation of a statute that guarantees a particular procedure, while substantive injury results from the violation of a statute that guarantees a particular result." *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 930 n. 14 (9th Cir. 2000). Guardians has alleged that Wildlife Services failed to comply with procedures guaranteed under NEPA. "[T]he asserted injury is that environmental consequences might be overlooked, as a result of deficiencies in the government's analysis under environmental statutes." *Seattle Audubon Soc'y v. Espy*, 998 F.2d 699, 702 (9th Cir.1993) (holding that the fact that "redrafting the EIS might not change the Secretary's decision ... is not relevant to standing."). An adequate EIS will redress Guardians' alleged injury, regardless of Nevada's subsequent intention or authority, "because Congress has determined that the [procedural] relief plaintiffs seek is the appropriate means of achieving" environmental protection. *Alaska Ctr. for Env't*, 20 F.3d at 984; *accord Lujan* 504 U.S. at 580 (Kennedy, J. concurring).

This congressional intent staves off any need for the sort of speculation that besets the District Court's opinion. If WildEarth Guardians

were to prevail here, Wildlife Services could issue an adequate EIS and

nevertheless decline to alter its decision, or the agency could abandon the

program, in which case Nevada could choose to carry out its own PDM

program for species currently managed by Wildlife Services. But regardless,

Wildlife Services, the State, and the public would benefit from being fully

informed of the program's expected environmental impacts. Moreover, the

possibility remains that information disclosed in an EIS may prompt federal

officials to take actions that lessen the environmental impacts of the program

and thus protect Plaintiff's concrete interests by, for example, facilitating

more opportunities to view wildlife. In passing NEPA, Congress determined

that this possibility justifies the creation of a procedural right, and this Court

should not encroach on Congress' authority to make that determination. *See*

*Lujan* 504 U.S. at 580 (Kennedy, J. concurring) ("Congress has the power to

define injuries and articulate chains of causation that will give rise to a case

or controversy where none existed before."); *see also Friends of the Earth,*

*Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000)

(emphasizing the importance of congressional judgments to standing

analysis).


### B.     The hypothetical state action here has no bearing on the other two elements required for standing

Just as Nevada's proposed actions in the future are irrelevant to

whether Guardians can show redressability, they are irrelevant to the other

prongs of the standing analysis: injury-in-fact and causation. The injury-in-fact prong requires a plaintiff asserting procedural injury to allege only that (1) the agency violated certain procedural rules; (2) these rules protect the plaintiff's concrete interests; and (3) it is reasonably probable that the challenged action will threaten the plaintiff's concrete interests. *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 969-70 (9th Cir. 2003). For the purposes of challenging the Nevada EA, Wildlife Services conceded that "Plaintiff's member Don Molde can allege injury in fact." Order at 7. However, the lower court opinion oversimplifies Mr. Molde's "injury" as "viewing fewer coyotes, mountain lions, and ravens in Nevada's wild as a result of [Wildlife Services]' Nevada EA and Decision." Order at 7 n.3. This characterization omits Mr. Molde's procedural injury, conflating the violation of his procedural rights under NEPA with the underlying threat to his concrete interests in wildlife viewing. In doing so, the opinion misstates the standard for claiming a procedural injury under NEPA—a standard that Guardians clearly meets.

Guardians has alleged that Wildlife Services violated NEPA's environmental impact disclosure requirements, which protect its members' aesthetic and recreational interests in Nevada public lands where Wildlife Services kills wildlife. The challenged action—continuing the PDM program based on stale data—is virtually certain to threaten Guardians' aesthetic and recreational interests because the program, which the federal agency carries out directly, already affects those interests. For example, while visiting

Humboldt National Forest, Mr. Molde has observed aircraft engaging in coyote hunts, and his dog has been caught in a predator trap. Plaintiff's Corrected Response to Defendant's Motion to Dismiss, at ¶¶ 13, 14, 17, 24, *WildEarth Guardians v. U.S. Dep't of Agric., Animal & Plant Health Inspection Serv.*, No. 2:12-cv-00716-MMD-PAL, 2013 WL 1088700 (D. Nev. March 14, 2013) (Declaration of Don Molde) [herinafter Molde Decl.]. Nothing in the analysis of injury-in-fact should turn on whether the State of Nevada has authority to undertake the challenged federal action, or whether the State has the means or the inclination to do so.

The State of Nevada's speculative actions similarly have no bearing on whether Guardians has alleged facts sufficient to establish causation. Plaintiffs establish causation by showing the harm to their interests is "fairly traceable to the challenged action of the defendant" and not "the result of the independent action of some third party not before the court." *Tyler v. Cuomo*, 236 F.3d 1124, 1132 (9th Cir. 2000) (upholding homeowners' standing to challenge authorization of housing project under NEPA). Here, Guardians challenged the decision adopting Wildlife Services' PDM program in Nevada. Under that program, federal authorities have "primary responsibility to respond to complaints involving coyotes, mountain lions, bobcats, skunks, weasels, badgers, raccoons, and ringtails," and they have trapped, shot, and poisoned thousands of these animals each year. EA at 2, 77-84. Wildlife Services' action directly harms Mr. Molde's recreational interests in viewing this wildlife. Molde Decl. ¶ 13.

The District Court opinion suggests that the State has actually caused this harm to Mr. Molde's interests. It asserts that the State "has its own predator damage management plan for coyotes, mountain lions, and ravens," and that it "merely used the [Wildlife Services] for federal assistance" in carrying out that program. Order at 9. In other words, the lower court implies that the cause of Mr. Molde's harm originates not with the federal agency's actual trapping, shooting, and poisoning of wildlife, but with the State of Nevada's decision "to utilize Defendant's services." *Id.* No binding precedent of this Court supports this interpretation of the standing inquiry's causation prong, and with good reason. Such a standard would insulate from judicial review any action—from highway construction to public benefits distribution—that a federal agency performs under the auspices of a State, upending this Court's settled law. *See, e.g., City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1160 (9th Cir. 1997) (remanding federal agency's authorization of highway project where EIS failed "to provide any useful analysis of the cumulative impact of past, present and future projects."); *Beno v. Shalala*, 30 F.3d 1057, 1065 (9th Cir.1994) (upholding standing to challenge federal agency approval of work incentive program even though "California might elect to continue the experiment at the risk of losing federal Medicaid funding.").

### III. The District Court mistakenly relied on *Goat Ranchers of Oregon v. Williams*

In its analysis of Guardians' third and fourth claims, the District Court relied extensively on this Court's unpublished opinion in *Goat Ranchers of Oregon v. Williams*, 379 Fed. App'x 662 (9th Cir. 2010). The court explained that it found the opinion's "reasoning on a case with similar facts and law persuasive." Order at 8, n.4. The District Court's reliance on *Goat Ranchers* was misplaced, however, because that case involved different facts and also because that decision conflicts with this Court's settled law.

The distinction between this case and *Goat Ranchers* relates to the State of Nevada's *actual* role in the PDM program challenged by Guardians. *Goat Ranchers* involved a challenge to Wildlife Services' killing of cougars in Oregon. The *Goat Ranchers* court found that "[c]ougars are being culled under Oregon's own state-run, state-funded Cougar Management Plan." 379 Fed. App'x at 662. In contrast, nothing in the record of this case negates Guardians' assertion that federal authorities provide the majority of the Nevada PDM program's funding, Compl. ¶128, and the EA indicates that the federal agency has sole responsibility for trapping, shooting, and poisoning various species that Plaintiff's members enjoy viewing in the wild. *See* EA at 1-2. In other words, the record does not support the District Court's assertion that Nevada has "merely used [Wildlife Services] for federal assistance" in its independent program. Order at 10.

Even putting aside this distinction, however, *Goat Ranchers* should

not inform the outcome of this case because it was wrongly decided. Like this case, it invokes hypothetical state action to immunize actual federal agency action from review. Such a rule, which ignores the special nature of procedural injuries, should not stand, for the reasons already discussed. Citing *Simon v. Eastern Kentucky Welfare Rights Organization*, the *Goat Ranchers* opinion notes that "the 'case or controversy' limitation of Art. III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." 426 U.S. 26, 41–42 (1976). But the opinion establishes a new rule barring a federal court from acting to redress injury *caused by* a federal agency merely because the independent action of a third party could also cause that harm.

The dissent in *Goat Ranchers* touches upon another infirmity in the majority opinion, related to causation and distinct from the shortcomings discussed in this brief. *See Goat Ranchers*, 379 Fed. App'x at 664 (Bea, Cir. J., dissenting). According to the majority opinion, the appellants failed to show "that whatever small probability they have of seeing a cougar in the wild will be reduced materially if the state does all rather than some of the cullings." *Id.* In other words, even if Wildlife Services succeeds in killing more wildlife than the State would on its own, its action "contributes so insignificantly to [appellant's] injuries that the Agency cannot be haled into federal court to answer for them." *Massachusetts v. E.P.A.*, 549 U.S. 497, 524 (2007). As the Supreme Court explained in the analogous context of

regulating greenhouse gas emissions, "this argument rests on the erroneous assumption that a small incremental step, because it is incremental, can never be attacked in a federal judicial forum." *Id.* Indeed, such an assumption "would doom most challenges to regulatory action." *Id.*

### IV. The District Court's ruling undermines the information disclosure purpose of NEPA

Congress passed NEPA to ensure that federal agencies fully consider the environmental impacts of their actions, and more broadly, "to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C.A. § 4321. The District Court's decision thwarts these purposes. Under it, State officials need only express a plausible intention to carry out a proposed federal agency action, and the agency's environmental impact analysis—no matter how stale, cursory, or incomplete—can evade judicial review. *See* Order at 9. Such a rule would reduce NEPA procedures to an empty formality, and eviscerate the statute's function as a tool of public disclosure.

NEPA creates no substantive rights, only procedural ones. *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 548 (1978). An adequate EIS may lead a federal agency to alter its actions, and indeed, often does. *See* Robert Dreher, *NEPA Under Siege*, 4-7

(2005)[2] ("Examples are legion in which proposed federal action that would have had serious environmental consequences were dramatically improved, or even in some cases abandoned, as a result of the NEPA process."). But judicial review cannot assure such an outcome, or any probability of it; rather, it merely "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002). In other words, "NEPA merely prohibits uninformed—rather than unwise— agency action." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989).

Informed agency action requires robust participation from an informed public, which is the ultimate goal of NEPA. Thus, this Court has explained that the law's EIS requirement is meant "to permit informed public comment on proposed action and any choices or alternatives that might be pursued with less environmental harm." *Lands Council v. Powell*, 395 F.3d 1019, 1027 (9th Cir. 2005). Similarly, Council on Environmental Quality regulations require that an EIS "inform . . . the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. Whether these measures lead to a change in a particular federal agency

---

[2] *Available at*: http://www.arcticgas.gov/sites/default/files/documents/2005-nepaundersiege.pdf

action, the benefits of informed agencies and an informed public extend beyond the environmental protections associated with any single project.

These benefits include the advancement of foundational democratic principles. *See, e.g.,* Mary O'Brien, 40 Envtl. L. Rep. News & Analysis 11183, 11188-89 (2010) ("No U.S. law implements democracy more comprehensively than NEPA."). As one commentator has noted, compulsory interactions between the public and agencies contribute to government transparency and holds agencies accountable to the public, subsequently bringing agencies into the democratic process. *See* Bradley C. Karkkainen, *Toward a Smarter NEPA: Monitoring and Managing Government's Environmental Performance*, 102 Colum. L. Rev. 903, 915-16 (2002).

Congress recognized the nature of these benefits when it passed NEPA, and indeed, specifically contemplated that federal agencies would establish a model of public participation that would guide the States. According to NEPA's legislative history, the statute was meant to provide "a demonstration to which State governments may look in their efforts to reorganize local institutions and to establish local policies conducive to sound environmental management." Senator Henry M. Jackson, Senate Committee on Interior and Insular Affairs 8 (July 9, 1969). In fact, NEPA has served as a model not only to the States, but also to at least sixty nation-states that have adopted analogous regulatory regimes. William L. Andreen, *Environmental Law and International Assistance: The Challenge of*

*Strengthening Environmental Law in the Developing World*, 25 Colum. J. Envtl. L. 17, 40 (2000) ("Based on NEPA's original example, environmental impact assessment has evolved into one of the most utilized methods worldwide for helping decisionmakers understand and heed the environmental ramifications of their actions.").

The District Court's opinion gives short shrift to the informational purpose of NEPA, not to mention the possibility of federal leadership on environmental management. It conditions information disclosure and public participation on the prospect of state action, and thus creates exactly the opposite incentives that Congress built into NEPA's design. Perversely, the rule would allow federal action to take place with less oversight in precisely those cases where state officials may be inclined to ignore adverse public comment and press ahead, regardless of what an adequate environmental analysis may reveal. Congress's intent in passing NEPA militates against adopting such a rule.

## V.    CONCLUSION

For the foregoing reasons, this Court should reverse the District Court's decision and remand the case to be decided on the merits.


Dated:  October 10, 2013                    Respectfully Submitted,

*/s/ Thomas M. Gremillion*
Thomas M. Gremillion
Institute for Public
Representation
600 New Jersey Avenue, NW
Washington, D.C.  20001
Telephone: (202) 662-9535
*Attorney for Amici Curiae*

**CERTIFICATE OF COMPLIANCE PURSUANT TO FED. R. APP. P.
32(a)(7)**

 I certify that pursuant to Federal Rules of Appellate Procedure 32(a)(7), the attached Brief of Amici Curiae is proportionally spaced, has a typeface of 14 point Times New Roman, and contains fewer than 4,200 words (3,939).

| 9th Circuit Case Number(s) | 13-16071 |
|---|---|

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Oct 10, 2013 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)  s/ Thomas M. Gremillion

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)