No. 13-16071

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

WILDEARTH GUARDIANS,

*Plaintiff-Appellant,*

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ANIMAL AND
PLANT HEALTH INSPECTION SERVICE,

*Defendant-Appellee.*

On Appeal from the United States District Court
for the District of Nevada
No. 2:12-cv-00716-MMD-PAL
Honorable Miranda M. Du, District Judge

**ANSWERING BRIEF OF DEFENDANT-APPELLEE USDA**

ROBERT G. DREHER
Acting Assistant Attorney General

OF COUNSEL:

ANNALISA JABAILY
LAUREN AXLEY
USDA Office of General Counsel

ANDREW C. MERGEN
J. DAVID GUNTER II
BRIAN COLLINS
EMILY A. POLACHEK
Attorneys, U.S. Dep't of Justice
Env't & Natural Resources Div.
P.O. Box 7415
Washington, DC 20044
(202) 514-5442
emily.polachek@usdoj.gov

# TABLE OF CONTENTS

INTRODUCTION .......................................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 2

STATEMENT OF THE ISSUES ......................................................... 2

STATEMENT OF THE CASE ........................................................... 3

LEGAL FRAMEWORK .................................................................. 5

    I.    NATIONAL ENVIRONMENTAL POLICY ACT ................................. 5

    II.   ADMINISTRATIVE PROCEDURE ACT .......................................... 7

STATEMENT OF FACTS ................................................................ 8

    I.    APHIS'S ROLE IN ASSISTING STATES WITH WILDLIFE CONTROL
        PROGRAMS ................................................................... 8

    II.   APHIS'S 1994/1997 PROGRAMMATIC EIS ................................ 8

    III.  PREDATOR DAMAGE MANAGEMENT IN NEVADA ...................... 11

    IV.  PROCEDURAL HISTORY ............................................................ 14

SUMMARY OF ARGUMENT ................................................................ 17

STANDARD OF REVIEW .................................................................... 19

ARGUMENT .................................................................................. 21

    I.    THE DISTRICT COURT DID NOT ERR WHEN IT HELD THAT WEG
        LACKED STANDING TO SUE ON ITS NEPA CLAIMS BECAUSE
        NEITHER OF WEG'S MEMBERS ESTABLISHED STANDING. ......... 21

A. Dr. Molde does not have standing to sue on any of WEG's claims because the relief sought is unlikely to redress Dr. Molde's alleged injuries............................ 22

    1. *WEG's requested relief will not redress Dr. Molde's alleged injuries because third parties not before the Court would continue wildlife damage management in Nevada.*...................................... 24

    2. *The relaxed redressability requirement applies to the agency's own NEPA procedure, but not to the actions of other parties.*....................................... 30

    3. *The district court did not err when it followed this Court's reasoning in* Goat Ranchers of Oregon v. Williams. ........................................... 33

    4. *WEG failed to allege facts showing a significant likelihood that Dr. Molde's alleged injuries would be redressed if NDOW conducted all PDM in Nevada.* ............................................ 35

B. Mr. Weurthner does not have standing because he failed to allege that APHIS's failure to supplement the PEIS caused him to suffer a concrete injury. .............. 44

II. CLAIMS ONE AND TWO SHOULD BE DISMISSED AS A MATTER OF LAW BECAUSE WEG FAILED TO PROPERLY STATE A CLAIM UNDER THE APA.................................................... 48

A. Claim One fails to assert a claim under APA Section 706(2) because WEG failed to challenge a discrete agency action................................................. 49

B. Claim Two fails to assert a claim under APA Section 706(1) because APHIS did not have a mandatory duty to supplement the PEIS................................................55

ii

III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED WEG'S MOTION FOR JURISDICTIONAL DISCOVERY. .... 63

CONCLUSION ........................................................................... 66

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**<u>CASES:</u>**

*Allen v. Wright*,
468 U.S. 737 (1984) ........................................................................ 44

*Americanus v. Wildlife Services*,
No. CV-03-1606-HU, 2004 WL 2127182 (D. Ore. Sept. 23, 2004) . 29

*Berardinelli v. Castle & Cooke, Inc.*,
587 F. 2d 37 (9th Cir. 1978) ........................................................... 63

*Broam v. Bogan*,
320 F.3d 1023 (9th Cir. 2003) ........................................................ 52

*Cantrell v. City of Long Beach*,
241 F.3d 674 (9th Cir. 2001) .......................................................... 44

*Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*,
710 F.3d 946 (9th Cir. 2013) .......................................................... 20

*Citizens for Better Forestry v. U.S. Dep't of Agric.*,
341 F.3d 961 (9th Cir. 2003) .......................................................... 33

*Clapper v. Amnesty Int'l USA*,
___ U.S. ___, 133 S. Ct. 1138 (2013) ........................................ 21, 39

*Cold Mountain v. Garber*,
375 F. 3d 884 (9th Cir. 2004) ......................................................... 58

*Ctr. for Biological Diversity v. Salazar*,
706 F.3d 1085 (9th Cir. 2013) .................................................... 58, 61

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ........................................................................ 44

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,
528 U.S. 167 (2000) .................................................................... 21, 22

*Fund for Animals v. Babbitt*,
    2 F. Supp. 2d 570 (D. Vt. 1997)......................................................29

*Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*,
    465 F.3d 1123 (9th Cir. 2006) .......................................................25

*Goat Ranchers of Oregon v. Williams*,
    379 Fed. App'x 662 (9th Cir. 2010) ...................17, 28, 29, 33, 34, 42

*Grynberg v. Ivanhoe Energy, Inc.*,
    490 Fed. App'x 86 (10th Cir. 2012) ................................................64

*Hall v. Norton*,
    266 F.3d 969 (9th Cir. 2001) ....................................................23, 45

*Idaho Sporting Congress, Inc. v. U.S. Forest Serv.*,
    92 F.3d 922 (9th Cir. 1996) ...........................................................20

*Laub v. U.S. Dep't of Interior*,
    342 F.3d 1080 (9th Cir. 2003) ........................................................30

*Levine v. Vilsack*,
    587 F.3d 986 (9th Cir. 2009) ..........................................................24

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .........................19, 20, 22, 24, 31, 34, 35, 36, 44

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) ......................................................7, 46, 52, 53

*Marsh v. Or. Natural Res. Council*,
    490 U.S. 360 (1989) ...................................................................6, 57

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ........................................................................21

*Nat'l Wildlife Fed'n. v. Cosgriffe*,
    21 F. Supp. 2d 1211 (D. Ore. 1998) ................................................53

*Neighbors of Cuddy Mountain v. Alexander*,
    303 F.3d 1059 (9th Cir. 2002) ........................................51

*Norton v. Southern Utah Wilderness Alliance* (*SUWA*),
    542 U.S. 55 (2004) ........................................7, 56, 57, 58, 59, 60, 61

*Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n*,
    457 F.3d 941 (9th Cir. 2006) ................................24, 31, 32

*Ocean Advocates v. U.S. Army Corps of Eng'rs*,
    402 F.3d 846 (9th Cir. 2005) ..........................................33

*Ohio Forestry Ass'n, Inc. v. Sierra Club*,
    523 U.S. 726 (1998) ......................................................52

*ONRC Action v. Bureau of Land Management*,
    150 F.3d 1132 (9th Cir. 1998) ..................................54, 55

*Rattlesnake Coalition v. U.S. E.P.A.*,
    509 F.3d 1095 (9th Cir. 2007)........................................36

*Renee v. Duncan*,
    686 F.3d 1002 (9th Cir. 2012) ......................................25

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ........................................................5

*Safe Air for Everyone v. Meyer*,
    373 F.3d 1035 (9th Cir. 2004)........................................19

*Salmon Spawning & Recovery Alliance v. Gutierrez*,
    545 F.3d 1220 (9th Cir. 2008) ......................................24

*San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*,
    819 F. Supp. 2d 1077 (E.D. Cal. 2011) ..........................31

*Simon v. E. Ky. Welfare Rights Org.*,
    426 U.S. 26 (1976) ........................................................34

*St. Clair v. City of Chico,*
880 F.2d 199 (9th Cir. 1989) ........................................20

*St. John's United Church of Christ v. F.A.A.,*
520 F.3d 460 (D.C. Cir. 2008) ..............................30, 31

*Town of Babylon v. Fed. Hous. Fin. Agency,*
699 F.3d 221 (2d Cir. 2012)...........................................24

*Tri-Valley CAREs v. U.S. Dep't of Energy,*
671 F.3d 1113 (9th Cir. 2012) .........................................7

*US Ecology, Inc. v. U.S. Dep't of Interior,*
231 F.3d 20 (D.C. Cir. 2000) ........................................39

*Utah v. Evans,*
536 U.S. 452 (2002) ...............................................25, 36

*W. Watersheds Project v. Kraayenbrink,*
632 F.3d 472 (9th Cir. 2011) .......................................33

*Wash. Envtl. Council v. Bellon,*
732 F.3d 1131 (9th Cir. 2013) .....................................24

*Wells Fargo & Co. v. Wells Fargo Exp. Co.,*
556 F.2d 406 (9th Cir. 1977) .......................................63

*White v. Lee,*
227 F.3d 1214 (9th Cir. 2000) .....................................19

*Wright v. Riveland,*
219 F.3d 905 (9th Cir. 2000) .......................................20

*Yesler Terrace Cmty. Council v. Cisneros,*
37 F.3d 442 (9th Cir. 1994) ....................................35, 36

**STATUTES:**

Administrative Procedure Act ("APA")

5 U.S.C. § 701 ......................................................... 2, 14

5 U.S.C. § 702 ............................................................ 7

5 U.S.C. § 706 ........................................................... 49

5 U.S.C. § 706(1) .............................. 7, 14, 18, 49, 55, 56, 62

5 U.S.C. § 706(2) ................................. 7, 49, 50, 55

5 U.S.C. § 706(2)(A), (D) ..................... 7, 14, 50, 62

Federal Inseccticide, Fungicide, and Rodenticide Act ("FIFRA")

7 U.S.C. § 136 *et seq.* ....................................... 38

Migratory Bird Treaty Act,

16 U.S.C. §§ 703–12 ....................................... 40

Wilderness Act,

16 U.S.C. § 1131 *et seq.* ................................ 14

National Environmental Policy Act ("NEPA")

42 U.S.C. § 4321 *et seq.* ................................ 3, 5

42 U.S.C. § 4332 ........................................... 56

42 U.S.C. § 4332(C) ...................................... 5, 6

7 U.S.C. § 426 ............................................................... 8

7 U.S.C. § 426c ............................................................. 8

7 U.S.C. §§ 426–426c ................................................... 8

28 U.S.C. § 1291 ........................................................... 2

28 U.S.C. § 1331 ........................................................... 2

28 U.S.C. § 1346(a)(2) ................................................. 2

28 U.S.C. § 2201 ........................................................... 2

Nev. Rev. Stat. §§ 501.181, 501.331, 503.595 ..................... 11, 26

# RULES AND REGULATIONS:

Fed. R. App. P. 32.1 ................................................................ 28

Fed. R. Civ. P. 12(b)(1) ................................................ 15, 19, 20
Fed. R. Civ. P. 12(b)(6) ................................................ 15, 20, 63

Fed. R. Evid. 201(b)(2) ........................................................ 40

7 C.F.R. § 371.6 ...................................................................... 8
7 C.F.R. § 371.11 .................................................................... 8
7 C.F.R. § 372.5 .................................................................... 59
7 C.F.R. § 372.5(a) ............................................................... 61
7 C.F.R. § 372.5(a)(2) ........................................................... 60
7 C.F.R. § 372.5(b)(1)(ii) ...................................................... 61

40 C.F.R. § 152.175 ............................................................. 38
40 C.F.R. § 1500.4 .................................................................. 6
40 C.F.R. § 1501.4(b) ............................................................. 6
40 C.F.R. § 1502.9(c)(1) ................................... 6, 49, 50, 56
40 C.F.R. § 1502.9(c)(2) ....................................................... 56
40 C.F.R. § 1502.20 ................................................................ 6
40 C.F.R. § 1508.9 .................................................................. 6

43 C.F.R. § 1601.0-2 (2003) ............................................... 58
43 C.F.R. § 1601.0-5(k) (2003) ........................................... 58
43 C.F.R. § 1601.0-6 (2003) ............................................... 58

46 Fed. Reg. 18026 (Mar. 23, 1981) .................................. 56

60 Fed. Reg. 13399 (Mar. 13, 1995) ................... 10, 47, 50, 59, 61

# INTRODUCTION

The Wildlife Services program of the U.S. Department of Agriculture, Animal and Plant Health Inspection Service ("APHIS"), among other duties, works at the behest of state and federal agencies to mitigate the impacts of predators on human health and safety, agriculture, property, and natural resources across the country. In Nevada, the Nevada Department of Wildlife ("NDOW") has primary responsibility for managing predators. At NDOW's request, APHIS works with Nevada state agencies to implement a predator damage management ("PDM") program.

Pursuant to the National Environmental Policy Act ("NEPA"), APHIS conducted an environmental assessment ("EA") for its PDM activities in Nevada. The EA references discussions found in a Programmatic Environmental Impact Statement ("PEIS") that APHIS completed in 1994 and revised in 1997.

Appellant WildEarth Guardians ("WEG") disagrees with the methods used in the Nevada PDM program. Rather than challenging a specific action in Nevada, however, WEG brought this broad, programmatic challenge to APHIS's nationwide PDM program. The

district court correctly dismissed WEG's NEPA claims for lack of standing, and this Court should affirm.

## JURISDICTIONAL STATEMENT

WEG invoked the district court's jurisdiction under 28 U.S.C. §§ 1331, 1346(a)(2), 2201, and 5 U.S.C. §§ 701 *et seq.* Compl. ¶¶ 8–10 (Appellant's Excerpts of Record ("ER") at 218). As explained in the Argument below, the district court correctly dismissed WEG's NEPA claims for lack of jurisdiction because WEG failed to demonstrate standing. *See* Order 3–11 (ER at 7–15). WEG voluntarily dismissed its remaining claim, *see* ECF No. 34, and the district court entered judgment dismissing the case on September 16, 2013, ER at 4. WEG filed a timely notice of appeal on September 17, 2013, ER at 1–2. This Court's jurisdiction rests on 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

In this case, WEG challenges a Programmatic EIS and site-specific EA that APHIS prepared under NEPA. The issues presented on appeal are:

1.  Did WEG meet its burden of showing that at least one of its members has standing to sue on each of WEG's claims?

2. Do WEG's challenges to the PEIS fail to assert cognizable claims under the APA because APHIS was not required to supplement the PEIS, and WEG did not challenge a discrete agency action?

3. Did the district court abuse its discretion when it denied WEG's motion for jurisdictional discovery because there were no material facts in dispute?

## STATEMENT OF THE CASE

In this case, WEG challenges two separate agency actions. First, it challenges a broad, policy-level Programmatic Environmental Impact Statement ("PEIS") that APHIS completed in 1994, and revised in 1997, which analyzes the environmental impacts of its nationwide wildlife damage management program. Second, WEG challenges APHIS's environmental analysis of its predator damage management ("PDM") activities in Nevada and subsequent finding of no significant impact ("FONSI"). APHIS issued the FONSI based on an Environmental Assessment ("EA") that studied the proposed Nevada PDM program and referenced the earlier, broader PEIS. Both of these arguments are based upon NEPA, 42 U.S.C. § 4321 *et seq.* *See* Compl. (ER at 214–39).

The district court granted APHIS's motion to dismiss four of WEG's five claims for lack of jurisdiction. Order 13–14 (ER at 17–18). In Claims One and Two, WEG alleges that APHIS violated NEPA by

failing to supplement its PEIS. Compl. ¶¶ 155–69 (ER at 246–48). The district court dismissed these claims for lack of standing, holding that WEG's members failed to assert concrete injuries with a sufficient geographical nexus to APHIS's nationwide PEIS. Order 6–7 & n.2 (ER at 10–11).

In Claims Three and Four, WEG claims that APHIS's 2011 EA for its Nevada PDM program is inadequate under NEPA, and that APHIS must prepare a full EIS for its Nevada program. Compl. ¶¶ 170–80, 183–86 (ER at 248–50). The Court also dismissed these claims for lack of standing, finding that vacating the EA would not redress WEG's claimed injuries, because Nevada state agencies had pledged to continue the PDM activities described in the EA. Order 7–11 (ER at 11–15).

WEG asserted a fifth claim under the Wilderness Act, challenging APHIS's aerial hunting practices. Compl. ¶ 188 (ER at 250). The district court denied APHIS's Motion to Dismiss with respect to this Wilderness Act claim. Order 11–13 (ER at 15–18). However, WEG voluntarily dismissed that claim, ECF No. 34, and it is not at issue on appeal.

Finally, WEG sought discovery from APHIS of facts that WEG hoped would establish the court's jurisdiction. In the same order dismissing WEG's NEPA claims, the district court denied that motion, and WEG appeals that ruling here.

## LEGAL FRAMEWORK

### I. NATIONAL ENVIRONMENTAL POLICY ACT

The National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, is a purely procedural statute that serves the dual purpose of informing agency decisionmakers of the environmental effects of proposed major federal actions and ensuring that relevant information is made available to the public. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349, 351 (1989). NEPA requires a federal agency proposing a "major Federal action[] significantly affecting the quality of the human environment" to prepare an Environmental Impact Statement ("EIS") analyzing the potential impacts of the proposed action and possible alternatives. 42 U.S.C. § 4332(C).

Pursuant to NEPA's implementing regulations, an agency may prepare an Environmental Assessment ("EA") to determine whether a proposed action may significantly affect the quality of the environment

such that a detailed EIS is required. *See* 40 C.F.R. §§ 1501.4(b), 1508.9.

An EA is a "concise public document" that "[b]riefly provide[s] sufficient

evidence and analysis for determining whether to prepare an [EIS] or a

finding of no significant impact [('FONSI')]." *Id.* § 1508.9. If an agency

finds that its action will have no significant impact, it need not prepare

an EIS. *See* 42 U.S.C. § 4332(C). Agencies are encouraged to

incorporate by reference or summarize discussions from broad,

programmatic NEPA documents in related site-specific analyses. *See*

40 C.F.R. §§ 1500.4, 1502.20.

NEPA implementing regulations require preparation of a

supplemental EIS if "[t]here are significant new circumstances or

information relevant to environmental concerns and bearing on the

proposed action or its impacts." *Id.* § 1502.9(c)(1). However, an agency

"need not supplement an EIS every time new information comes to

light," because "[t]o require otherwise would render agency

decisionmaking intractable, always awaiting updated information only

to find the new information outdated by the time a decision is made."

*Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 373 (1989). Instead,

an agency must supplement only where the new information shows "a

seriously different picture of the likely environmental harms stemming from the proposed project." *Tri-Valley CAREs v. U.S. Dep't of Energy*, 671 F.3d 1113, 1130 (9th Cir. 2012).

## II.  ADMINISTRATIVE PROCEDURE ACT

Because NEPA does not provide an independent cause of action, NEPA challenges must be brought under the Administrative Procedure Act ("APA").  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882–83 (1990).  APA § 702 provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  Under section 706(1), a plaintiff may seek to compel a discrete agency action that has been "unlawfully withheld or unreasonably delayed."  *Id.* § 706(1); *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 66 (2004).  Section 706(2) requires a reviewing court to invalidate final agency actions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "without observance of procedure required by law."  5 U.S.C. § 706(2)(A), (D).

# STATEMENT OF FACTS

## I. APHIS's ROLE IN ASSISTING STATES WITH WILDLIFE CONTROL PROGRAMS

The United States Department of Agriculture ("USDA") is authorized to protect the nation's agricultural resources from damage associated with predatory wildlife. *See, e.g.*, 7 U.S.C. §§ 426–426c. To that end, the Wildlife Services program of USDA's Animal and Plant Health Inspection Service ("APHIS") is charged with carrying out wildlife control programs. *See* 7 C.F.R. §§ 371.6, 371.11.

Throughout the country, APHIS "strives to manage the damage caused by wildlife by providing environmentally balanced wildlife damage management services that are safe, effective, and practical." PEIS Summary 1 (ER at 44). Pursuant to Memoranda of Understanding and other agreements, APHIS cooperates with states, local jurisdictions, individuals, organizations, institutions, and public and private agencies in funding and carrying out wildlife programs. *See* 7 U.S.C. §§ 426, 426c; *see also* EA 1 (ER at 68).

## II. APHIS's 1994/1997 PROGRAMMATIC EIS

In 1994, APHIS prepared a Programmatic EIS that could serve as a reference for local decisionmakers assessing the environmental

impact of predator damage management. APHIS's Animal Damage Control program (now Wildlife Services) issued its Final PEIS in 1994, and revised it to make technical corrections in 1997. *See* PEIS (ER at 39). As a programmatic guide, the PEIS is purposefully broad in scope and "addresses the entire APHIS [animal damage control] program, including its various functions, methods of operation, and locations throughout the Nation." PEIS Summary 1 (ER at 44). The PEIS does not establish a specific program for wildlife damage management, but identifies 13 alternative approaches to PDM and provides a detailed analysis for the five most viable alternatives. PEIS Summary 2 (ER at 45). It also provides an extensive discussion of the history of federal wildlife damage control and the NEPA documentation process. *See* PEIS Readers Guide (ER at 41–42).

In addition to the lengthy historical and programmatic descriptions, the PEIS explicitly contemplates the necessity of future, site-specific NEPA documentation. In numerous places, the PEIS notes its deference to site-specific factors, such as natural resources of specific concern, economic considerations, and physical environments. PEIS Summary 5–6 (ER at 48–49). Most importantly, rather than selecting

one of the five alternatives examined in detail in the PEIS for implementation nationwide, APHIS's Record of Decision ("ROD") suggests that the PEIS serve as a reference for local decisionmakers when carrying out environmental studies of their own animal damage control activities:

> Since this final EIS is programmatic in nature and national in scope, a single alternative as the sole, all-encompassing focus of the ADC program may not adequately cover all wildlife damage problems and situations. Therefore, my decision is to send forward to regional and local decisionmakers the viable alternatives discussed in the final EIS for consideration as management approaches, when appropriate, practical, and reasonable, in preparation of local and site-specific documents and actions. This approach provides a complete range of wildlife damage control strategies available as part of an overall integrated management approach. Application of appropriate methods will be determined following the processes defined in the ADC decision model [(ER at 98)] and completion of local analyses subject to the NEPA process.

Animal Damage Control Program, Record of Decision Based on Final Environmental Impact Statement, 60 Fed. Reg. 13399, 13400 (Mar. 13, 1995). Therefore, the PEIS itself does not authorize or implement any PDM programs at the action level. Instead, it contemplates that additional NEPA analysis will be done for specific projects, referencing the broader analysis of the PEIS where appropriate.

## III.  PREDATOR DAMAGE MANAGEMENT IN NEVADA

In Nevada, primary responsibility for managing most wildlife species rests with the Nevada Board of Wildlife Commissioners and the Nevada Department of Wildlife ("NDOW").  EA 83, C-163 (ER at 150, 213); *see also* Nev. Rev. Stat. §§ 501.181, 501.331, 503.595.  To discharge this duty, NDOW uses the Nevada Wildlife Services Program ("NWSP"), a joint federal-state program operated by APHIS and the Nevada Department of Agriculture's ("NDOA") Division of Resource Protection ("NDRP").  EA 32 (ER at 99).  Although APHIS provides resources and expertise to NWSP, APHIS and NDRP remain distinct entities.  Additionally, a 2010 letter from NDOW Director Kenneth Mayer unequivocally asserts: "Without WS [(APHIS's Wildlife Services program)] participation, NDOW would, by statu[t]e, carry out the management of wildlife with existing personnel or contract the work to other capable entities."  EA C-163 (ER at 213).

NWSP has conducted predator damage management ("PDM") activities in Nevada for more than 80 years, and its activities and methods continue to evolve "to reflect societal values and minimize impacts on people, wildlife, and the environment."  EA 2 (ER at 69).

APHIS has issued several Environmental Assessments to study the impacts of the PDM activities that it carries out in Nevada as part of NWSP, including an EA in 1999, an amendment to that EA in 2004, and the 2011 EA that is challenged here.  EA 28 (ER at 95).  The proposed action analyzed in the 2011 EA was "a continuation of NWSP's current predator damage management (PDM) program in the State of Nevada … with a greater emphasis on protection of game species" such as sage grouse, bighorn sheep, pronghorn antelope, elk, and mule deer. 2011 FONSI & Decision,[1] at 1; *see also* EA 41 (ER at 108).

The 2011 Nevada EA contains over 130 pages of site-specific analysis of the environmental effects of PDM.  Within that analysis, the EA incorporates by reference some of the statements and discussions in APHIS's PEIS.  *See* EA 27 (ER at 94).  These references to the PEIS do not replace any site-specific analyses, and are often discussed in conjunction with more recent literature.  *See, e.g.*, EA 39 (ER at 106) (referencing the issues identified in the PEIS as potential

_____

[1] Finding of No Significant Impact and Decision for Predator Damage Management in Nevada (June 22, 2011), *available at* http://www.aphis.usda.gov/regulations/pdfs/nepa/Signed_FONSI_June_2011.pdf (last visited Dec. 18, 2013).

environmental impacts before analyzing each issue in detail in the EA). The portions of the PEIS most often cited in the EA reference nationwide policies and effects. For example, the PEIS set forth a decision model to be used in the field when responding to requests for assistance. EA 30–31, 45, 61 (ER at 97–98, 112, 128). The EA also relied on PEIS Appendix P—a 297-page study of the risks associated with each of APHIS's wildlife damage control methods—to conclude that NWSP's PDM methods would have negligible impacts on the environment and present a low risk of hazards to the public. EA 36, 60, 105–06, 123 (ER at 103, 127, 172–73, 190).

NWSP uses a variety of lethal and nonlethal methods to conduct PDM for "the protection of livestock, crops, property, human health and safety, and natural resources, with a greater emphasis on protection of game species." EA 3 (ER at 70). When using lethal methods, NWSP's take is monitored and reported to other federal and state agencies. EA 52, 58 (ER at 119, 125). The lethal methods that NWSP is authorized to use include neck snares, firearms, aerial hunting, M-44s (sodium cyanide ejector mechanisms), gas cartridges, and DRC-1339 (avian toxicant). EA 48 (ER at 115). To protect the public and domestic

animals, NWSP conducts PDM away from populated areas and also provides "[c]onspicuous, bilingual warning signs alerting people to the presence of traps, snares and M-44s." EA 60–61 (ER at 127–28).

## IV. PROCEDURAL HISTORY

WEG filed suit against APHIS on April 30, 2012. *See* Compl. (ER at 214–52). WEG sought injunctive and declarative relief for four claims alleging violations of NEPA and one claim under the Wilderness Act, 16 U.S.C. § 1131 *et seq*. Compl. ¶¶ 155–88 (ER at 246–52). Claims One and Two allege, respectively, that APHIS's failure to supplement its PEIS is (1) arbitrary, capricious, an abuse of discretion, not in accordance with law, or without observance of procedures required by law, 5 U.S.C. § 706(2)(A), (D); and (2) an agency action unlawfully withheld or unreasonably delayed, *id.* § 706(1). Compl. ¶¶ 163, 169 (ER at 247–48). Claim Three contends that the Nevada EA is inadequate under NEPA, and Claim Four alleges that the EA's FONSI determination was arbitrary and capricious, or without observance of procedures required by law, 5 U.S.C. § 706(2)(A), (D). Compl. ¶¶ 180, 184 (ER at 249–50). WEG's fifth claim argued that NWSP's aerial hunting practices violate the Wilderness Act. Compl. ¶ 188 (ER at 250).

APHIS moved to dismiss these claims on various grounds, including that WEG's complaint should be dismissed under Fed. R. Civ. P. 12(b)(1) because it failed to allege a redressable, concrete harm to at least one of its members. ECF No. 12, at 10–17. WEG responded with declarations from two of its members, Dr. Don Molde and George Weurthner, asserting various aesthetic and recreational injuries allegedly caused by APHIS's NEPA violations. *See* ER at 21–37.

Alternatively, APHIS asserted that Claims One and Two should be dismissed under Rule 12(b)(6) because WEG did not allege a cognizable APA claim for failure to supplement the PEIS. ECF No. 12, at 17–23. APHIS also argued that the Wilderness Act claim should be dismissed under Rule 12(b)(6). *Id.* at 23–24.

After APHIS's motion to dismiss was fully briefed—and nearly seven months after filing the complaint—WEG filed a motion for leave to conduct jurisdictional discovery. *See* ECF No. 27. WEG requested the opportunity to conduct discovery if the district court did one of three things: (1) converted APHIS's motion to dismiss into a motion for summary judgment, (2) determined that it needed more facts to rule on the motion to dismiss, or (3) granted the motion to dismiss with leave to

amend the complaint. ECF No. 27, at 1–2. WEG did not ask the court to permit discovery before the court ruled on the motion to dismiss, conceding that the court "must take further action on [APHIS]'s Motion to Dismiss *before* discovery may proceed." *Id.* at 5 (emphasis added).

The district court did not do any of the three things that WEG identified as a basis for discovery, and instead granted APHIS's motion to dismiss WEG's NEPA claims for lack of standing. Order 13 (ER at 17). In the same order, the court denied WEG's request for discovery. *Id.* (ER at 17). The court held Dr. Molde and Mr. Weurthner alleged injuries without a sufficient geographical nexus to APHIS's PDM activities, and therefore lacked standing to challenge the PEIS in Claims One and Two. *Id.* at 6–7 & n.2 (ER at 10–11). Additionally, the court found that it could not grant relief under Claims Three and Four to redress WEG's injuries because, even if the court enjoined APHIS or invalidated the PEIS and Nevada EA and Decision, NDOW had pledged to continue PDM activities in Nevada. *Id.* at 7–11 (ER at 11–15). To appeal these rulings, WEG moved to amend its complaint to dismiss the remaining Wilderness Act claim, *see* ECF No. 34.

## SUMMARY OF ARGUMENT

In this case, WEG chose to assert a broad challenge to APHIS's wildlife damage control activities in Nevada and across the country. In doing so, WEG makes sweeping allegations paired with unfocused arguments that constitute improper APA challenges and fail to establish standing. The district court therefore correctly dismissed WEG's NEPA claims.

To sue as an organization, WEG must demonstrate that at least one of its members has standing to bring the asserted claims. Neither of the WEG members who submitted declarations in this case can establish standing. Dr. Molde cannot show that his Nevada-specific injuries are redressable because NDOW has unequivocally expressed its intention to carry out predator damage management activities in Nevada regardless of APHIS's participation. APHIS asks that the Court follow its previous ruling in *Goat Ranchers of Oregon v. Williams*, 379 Fed. App'x 662, 664 (9th Cir. 2010), which found no redressability where the state said it would remove cougars with or without APHIS's assistance. Similarly, in this case, even if the Court granted WEG the requested injunctive or declarative relief, NDOW's PDM activities

would continue to allegedly harm Dr. Molde's aesthetic and recreational pursuits in Nevada.

Furthermore, Mr. Weurthner's declaration does not show that he has standing to challenge APHIS's PEIS to enjoin its nationwide wildlife damage management program. Mr. Weurthner cannot demonstrate a reasonable probability that his alleged injuries were caused by APHIS's failure to supplement its PEIS. Because neither Dr. Molde nor Mr. Weurthner has standing to bring WEG's claims, the Court should affirm the district court's dismissal for lack of jurisdiction.

Even if WEG has sufficiently demonstrated standing, this Court could affirm the district court's dismissal of Claims One and Two for failure to allege a cognizable challenge to the PEIS under the APA. Rather than challenging a discrete agency action that APHIS took under the PEIS, Claim One makes sweeping allegations of programmatic NEPA violations. And Claim Two seeks to compel agency action under 5 U.S.C. § 706(1), but APHIS has no duty to supplement the PEIS because no major federal action remains. Claims One and Two should therefore be dismissed as a matter of law for failure to state a claim.

Finally, this Court should affirm the district court's denial of
WEG's motion for jurisdictional discovery. WEG did not ask the court
to permit discovery before ruling on APHIS's Motion to Dismiss; and,
even if WEG had so requested, WEG it is unlikely that discovery would
have uncovered any facts to establish standing.

## STANDARD OF REVIEW

The district court granted APHIS's Motion to Dismiss WEG's
NEPA claims under Fed. R. Civ. P. 12(b)(1) for lack of subject-matter
jurisdiction. Order 13 (ER at 17). This Court reviews *de novo* an order
of dismissal under Rule 12(b)(1). *White v. Lee*, 227 F.3d 1214, 1242 (9th
Cir. 2000). APHIS asserted a factual attack under Rule 12(b)(1),
contesting "the truth of the allegations that, by themselves, would
otherwise invoke federal jurisdiction." *Safe Air for Everyone v. Meyer*,
373 F.3d 1035, 1039 (9th Cir. 2004). Generally, "[a]t the pleading stage,
general factual allegations of injury resulting from defendant's conduct
may suffice." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).
But in a Rule 12(b)(1) factual attack, "[t]he court need not presume the
truthfulness of the plaintiff's allegations." *Safe Air*, 373 F.3d at 1039
(citing *White*, 227 F.3d at 1242). Instead, the party asserting

jurisdiction bears the burden of establishing that the court indeed possesses subject matter jurisdiction. *Defenders of Wildlife*, 504 U.S. at 561; *St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989).

APHIS also renews its alternative argument that Claims One and Two must be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a cognizable claim under the APA. *See* ECF No. 12, at 17–23. Although the district court declined to rule on those arguments, APHIS renews them here as alternate grounds on which this Court could affirm the dismissal of those claims. *See Wright v. Riveland*, 219 F.3d 905, 912 (9th Cir. 2000). This Court reviews *de novo* a dismissal under Rule 12(b)(6). *See Idaho Sporting Congress, Inc. v. U.S. Forest Serv.*, 92 F.3d 922, 925 (9th Cir. 1996). Dismissal under Rule 12(b)(6) is proper when the complaint, viewed in the light most favorable to the nonmovant, "does not make out a cognizable legal theory or does not allege sufficient facts to support a cognizable legal theory." *Chubb Custom Ins. Co. v. Space Systems/Loral, Inc.*, 710 F.3d 946, 956 (9th Cir. 2013).

# ARGUMENT

## I. THE DISTRICT COURT DID NOT ERR WHEN IT HELD THAT WEG LACKED STANDING TO SUE ON ITS NEPA CLAIMS BECAUSE NEITHER OF WEG'S MEMBERS ESTABLISHED STANDING.

The district court correctly held that it lacked subject matter jurisdiction over WEG's claims because WEG did not have constitutional standing to challenge APHIS's NEPA documentation. *See* Order 5–11, 13 (ER at 9–15, 17). To establish a justiciable case or controversy under Article III of the Constitution, WEG must show that it suffered an injury-in-fact that is both fairly traceable to the challenged agency action and likely to be redressed by a favorable decision from the court. *See Clapper v. Amnesty Int'l USA*, ___ U.S. ___, 133 S. Ct. 1138, 1147 (2013) (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010)). As an organization, WEG must demonstrate this standing by showing that at least one of its members would have standing to sue on his or her own.[2] *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000).

_____

[2] Organizational standing also requires that the interests at stake in the litigation are germane to the organization's purpose and that the litigation does not require the organization's members to participate as individuals. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*,

(Footnote continued on next page.)

In practice, therefore, WEG must show that either Dr. Molde's or Mr. Weurthner's declaration alleges sufficient facts to support each element of constitutional standing: injury-in-fact, causation, and redressability. But both declarations fail on at least one standing prong. Dr. Molde alleges Nevada-specific injuries that the courts cannot remedy because NDOW has unequivocally asserted its intention to continue the PDM activities causing those injuries. And Mr. Weurthner did not allege that he suffered concrete harms caused by APHIS's failure to supplement its PEIS. Because neither member has standing, WEG also lacks standing to sue and this Court should affirm the district court's dismissal for lack of jurisdiction.

### A. Dr. Molde does not have standing to sue on any of WEG's claims because the relief sought is unlikely to redress Dr. Molde's alleged injuries.

To establish standing, Dr. Molde must show that it is "likely, as opposed to merely speculative, that [his] injur[ies] will be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citation and quotation marks omitted). In his declaration, Dr.

(Footnoted continued from previous page.)
528 U.S. 167, 181 (2000). APHIS does not contest these elements—this case turns on whether Dr. Molde and Mr. Weurthner have standing.

Molde makes allegations specific to his recreational experiences in Nevada, claiming that NWSP's PDM activities cause him injury in the form of (1) fewer opportunities to view coyotes in specific areas in Nevada, Molde Decl. ¶¶ 8, 21, 22, 23 (ER at 22–23, 27–28); (2) concern about the safety of his dog due to the presence of traps and M-44s in the Humboldt-Toiyabe National Forest, Gold Creek Guard Station, and Lemmon Valley water treatment plant area, *id.* ¶¶ 14, 17 (ER at 24–25); and (3) fewer opportunities to see ravens when driving in Nevada, *id.* ¶¶ 18, 20, 22, 23 (ER at 26–28).

The district court correctly held that these injuries are not redressable. Order 7–13 (ER at 11–17).[3] The court found that injuries from NWSP's PDM activities would not be redressed if the court ordered APHIS to remedy its alleged NEPA violations because NDOW

---

[3] The district court separated its analysis by claim rather than declaration and held that Claims Three and Four, which challenged the Nevada EA, were not redressable. Order 7–13 (ER at 11–17). Because the district court found that neither Dr. Molde nor Mr. Weurthner demonstrated injuries-in-fact for Claims One and Two, *see id.* 5–7 & n.2 (ER at 9–11), the court did not include those claims in its redressability analysis. But this Court reviews jurisdictional issues *de novo*, *Hall v. Norton*, 266 F.3d 969, 974–75 (9th Cir. 2001), and may consider whether Dr. Molde established redressability for any of WEG's claims for relief.

would conduct PDM in Nevada regardless of APHIS's involvement.  *Id.*

at 8–9 (ER at 12–13).  This holding was correct.

>    1.    <u>*WEG's requested relief will not redress Dr. Molde's alleged injuries because third parties not before the Court would continue wildlife damage management in Nevada.*</u>

Dr. Molde's injuries from NWSP's PDM activities are not

redressable because NDOW unequivocally expressed its intention to

carry out wildlife management activities in NWSP's absence.  EA C-163

(ER at 213).  This Court and others have repeatedly held that there is

no redressability where a nonparty could still engage in the offending

action, regardless of the outcome of the litigation.  *See, e.g.*, *Defenders of*

*Wildlife*, 504 U.S. at 562; *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131,

1144–47 (9th Cir. 2013); *Town of Babylon v. Fed. Hous. Fin. Agency*,

699 F.3d 221, 228–30 (2d Cir. 2012); *Levine v. Vilsack*, 587 F.3d 986,

994 (9th Cir. 2009); *Salmon Spawning & Recovery Alliance v. Gutierrez*,

545 F.3d 1220, 1226–29 (9th Cir. 2008).  "Redressability depends on

whether the court has the ability to remedy the alleged harm."  *Nuclear*

*Info. & Res. Serv. v. Nuclear Regulatory Comm'n*, 457 F.3d 941, 955 (9th

Cir. 2006).  The court cannot fashion relief when "any prospective

benefits depend on an independent actor who retains broad and

legitimate discretion the courts cannot presume either to control or to predict." *Glanton ex rel. ALCOA Prescription Drug Plan v. AdvancePCS Inc.*, 465 F.3d 1123, 1125 (9th Cir. 2006) (citation and quotation marks omitted). In that situation, a litigant can establish redressability only by showing a significant likelihood that the third party would also refrain from causing injury. *See, e.g.*, *Renee v. Duncan*, 686 F.3d 1002, 1013 (9th Cir. 2012) (quoting *Utah v. Evans*, 536 U.S. 452, 464 (2002)).

In this case, Dr. Molde asserts that NWSP's PDM activities in Nevada caused him to suffer less enjoyment from viewing fewer coyotes and ravens, reduced recreational enjoyment due to the presence of traps and M-44s, and concern that APHIS overlooked serious environmental impacts. (App.Br.[4] 31–32, 48–50). WEG seeks relief in the form of an order enjoining NWSP from conducting PDM or declaring the PEIS and Nevada EA and Decision invalid under NEPA—either of which would have the practical effect of halting APHIS's PDM activity in Nevada until it further analyzed that activity under NEPA. But an injunction

---

[4] The abbreviation "App.Br." refers to Appellant WEG's Opening Brief. The amicus brief from the Environmental Law Professors is designated "Profs.Br.," and the amicus brief authored by the Natural Resources Defense Council is abbreviated as "Envtl.Grps.Br."

against APHIS would not necessarily stop Nevada. To establish redressability, WEG would also have to show that the court's relief, by limiting APHIS's actions, would likely prevent Nevada from conducting PDM. The facts in the record suggest otherwise.

APHIS does not bear primary responsibility for wildlife damage management in Nevada; APHIS participates in PDM in Nevada at NDOW's invitation. *See* EA 2–3, C-163 (ER at 69–70, 213). The State of Nevada does not require APHIS's approval or statutory authority to manage its own wildlife. *See* Nev. Rev. Stat. §§ 501.181, 501.331. And regardless of government involvement, individuals may take action against livestock predation. *See, e.g.*, EA 71 (ER at 138) ("Private coyote take may legally occur at any time in Nevada."). Therefore, even if the court could order APHIS to cease its PDM activities in Nevada by either issuing an injunction or declaring the NEPA documents invalid, state agencies and private individuals would be free to engage in wildlife damage management. *See* EA 48 (ER at 115) (discussing the "no federal NWSP PDM" alternative and predicting that "wildlife damage conflicts would be addressed by NDOW, private resource owners and managers, private contractors, or other government

agencies"); EA 115 (ER at 182) (noting that even without APHIS, the NDRP personnel in NWSP "would probably still provide some level of professional direct control assistance with PDM").

More importantly, APHIS provided affirmative evidence that these third parties not only could, but *would* continue PDM activities in Nevada without APHIS's participation. Included in the Nevada EA is a letter from NDOW's Director, which states unequivocally:

> NDOW is responsible by State statute (NRS 503.595) for controlling wildlife causing damage to personal property or endangering personal safety. A protocol established by NDOW and approved by the Board of Wildlife Commissioners sets forth policies and procedures to be followed in controlling and preventing wildlife damage and addressing public safety issues. In carrying out these policies where wildlife/human interactions are involved, NDOW has the discretion to choose the most applicable management action, following guidelines outlined within the policy.
>
> In order to comply with this responsibility, NDOW utilizes USDA-APHIS-Wildlife Services (WS) to control offending wildlife which are causing, or about to cause, damage to livestock, wildlife resources, agricultural crops, or personal property and to protect the public from dangerous animals when it is warranted and authorized by Nevada Administrative Code . . . .
>
> *Without WS participation, NDOW would, by statu[t]e, carry out the management of wildlife with existing personnel or contract the work to other capable entities.*

EA C-163 (ER at 213) (emphasis added). NDOW's letter makes clear that, regardless of the outcome in this case, the State of Nevada will continue the PDM activities allegedly causing Dr. Molde aesthetic and recreational injuries. WEG therefore lacks standing because any relief it might obtain in the case will not redress these underlying injuries.

When presented with similar facts, this Court found, in an unpublished opinion,[5] that the plaintiffs failed to demonstrate redressability. The plaintiffs in *Goat Ranchers of Oregon v. Williams*, 379 Fed. App'x 662 (9th Cir. 2010), challenged APHIS's NEPA analysis for taking cougars under Oregon's state cougar management plan. *Goat Ranchers*, 378 Fed. App'x at 663. Highlighting the fact that APHIS was acting at the behest of the state, this Court noted: "Oregon does not need federal approval to manage the cougars within its borders, … and is free to continue (as it indicated it will) the trapping and killing of cougars regardless of any relief available to appellants in this case." *Id.* This Court found that the claims were not redressable because the

---

[5] Although they are not precedential, Ninth Circuit Rule 36-3 permits citation to unpublished decisions. *See also* Fed. R. App. P. 32.1. In this case, the district court explained that it cited *Goat Ranchers* "not for its precedential value, but because it finds the Ninth Circuit's reasoning on a case with similar facts and law persuasive." Order 8 n.4 (ER at 12).

plaintiffs "made no showing that whatever small probability they have of seeing a cougar in the wild will be reduced materially if the state does all rather than some of the cullings." *Id.* at 664; *see also Fund for Animals v. Babbitt*, 2 F. Supp. 2d 570, 575 (D. Vt. 1997) (finding no redressability for alleged NEPA violations where "absent the federal funding at issue, the state is authorized to continue, and will continue, to conduct the moose hunt"); *Americanus v. Wildlife Services*, No. CV-03-1606-HU, 2004 WL 2127182, at *5–6 (D. Ore. Sept. 23, 2004) (finding that the court could not "redress the harm created by Wildlife Services killing depredating bears" because Oregon law permits landowners to kill depredating bears at will).

WEG's claims in this case exhibit the same constitutional shortcomings as *Goat Ranchers*. APHIS operates in Nevada as NWSP—a collaborative agency made up of both state and federal employees—and pursuant to an agreement with NDOW. Like the Oregon Department of Fish and Wildlife, NDOW has the authority and stated intention to continue PDM regardless of APHIS's participation. And, as discussed more fully in Part I.A.4, WEG cannot show that Dr. Molde's ability to see coyotes and ravens will be materially affected if

NDOW assumes APHIS's role in carrying out PDM in Nevada.

Therefore, as in *Goat Ranchers*, judicial relief cannot provide redress,

and WEG lacks standing.

<blockquote>

2. <u>*The relaxed redressability requirement applies to the agency's own NEPA procedure, but not to the actions of other parties.*</u>

</blockquote>

WEG and the amici contend that the district court failed to follow

the relaxed redressability requirement generally applicable in

procedural injury cases. App.Br. 35, 37–38; Envtl.Grps.Br. 10–13;

Profs.Br. 5–10. Under that standard, a plaintiff asserting the

inadequacy of an agency's environmental study need only prove that

further analysis *could*, rather than *would*, influence the agency's

decision. *See Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1087 (9th

Cir. 2003). The redressability requirement is relaxed because a court

cannot predict how an agency's decision could change upon further

NEPA analysis; it is enough that the agency *might* change its decision.

But the relaxed standard "applies only when a party challenging

an agency's procedural failure cannot 'establish with any certainty' that

the *agency* would reach a different decision." *St. John's United Church

of Christ v. F.A.A.*, 520 F.3d 460, 463 (D.C. Cir. 2008) (quoting

*Defenders of Wildlife*, 504 U.S. at 573 n.7). When the actions of a nonparty cause uncertainty about whether the court can grant relief, the agency's decision becomes immaterial. In such cases, the relaxed redressability standard is inapposite. *See id.*; *San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv.*, 819 F. Supp. 2d 1077, 1098 (E.D. Cal. 2011) (citing *Defenders of Wildlife*, 504 U.S. at 573 n.7).

For example, in *Nuclear Information and Resources Services v. Nuclear Regulatory Commission*, the plaintiffs brought a NEPA challenge against a rule change by the Nuclear Regulatory Commission ("NRC") regarding the transportation of radioactive material. 457 F.3d at 947–49. But the NRC and Department of Transportation co-regulate the transportation of radioactive material, and the Department of Transportation had adopted the same standard as NRC. *Id.* at 945, 948. This Court noted that the relaxed standard of redressability applies "[i]n most NEPA cases," but found "this [was] not the usual NEPA case" because "the DOT rule would control even if the NRC rule was wiped off the books." *Id.* at 955. There was no redressability, this Court explained, because "even if [the Court] were to set aside the current NRC rule and remand to NRC with instructions that it prepare

an EIS, nothing requires DOT to revisit its identical exemption standards." *Id.*

Like *Nuclear Information and Resources Services*, this case is not a normal NEPA challenge. Dr. Molde's redressability obstacle is uncertainty over what Nevada, not APHIS, might do if relief was granted. Even if APHIS were ordered to reconsider the PEIS and EA and ultimately selected a more limited alternative for APHIS's PDM activities in Nevada, that change would not redress Dr. Molde's alleged injuries. NDOW could continue the PDM practices that form the basis of Dr. Molde's alleged harm. The relaxed redressability requirement does not apply to NDOW, a nonparty. Instead, Dr. Molde must show a significant likelihood that, if the courts enjoined APHIS, Nevada would also refrain from causing him any injury. Because NDOW has stated affirmatively that it would continue PDM activities in Nevada without APHIS's participation, and WEG cannot contradict that stated intention, Dr. Molde has failed to establish redressability.

3.   *The district court did not err when it followed this Court's reasoning in* Goat Ranchers of Oregon v. Williams.

Despite the nearly-identical facts and legal issues presented in *Goat Ranchers of Oregon*, 379 Fed. App'x at 663–64, WEG argues that the district court erred in relying on that case. *See* App.Br. 36–40. WEG first contends that *Goat Ranchers* is "in direct conflict" with Ninth Circuit NEPA cases applying the relaxed standard of redressability. App.Br. 37–38. As previously explained, the relaxed redressability standard applies only when an agency might choose to stop the injurious action—it is inapposite when the injury may continue regardless of what the agency chooses. The cases WEG cites as contrary to *Goat Ranchers* are distinguishable because they did not involve anticipated nonparty action that threatened the plaintiffs' concrete interests regardless of the agencies' decisions. *See W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011); *Ocean Advocates v. U.S. Army Corps of Eng'rs*, 402 F.3d 846 (9th Cir. 2005); *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961 (9th Cir. 2003).

Second, WEG argues that *Goat Ranchers* should be distinguished on its facts because, unlike Oregon's Cougar Management Plan, NWSP takes thousands of coyotes and ravens in Nevada. App.Br. 39–40. But WEG does not explain why the number of species or the number of individual animals subject to management would be determinative of whether the court has jurisdiction. This Court's rationale in *Goat Ranchers* relied not on the number of cougars taken, but the well-established principle that Article III does not allow the federal courts to redress "injury that results from the independent action of some third party not before the court." *Goat Ranchers*, 379 Fed. App'x at 663–64 (citing *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 41–43 (1976)).

Finally, WEG opines that affirming the district court's rationale would "create[] a loophole that would shield a broad swath of federal agencies' NEPA decisions from judicial review." App.Br. 38; *see also* Envtl.Grps.Br. 1; Profs.Br. 18. That is not the case. It is axiomatic that the courts do not have jurisdiction over cases in which the only relief to be granted is meaningless. Recalling *Marbury v. Madison* and separation of powers, the Supreme Court in *Lujan v. Defenders of Wildlife* explained that the courts adjudicate *individual* rights;

"[v]indicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive."  504 U.S. at 576.  APHIS simply asks that the Court apply that constitutional principle here.  Courts could still examine any agency NEPA decision that is reasonably likely to have a concrete effect on a plaintiff's individual interests.  But unless WEG can connect the cessation of APHIS's participation in NWSP to Dr. Molde's alleged injuries in Nevada, this Court is without the power to compel APHIS to reconsider its NEPA analyses.

    4. <u>*WEG failed to allege facts showing a significant likelihood that Dr. Molde's alleged injuries would be redressed if NDOW conducted all PDM in Nevada.*</u>

  Because redressability in this case "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," the burden rests with WEG to affirmatively "adduce facts showing that those choices have been or will be made in such a manner as to … permit redressability of injury." *Defenders of Wildlife*, 504 U.S. at 562 (citation and quotation marks omitted); *see also Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442,

447 (9th Cir. 1994). Here, WEG must show that if the court granted the requested relief, Nevada would also likely stop any activity that threatens Dr. Molde's enjoyment of ravens and coyotes or causes concern about the presence of traps and M-44s. *See Utah v. Evans*, 536 U.S. 452, 464 (2002); *Rattlesnake Coalition v. U.S. E.P.A.*, 509 F.3d 1095, 1102–03 (9th Cir. 2007). WEG offers several arguments in an attempt to undermine NDOW's assertion that it would resume its wildlife damage management responsibilities, none of which rise above the level of mere speculation to show a genuine likelihood of redressability.

First, WEG argues that NDOW may not engage in PDM because "no evidence exists in the record" that Nevada has its own PDM plan, and because NDOW's statutory authority to control wildlife is discretionary. App.Br. 41–43. That argument is no more than an attempt to shift the burden of proof from WEG to the Government. Here, the record contains an unequivocal statement from NDOW that the State will continue to conduct wildlife damage management regardless of APHIS's participation. EA C-163 (ER at 213). WEG

cannot simply suggest that Nevada may choose not to exercise a statutory authority that Nevada has stated it will exercise.

Moreover, WEG misunderstands APHIS's role in Nevada. NDOW currently manages PDM in Nevada by "utiliz[ing]" APHIS as part of NWSP. EA C-163 (ER at 213). The fact that Nevada does not currently have a *solely* state-run, state-funded PDM plan in place is immaterial. NWSP has conducted PDM in Nevada for more than 80 years, and WEG has not alleged the existence of any facts that would show that the State could not develop a state-only plan if the need arose. For example, Nevada could simply hire a qualified firm to conduct PDM according to Nevada's instructions, as it suggested in its letter. Therefore, the fact that the excerpted record before the Court lacks information about a currently nonexistent, state-run PDM program does not increase the likelihood that WEG's members' injuries would be redressed.[6]

---

[6] WEG alleges that APHIS made an "unsupported statement" that NDOW currently has its own PDM plan. App.Br. 40–42. In its reply brief before the district court, APHIS wrote, "The Nevada Department of Wildlife has its own predator damage management plan for coyotes, mountain lions, and ravens, and simply employs NWSP to implement NDOW's plan for predator management." ER at 59–60. APHIS did not

(Footnote continued on next page.)

Second, WEG argues that Dr. Molde's alleged injuries would be redressed if APHIS conducted further analyses, "even if NDOW conducted PDM in the interim," because such analyses would ensure that no serious environmental impacts are overlooked and APHIS could eventually make a decision to change its PDM practices. App.Br. 31, 33–34. But these arguments assume that NDOW would defer to APHIS in the future. In fact, NDOW has primary responsibility for PDM in Nevada and may choose to continue the practices that WEG currently challenges. For example, WEG notes that APHIS "could decide to ban the use of traps or M-44s." App.Br. 33. But APHIS cannot ban such methods—it can only abandon them in its own actions. Other authorized parties, including states, could continue using them.[7] Even

(Footnoted continued from previous page.)
intend to represent that NDOW currently has a plan that is solely state-run and state-funded, but rather that NDOW exercises its authority to control and conduct predator damage management in Nevada by employing APHIS and acting collaboratively through NWSP.

[7] M-44 ejector units contain sodium cyanide, a restricted use pesticide under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. §§ 136 *et seq.* 40 C.F.R. § 152.175. Currently, NWSP uses M-44 cyanide capsules under APHIS supervision, as required under FIFRA. However, other states, including Montana, New Mexico, South Dakota, Texas, and Wyoming have obtained authorizations to use M-44s. Based on NDOW's representations, it is reasonable to conclude
(Footnote continued on next page.)

assuming under the relaxed redressability standard that APHIS would decide to alter its PDM practices, WEG has not shown that Dr. Molde's injuries would be redressed.

Third, WEG alleges that if APHIS "prepared an EIS for its Nevada activities … that analysis could cause the State to change its own strategies for managing coyotes and livestock losses." App.Br. 34 (footnote omitted). But "[c]ourts have been loath to find standing when redress depends largely on policy decisions yet to be made by government officials." *US Ecology, Inc. v. U.S. Dep't of Interior*, 231 F.3d 20, 24 (D.C. Cir. 2000); *see also Clapper*, 133 S. Ct. at 1150 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors."). Here, WEG's argument is not a theory of redressability so much as an aspiration that Nevada, a third party, will voluntarily adopt the decision that WEG hopes APHIS will reach if a court orders further NEPA analyses.

---

(Footnoted continued from previous page.)
that, if this Court restricted APHIS's PDM activities in Nevada, NDOW would obtain the necessary authorizations to use M-44s.

Fourth, WEG mistakenly argues that NDOW is not allowed to take ravens under the Migratory Bird Treaty Act, 16 U.S.C. §§ 703–12. App.Br. 44. In fact, NDOW has a permit from U.S. Fish & Wildlife Service ("FWS") to take up to 2,500 common ravens for the protection of sage grouse and other game. 2013 FWS Permit (9th Cir. Dkt. No. 31, Ex. 1).[8] NDOW is listed as the permittee, and APHIS operates under NDOW's permit as a subpermittee. *See id.* (9th Cir. Dkt. No. 31, Ex. 1). NDOW's current permit expires on February 28, 2014, but can be, and consistently has been, renewed.

Fifth, WEG opines that NDOW's inability to use DRC-1339 avicide absent federal supervision would result in less raven take and thus make NDOW's exercise of Nevada PDM less likely to harm Dr.

---

[8] In its opening brief to this Court, WEG asserts: "[T]here is *no evidence* in the record that NDOW is authorized to manage raven populations by virtue of its Migratory Bird Depredation Permit from [FWS] . . . . This was a statement made by [APHIS] in its reply brief, which was wholly unsupported by any evidence, and to which [WEG] had no opportunity to respond." App.Br. 44. In fact, WEG first questioned Nevada's ability to take ravens in its response to APHIS's motion to dismiss. *See* ECF No. 25, at 18–19. APHIS's reply brief simply countered WEG's arguments. *See* ECF No. 26, at 5 (ER at 20). To halt further speculation about the existence or contents of the permit, APHIS has requested that the Court take judicial notice of the permit. *See* 9th Cir. Dkt. No. 31.

Molde's enjoyment of ravens. App.Br. 31, 35–36, 43–44. WEG correctly cites the Nevada EA as predicting that, in a no-federal activity alternative, "raven take would be likely to decrease substantially because the primary proposed means of removing ravens is with DRC-1339, a toxicant registered exclusively for use by federal Wildlife Services employees or individuals under their supervision." EA 114 (ER at 181). Nevertheless, the number of birds NDOW is allowed to take is determined by its FWS permit, and the authorized take would not change if NDOW used other methods or conducted its program without APHIS assistance. For example, NDOW's FWS permit also authorizes various shooting methods. 2013 FWS Permit (9th Cir. Dkt. No. 31, Ex. 1). Although these methods may be "more time consuming and expensive to implement," EA 115 (ER at 182), NDOW has stated its intent to continue its PDM program and could contract those services out to appropriate agencies or firms. EA C-163 (ER at 213). It is therefore impossible to know for certain whether NDOW, acting without federal assistance, would take as many ravens as NWSP.

Additionally, even if NDOW's take of ravens declined without APHIS participation, that does not mean Dr. Molde's injury would

necessarily be redressed. APHIS estimates that Nevada's raven population exceeds 100,000 birds and is growing at an increasing rate. EA 77 (ER at 144). The 2,500 ravens NDOW is authorized to take under its permit therefore represent less than 2.5% of Nevada's raven population. Given this small number, any change in the number of birds actually taken would be imperceptible compared to the State's total population. As this Court noted in *Goat Ranchers*, 379 Fed. App'x at 664, it is therefore unlikely that any potential difference in the actual amount of take would materially affect Dr. Molde's ability to see ravens from Nevada's roadways.

Finally, WEG argues that Nevada's budget deficit makes it significantly unlikely that State would be able to shoulder APHIS's portion of the PDM funding. Dr. Molde's declaration alleges that a newspaper article reported that Nevada was facing an estimated $2.7 billion budget deficit. Molde Decl. ¶ 29 (ER at 30). But in fiscal year 2010, NWSP received only $1,530,024 from the federal government. *See id.* ¶ 28 (ER at 29). By comparison, in the 2010-2011 biennium, Nevada's legislature approved a budget of $6.548 billion and

provided NDOW with $103.7 million in funding.[9]  How Nevada handles

its state budget deficit is a matter beyond the scope of this case and

subject to many other factors that the Court cannot predict.  The fact

that Nevada has a large budget deficit is not enough to carry WEG's

burden to show it is reasonably likely that Nevada will not find

sufficient funding to replace APHIS's financial contribution to NWSP.

This Court should decline WEG's invitation to speculate on the future

budget decisions of Nevada's legislature and agencies, especially when

it is directly contradicted by NDOW's stated intent to continue PDM in

Nevada.

     In sum, Dr. Molde's injuries in Nevada are not redressable

because NDOW intends to carry out the PDM activities that allegedly

caused those injuries regardless of the outcome of this litigation.  And

WEG cannot demonstrate a significant likelihood that NDOW will not

follow through on its pledge.  For these reasons, WEG has not

established standing based on Dr. Molde's declaration.

---

[9] Nevada Legislative Appropriations Report: Fiscal Years 2009-10 and 2010-11, at 1, 308 (October 2009), *available at* http://www.leg.state.nv.us/Division/fiscal/Appropriation%20Reports/2009AppropriationsReports/2009AppropriationsReport.cfm (last visited Dec. 18, 2013).

**B. Mr. Weurthner does not have standing because he failed to allege that APHIS's failure to supplement the PEIS caused him to suffer a concrete injury.**

Because Dr. Molde's alleged, Nevada-specific injuries cannot be redressed, Mr. Weurthner must be able to demonstrate standing for WEG to have organizational standing to sue. WEG relies on Mr. Weurthner's declaration to establish standing on Claims One and Two, which challenge APHIS's national PDM program. App.Br. 48. But Mr. Weurthner's allegations of injury fail to satisfy the causation element for standing.

Standing requires that the injury complained of be fairly traceable to the challenged conduct. *See Allen v. Wright*, 468 U.S. 737, 757 (1984). As with redressability, NEPA challenges generally enjoy a relaxed standard for causation, but only with respect to the immediacy of the injury. *See Cantrell v. City of Long Beach*, 241 F.3d 674 (9th Cir. 2001) (quoting *Defenders of Wildlife*, 504 U.S. at 572 n.7). NEPA still requires "a reasonably close causal relationship between the environmental effect and the alleged cause." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 767 (2004) (citation and quotation marks omitted). In other words, a procedural-rights plaintiff must

demonstrate a reasonable probability that the alleged procedural breach threatens the plaintiff's concrete interests. *See Hall v. Norton*, 266 F.3d 969, 977 (9th Cir. 2001). Here, to establish its own standing on Claims One and Two, WEG must show a reasonable probability that APHIS's failure to supplement its PEIS caused Mr. Weurthner's injuries.

The district court held that Mr. Weurthner failed to demonstrate a concrete, particularized injury sufficient to establish standing. *See* Order 6–7 (ER at 10–11). The court also indirectly touched on causation, noting: "Mr. Weurthner presents no evidence about how the PEIS is implemented in the McDonald Pass or any other areas he has traversed so as to tie his aesthetic injury—viewing fewer predators in the wild—to WS's activities." *Id.* On appeal, WEG argues that the district court "misunderstood both the scope of the 1994/1997 PEIS and the nature of Mr. Weurthner's injury." App.Br. 49. But it is WEG that is mistaken on these points. Mr. Weurthner did not show that APHIS's failure to supplement the PEIS caused him any concrete injury.

To show standing to challenge the PEIS, WEG relies on Mr. Weurthner allegations that he suffered two concrete injuries in national

forests in Montana.  *See* App.Br. 48–51.  He first claims that "Wildlife Services['] killing of native carnivores, including wolves, in the Gallatin National Forest" impacts his ecological studies, profession as a tour guide, and personal recreation in the area.  Weurthner Decl. ¶¶ 25, 29 (ER at 36, 37).[10]  Mr. Weurthner also contends that "Wildlife Services['] activities in the Helena National Forest, involving the use of indiscriminate traps (and *possibly* M-44s) that have the potential to harm dogs, are reducing [his] enjoyment of the M[a]cDonald Pass area." *Id.* ¶ 28 (ER at 36–37) (emphasis added).

Assuming that these injuries are sufficiently concrete, they still do not establish standing because WEG has not shown that APHIS's actions in Montana are caused by the PEIS.  The PEIS is a programmatic environmental document that does not, on its own, implement or authorize any action-level programs.  To the contrary, the PEIS specifically contemplates the completion of site-specific NEPA

_____

[10] Wolves are not one of the 17 target species discussed in the PEIS.  *See* PEIS Summary 4 (ER at 47).  Because this case is at the pleading stage, APHIS assumes that Mr. Weurthner's general allegation encompasses specific predators that are discussed in the PEIS.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990) (assuming on a motion to dismiss that "general allegations embrace those specific facts that are necessary to support the claim").

analyses to evaluate the environmental effects of particular methods for animal damage control for each project. *See* 60 Fed. Reg. 13399, 13400. WEG has not explained how APHIS uses the PEIS, if at all, in its predator control activities in Montana. The closest WEG comes to establishing a causal link between APHIS's actions in Montana and the PEIS is a generic statement that APHIS "continues to rely on its PEIS, which contains outdated information and analysis regarding trapping, in order to justify its trapping in McDonald Pass." App.Br. 50. But if the PEIS is no longer sufficient to support the NEPA analysis for trapping in Montana, WEG's remedy is to challenge the agency action that causes Mr. Weurthner's injury, rather than the PEIS.[11] Indeed, Mr. Weurthner is uncertain about whether APHIS uses M-44s in the

---

[11] For example, APHIS prepared EAs and issued FONSIs for the Montana's Eastern and Western regions in 1997. *See* Wildlife Damage Management—Montana, http://www.aphis.usda.gov/regulations/ws/ws_environmental_montana.shtml (last visited Dec. 17, 2013). WEG did not challenge these site-specific analyses in this lawsuit. The alternative selected in the Montana decisions defines the scope of APHIS's on-the-ground activities in Montana. Absent an explanation of how, if at all, the PEIS informed those decisions, WEG cannot show a reasonable probability that the PEIS caused Mr. Weurthner's injuries. WEG's failure to connect the PEIS to specific agency actions in Montana or elsewhere deprives Mr. Weurthner of standing and fails to allege a cognizable claim under the APA.

MacDonald Pass because the PEIS does not address site-specific applications of PDM methods.  Instead, the PEIS simply provides some background analysis to local decisionmakers, who must make a separate site-specific decision before using particular methods in the MacDonald Pass.  To the extent there is any causal connection between the methods APHIS actually employs in the Helena and Gallatin National Forests, that connection runs only through another agency action that is not at issue here.

For the foregoing reasons, Mr. Weurthner cannot demonstrate a reasonable probability APHIS's failure to supplement the PEIS caused him to suffer any concrete harms.  Because neither Dr. Molde nor Mr. Weurthner has standing to sue on WEG's claims, WEG lacks organizational standing.  As such, this Court should affirm the district court's order dismissing WEG's NEPA claims for lack of jurisdiction.

## II. CLAIMS ONE AND TWO SHOULD BE DISMISSED AS A MATTER OF LAW BECAUSE WEG FAILED TO PROPERLY STATE A CLAIM UNDER THE APA.

Even if WEG has standing to raise Claims One and Two, there is a separate and equally important reason that the Court lacks jurisdiction to hear WEG's challenges to the PEIS: WEG fails, as a matter of law, to

properly state a claim under the APA.  Claims One and Two assert

claims for failure to supplement the PEIS under APA § 706(1) and (2), 5

U.S.C. § 706.  Compl. ¶¶ 155–69 (ER at 246–48).  Agencies are required

to supplement an EIS if "[t]he agency makes substantial changes in the

proposed action that are relevant to environmental concerns" or "[t]here

are significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its

impacts." 40 C.F.R. § 1502.9(c)(1).  But WEG's claims fail as a matter of

law because Claim One does not challenge a discrete agency action

requiring supplementation, and Claim Two cannot establish that

APHIS has a mandatory duty to supplement the PEIS.

### A. **Claim One fails to assert a claim under APA Section 706(2) because WEG failed to challenge a discrete agency action.**

Claim One seeks to invalidate the PEIS under APA § 706(2)

because APHIS's failure to supplement the PEIS was "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with

law" or "without observance of procedure required by law," 5 U.S.C. §

706(2)(A), (D).  Compl. ¶¶ 156–63 (ER at 246–47).  But rather than

identifying specific agency actions that required supplementation of the

PEIS under 40 C.F.R. § 1502.9(c)(1), Claim One makes sweeping allegations that APHIS violated NEPA by "failing to gather and evaluate new information that may alter" its analyses in the PEIS; "failing to continue to take a hard look at the environmental effects of its national PDM program"; "failing to supplement its 1994/1997 PEIS or prepare a new EIS for its national PDM program"; "continuing to rely on its 1994/1997 PEIS for its PDM activities, in Nevada and nationwide"; and "tiering to its 1994/1997 PEIS in its environmental analyses, in Nevada and nationwide." Compl. ¶¶ 158–62 (ER at 247). As demonstrated by the number and breadth of allegations, Claim One clearly and inappropriately asserts a programmatic challenge to APHIS's nationwide PDM efforts, rather than identifying specific agency actions related to the PEIS that harmed WEG's members.

Claim One's lack of focus likely stems from WEG's misunderstanding of the nature of the PEIS. The PEIS informs local APHIS decisionmakers about the potential environmental effects of thirteen different approaches to wildlife damage management, leaving the implementation of specific approaches to the local agencies. *See* 60 Fed. Reg. 13399, 13399–13400. In other words, the PEIS serves as a

reference tool that local agencies may choose to utilize, as relevant, in their own analyses.  In this framework, the PEIS may be properly challenged if a local APHIS agency chooses to use the PEIS and relies solely on its analysis to support an action that harms WEG's members. Because WEG instead chose to bring a sweeping challenge to APHIS's nationwide practices, Claim One suffers the same infirmity as other programmatic challenges.

In *Lujan v. National Wildlife Federation*, the Supreme Court rejected a broad claim containing general allegations of violations of the Federal Land Policy and Management Act.  497 U.S. 871, 879 (1990). The Court held that a plaintiff suing under the APA "cannot seek *wholesale* improvement of [a] program by court decree" but must instead "direct its attack against some particular 'agency action' that causes it harm."  *Id.* at 891; *see also Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1067 (9th Cir. 2002) (holding that broad management practices "are reviewable when, and to the extent that, they affect the lawfulness of a particular agency action").

WEG's failure to observe this distinction is fatal to its claims against the PEIS.  WEG may challenge the Nevada FONSI and

Decision as the "particular 'agency action' that causes it harm." *Nat'l Wildlife Fed'n*, 497 U.S. at 891. But WEG did not specifically mention the Nevada FONSI and Decision in Claim One, let alone show how that action implicated the PEIS. *See, e.g., Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998) (stating, in a ripeness analysis, that challenges to site-specific environmental analyses "might also include a challenge to the lawfulness of the present [programmatic] Plan if (but only if) the present Plan then matters"). Instead, Claim One challenges past, ongoing, and future PDM activities by APHIS on a national scale, without relating the PEIS to a particular agency action. Because Claim One, as presented in the Complaint, fails to identify a discrete agency action, it should be dismissed as a matter of law for failure to state a claim under the APA.

WEG attempted to reshape its PEIS challenge in Claim One to identify two discrete APHIS actions related to the PEIS in its response to APHIS's motion to dismiss. *See* ECF No. 25, at 23–24. But post-hoc clarification cannot save Claim One because a motion to dismiss must be resolved on the complaint itself, and not refinements included in a response to the motion. *See Broam v. Bogan*, 320 F.3d 1023, 1026 n.2

(9th Cir. 2003).  In any event, WEG's belated arguments regarding discrete agency actions are without merit.

WEG first contends that Claim One challenges the issuance of the Nevada EA and Decision, which rely on the PEIS, "without analysis and disclosure to the public of the environmental effects of significant changed circumstances and new information in a supplemental PEIS." ECF No. 25, at 23.  But that argument is actually a challenge to the sufficiency of the EA, and only serves to highlight the difference between the Nevada EA and Decision, which analyzes and authorizes the specific activities that allegedly harmed one of WEG's members, and the PEIS, which does not.  The EA's incorporation by reference of information from the PEIS does nothing to change the nature of the PEIS, nor does it suddenly render the PEIS arbitrary and capricious. *See Nat'l Wildlife Fed'n. v. Cosgriffe*, 21 F. Supp. 2d 1211, 1224 (D. Ore. 1998) (discussing *Lujan v. National Wildlife Federation* and holding that plaintiffs could not raise a "wholesale challenge" to BLM's grazing policy by arguing that "BLM inappropriately tiered its site-specific decisions to [programmatic] EISs" and instead had to challenge the site-specific decisions individually).

WEG also argued before the district court that Claim One challenges APHIS's failure to supplement the PEIS after WEG requested supplementation. *See* ECF No. 25, at 23–24. WEG alleges that, on or about February 17, 2009, it sent APHIS a letter demanding the immediate supplementation of the PEIS, and that APHIS responded that it would consider WEG's comments during ongoing evaluation of its program. Compl. ¶¶ 57–58 (ER at 229–30). Ignoring for a moment the fact that Claim One makes no mention of the correspondence between APHIS and WEG, the failure to take any further concrete action on that request is not a "discrete action" that the Court may review under the APA's arbitrary or capricious standard. This Court rejected a similar argument in *ONRC Action v. Bureau of Land Management*, 150 F.3d 1132 (9th Cir. 1998). In that case, the plaintiffs sent the Bureau of Land Management ("BLM") a petition that requested a moratorium on various BLM actions taken under program statements. *Id.* at 1134–35. BLM responded to the plaintiffs' petition with a two-page letter indicating that their concerns would be more appropriately raised in "site-specific challenges to actual projects." *Id.* at 1135. The plaintiffs challenged BLM's response under the APA, and

this Court rejected the claim, finding that BLM's letter was merely informative and was not "subject to challenge as a final agency action." *Id.* at 1136.

Like BLM's letter in *ONRC Action*, APHIS's response to WEG's request that APHIS supplement the PEIS merely informed WEG that APHIS would consider WEG's comments in future environmental evaluations. Consequently, neither APHIS's letter nor its subsequent failure to supplement the PEIS constitutes an "agency action" within the meaning of APA § 706(2). Because Claim One does not identify a discrete action by APHIS that is related to the PEIS and affected WEG's members, it should be dismissed for failure to state a cognizable claim under the APA.

**B.** **Claim Two fails to assert a claim under APA Section 706(1) because APHIS did not have a mandatory duty to supplement the PEIS.**

WEG's "Second Alternative Claim for Relief," also fails to allege a cognizable claim under the APA. WEG challenges APHIS's failure to supplement the 1994/1997 under the APA, 5 U.S.C. § 706(1), which permits courts to "compel agency action unlawfully withheld or unreasonably delayed." Compl. ¶¶ 164–69 (ER at 247–48). WEG's

claim fails as a matter of law because, under controlling Supreme Court precedent, APHIS does not have a mandatory duty to supplement the PEIS.

To state a claim under APA § 706(1), a plaintiff must assert "that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. Southern Utah Wilderness Alliance* (*SUWA*), 542 U.S. 55, 64 (2004). As noted, NEPA regulations issued by the Council on Environmental Quality require supplementation of an EIS only if the agency makes "substantial changes" in its proposed action or "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."[12] 40 C.F.R. § 1502.9(c)(1). The Supreme Court has interpreted this regulation, together with NEPA § 4332, to mandate

---

[12] Agencies have the *discretion* to prepare supplemental EISs at more frequent intervals. *See* 40 C.F.R. § 1502.9(c)(2). As WEG notes in its brief, App.Br. 6, CEQ proposed a "rule of thumb" stating that "if the EIS concerns an ongoing program, EISs that are more than 5 years old should be carefully reexamined to determine if the criteria in Section 1502.9 compel preparation of an EIS supplement." 46 Fed. Reg. 18026, 18036. This recommendation does not, however, impose an affirmative obligation on federal agencies to supplement EISs at regular five-year intervals. Because the five-year guideline for supplementation is not mandatory, the Court cannot compel its implementation under APA § 706(1). *See SUWA*, 542 U.S. at 65.

supplementation only if "there remains major Federal actio[n] to occur."
*SUWA*, 542 U.S. at 73 (quoting *Marsh v. Or. Natural Res. Council*, 490
U.S. 360, 361 (1989)) (alteration in original) (internal quotation marks
omitted).

Here, no federal action remains to occur pursuant to the PEIS.
The PEIS may be used to inform additional NEPA analyses, and those
additional NEPA determinations may be subject to challenge if they
rely on outdated information. But the potential for the PEIS to be used
in this way does not create a mandatory duty for APHIS to continually
update the PEIS itself. This result is compelled by the Supreme Court's
decision in *SUWA*.

In *SUWA*, the plaintiffs alleged that BLM violated NEPA by
failing to take a hard look at whether BLM should prepare
supplemental environmental analyses for wilderness study areas in
which the use of off-road vehicles had increased. 542 U.S. at 61.
Pursuant to BLM regulations, the agency had previously prepared a
land use plan for the area. *Id.* at 59. Land use plans, the Court noted,
are "a preliminary step in the overall process of managing public lands,"
which are "designed to guide and control future management actions

and the development of subsequent, more detailed and limited scope plans." *Id.* at 69 (citing 43 CFR § 1601.0-2 (2003)). The subsequent management decisions, which conform to the land use plan, "are distinct from the plan itself." *Id.* Therefore, the land use plan at issue in *SUWA* was "not a final implementation decision," because it would require "further specific plans, process steps, or decisions under specific provisions of law and regulations." *Id.* at 69–70 (citing 43 CFR § 1601.0-5(k) (2003)). Although BLM's regulations provided that the "'[a]pproval of a [land use plan]' is a 'major Federal action,'" *see id.* at 73 (quoting 43 C.F.R. § 1601.0-6 (2003)) (alterations in original), the Court concluded that the federal action "is completed when the plan is approved," so there was "no ongoing 'major Federal action' that could require supplementation." *Id.*; *see also Ctr. for Biological Diversity v. Salazar*, 706 F.3d 1085, 1095 (9th Cir. 2013) (finding that no major federal action requiring supplement remained after BLM's approval of a 1988 plan for mining operations); *Cold Mountain v. Garber*, 375 F. 3d 884, 894 (9th Cir. 2004) (holding that there was no ongoing major federal action requiring supplementation following the issuance of a FONSI and special use permit).

The facts and legal analysis in *SUWA* are analogous to this case. Like the plaintiffs in *SUWA*, WEG claims that new information and scientific studies require APHIS to supplement its PEIS. And similar to BLM's land use plan, the PEIS is a broad programmatic document that evaluates the environmental impacts of general approaches and methods for PDM. The scope of the analysis in the PEIS informs future agency action, but the PEIS does not prescribe particular activities, leaving those details to future site-specific analyses, such as the Nevada EA. *See* 60 Fed. Reg. 13399, 13400 ("[M]y decision is to send forward to regional and local decisionmakers the viable alternatives discussed in the final EIS for consideration as management approaches."). When issuing its decision, APHIS explained that "[t]his approach provides a complete range of wildlife damage control strategies available as part of an overall integrated management approach." *Id.*

The APHIS regulations governing the use of programmatic EIS's are also analogous to the BLM regulations that the Court considered in *SUWA*. APHIS's regulations specifically identify major federal actions requiring environmental analyses. *See* 7 C.F.R. § 372.5. APHIS's NEPA regulation provides that when the agency "seeks to establish

programmatic approaches to animal and plant health issues," the action necessitating NEPA review is the "adoption of strategic or other long-range plans that purport to adopt for future program application a preferred course of action." *Id.* § 372.5(a)(2). According to the Court's analysis in *SUWA*, this type of regulation shows that no federal action remained after the final PEIS was adopted and sent forward to the regional and local decision-makers under the ROD. Therefore, APHIS has no mandatory duty to supplement the PEIS.

WEG may attempt to distinguish *SUWA*, as it did in the district court, on the grounds that the land use plan in *SUWA* was a discrete plan, whereas the PEIS here made available a range of alternatives and methods for local PDM decisions. If anything, this distinction makes it even less appropriate for the Court to find a mandatory duty to continually supplement the PEIS. Like the BLM regulations in *SUWA*, APHIS's regulation identifies the "adoption of strategic or other long-range plans" as an action requiring an EIS. 7 C.F.R. § 372.5(a)(2). In the PEIS, APHIS adopted a long-range plan that analyzed the impacts of a range of alternatives and methods for PDM, as well as a decision

model for regional and local decision-makers to use when selecting

appropriate alternatives. *See* 60 Fed. Reg. 13399, 13400.

Furthermore, the fact that regional and local APHIS programs

continue to conduct PDM activities has no bearing on whether major

federal action remains under the PEIS. The Supreme Court in *SUWA*

held that no federal action remained on the land use plan at issue,

despite the fact that future implementation decisions would be based on

that plan. *SUWA*, 542 U.S. at 69–70; *see also Ctr. for Biological*

*Diversity*, 706 F.3d at 1095 (finding that the issuance of a gravel permit

and approval of an updated reclamation bond could themselves be

major federal actions under NEPA, but did not "affect[] the validity or

completeness of the 1988 approval of the [challenged] plan of

operations"). Similarly, once APHIS adopted the PEIS and issued its

ROD, that action "seek[ing] to establish programmatic approaches" to

PDM was complete. 7 C.F.R. § 372.5(a). The regional and local agency

action contemplated in the PEIS and ROD—"[i]mplementation of

program plans at the site-specific, action level"—is a new federal action

requiring its own review under NEPA, and not a continuation of the

nationwide programmatic plan. *Id.* § 372.5(b)(1)(ii). Consequently,

although APHIS continues to conduct PDM activities across the country, no federal action remains with respect to the PEIS; therefore, APHIS has no mandatory obligation to supplement the PEIS.[13]

In sum, WEG's challenges to the PEIS do not constitute cognizable claims under the APA. WEG failed to identify in its complaint the discrete agency action challenged in Claim One, thereby alleging an impermissibly broad programmatic attack under APA § 706(2)(A), (D). And Claim Two seeks to compel, under APA § 706(1), supplementation of the PEIS when APHIS has no such duty because no major federal action remains. Consequently, the Court should affirm the dismissal of those claims on the alternate grounds of Fed. R. Civ. P. 12(b)(6).

---

[13] Although litigants cannot force APHIS to supplement its PEIS, they can still make the argument that its analysis is out of date. As discussed in the previous section, however, they must frame that argument as a claim that a site-specific agency action that authorizes some discrete action is based on out-of-date NEPA analyses; WEG makes such a claim here, for example, in alleging that the 2011 Nevada EA is invalid. But there is no general mandatory duty for an agency to supplement past NEPA analyses for every programmatic action that may support future decisions.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION WHEN IT DENIED WEG'S MOTION FOR JURISDICTIONAL DISCOVERY.

WEG contends that the district court abused its discretion when it denied WEG's motion for leave to conduct jurisdictional discovery. App.Br. at 52–57. It is not an abuse of discretion for a court to deny discovery when the plaintiff had the opportunity but declined to request discovery. *See Berardinelli v. Castle & Cooke, Inc.*, 587 F. 2d 37, 39 (9th Cir. 1978) (affirming the denial of jurisdictional discovery when seven months had elapsed between the filing of the complaint and the request for discovery). Whether to permit jurisdictional discovery is a decision that lies within the sound discretion of the district court:

> An appellate court will not interfere with the trial court's refusal to grant discovery except upon the clearest showing that the dismissal resulted in actual and substantial prejudice to the litigant; such a refusal is not an abuse of discretion when it is clear that further discovery would not demonstrate facts sufficient to constitute a basis for jurisdiction.

*Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977). Here, the district court did not abuse its discretion in denying discovery because (1) WEG did not request discovery at the pleadings stage, and (2) discovery may not have uncovered facts sufficient to constitute a basis for jurisdiction.

First, WEG's request for jurisdictional discovery was premised on conditions that never came to pass. WEG told the district court that "Guardians ha[d] alleged facts sufficient to establish Guardians' standing to bring this action at the pleadings stage," and was instead requesting discovery in the event the court converted APHIS's motion to dismiss to a motion for summary judgment, determined that more facts were needed to rule on the motion, or granted the motion with leave to amend the complaint. ECF No. 29, at 2. The court did none of those things. It cannot be an abuse of discretion for a court to decline to grant relief in a situation in which the relief was not requested. *See, e.g.*, *Grynberg v. Ivanhoe Energy, Inc.*, 490 Fed. App'x 86, 104 (10th Cir. 2012) (affirming the denial of jurisdictional discovery when the plaintiffs "acknowledged that they did not need jurisdictional discovery … until after the district court ruled on the defendants' motion to dismiss"). Therefore, the district court did not abuse its discretion when it denied WEG's motion for prospective jurisdictional discovery.

Second, the district court did not abuse its discretion when it denied WEG's request to conduct likely intrusive discovery into Nevada's budgeting priorities when a clear statement of those priorities

was already in the record.  APHIS provided the court with an affirmative statement from NDOW that "[w]ithout WS participation, NDOW would, by statu[t]e, carry out the management of wildlife with existing personnel or contract the work to other capable entities."  EA C-163 (ER at 213).  It was not an abuse of discretion for the court to decline to entertain discovery that would likely require solicitation of testimony from Nevada government officials about the State's funding and budget priorities where the State had already stated its intentions.

WEG also argued that discovery would show that NWSP would take fewer coyotes and ravens if APHIS did not participate, and that Dr. Molde's injuries would therefore be redressed.  As previously discussed in Part I.A.4, Nevada has numerous options for constructing and implementing a state-only PDM program—alternative methods for taking predators, avenues to obtain the authority to use federally-regulated methods, and the ability to contract with other agencies and individuals who could act in APHIS's stead.  In light of these variables, it was not an abuse of discretion for the district court to deny jurisdictional discovery.  This Court should therefore affirm the district court's decision.

## CONCLUSION

For the foregoing reasons, the district court's decision should be affirmed.

Respectfully submitted,
*s/ Emily A. Polachek*

ROBERT G. DREHER
Acting Assistant Attorney General

OF COUNSEL:

ANDREW C. MERGEN
J. DAVID GUNTER II
BRIAN COLLINS
ANNALISA JABAILY
LAUREN AXLEY
USDA Office of General Counsel

EMILY A. POLACHEK
Attorneys, U.S. Dep't of Justice
Env't & Natural Resources Div.
P.O. Box 7415
Washington, DC 20044
(202) 514-5442
emily.polachek@usdoj.gov

December 20, 2013

DJ # 90-1-4-13688

## STATEMENT OF RELATED CASES

Attorneys for the Federal Defendant-Appellee are not aware of any related cases as defined in Ninth Circuit Rule 28-2.6.

*/s/ Emily A. Polachek*
EMILY A. POLACHEK
U.S. Department of Justice
Env't & Natural Resources Div.
P.O. Box 7415
Washington, DC  20044
(202) 514-5442
emily.polachek@usdoj.gov

## CERTIFICATE OF COMPLIANCE
## WITH TYPE VOLUME LIMITATION, TYPEFACE
## REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 13,224 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 14-point Century Schoolbook.

*/s/ Emily A. Polachek*
EMILY A. POLACHEK
U.S. Department of Justice
Env't & Natural Resources Div.
P.O. Box 7415
Washington, DC 20044
(202) 514-5442
emily.polachek@usdoj.gov

# CERTIFICATE OF SERVICE

I hereby certify that on December 20, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system, which will serve the brief on the other participants in this case.

*/s/ Emily A. Polachek*
EMILY A. POLACHEK
U.S. Department of Justice
Env't & Natural Resources Div.
P.O. Box 7415
Washington, DC  20044
(202) 514-5442
emily.polachek@usdoj.gov