No. 13-16071

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

---

WILDEARTH GUARDIANS,

*Plaintiff-Appellant,*

v.

UNITED STATES DEPARTMENT OF AGRICULTURE, ANIMAL AND
PLANT HEALTH INSPECTION SERVICE,

*Defendant-Appellee.*

---

On Appeal from the United States District Court for the District of Nevada,
Case No. 2:12-cv-00716-MMD-PAL, Hon. Miranda M. Du, District Judge

---

**APPELLANT'S REPLY BRIEF**

---

Ashley D. Wilmes
WildEarth Guardians
680 W. Hickory Street
Louisville, Colorado 80027
Tel. 859-312-4162
awilmes@wildearthguardians.org

Attorney for Plaintiff-Appellant
WildEarth Guardians

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ……………………………………...…….…...iv

GLOSSARY……………………………………………………………......vii

INTRODUCTION………..………………………………………...............1

ARGUMENT IN REPLY………..……………………….….….….……5

I.  GUARDIANS HAS STANDING ON ALL ITS NEPA CLAIMS
    BECAUSE DR. MOLDE'S INJURIES ARE REDRESSABLE...................3

    A.  Because Dr. Molde's Injury-in-Fact is Caused by Wildlife
        Services' Actions and its Failure to Comply with NEPA, the
        Relaxed Redressability Standard Applies..............................5

    B.  Guardians is Not Required to Show that NDOW Would Stop
        Implementing a Non-Existent State Plan or that it will Refrain
        from Taking Some Undefined Action; It is Enough that the Court
        May Afford Some Relief.......................................9

    C.  The Record Demonstrates that Dr. Molde's Injuries are
        Redressable, Notwithstanding the Mayer Letter.................12

    D.  This Court May Grant Meaningful Relief..........................15

II.  JURISDICTIONAL DISCOVERY WAS WARRANTED..........................16

III.  GUARDIANS STATED A LEGALLY COGNIZABLE CLAIM FOR
      RELIEF THAT WILDLIFE SERVICES' FAILURE TO  SUPPLEMENT
      ITS 1994/1997 PEIS VIOLATES THE APA...............................22

    A.  Wildlife Services has a Mandatory Duty to Supplement its PEIS......23

    B.  Federal Action Remains to Occur under the PEIS.............................25

    C.  Unlike *SUWA*, the PEIS Continues to be Used to Support and Justify
        an Ongoing  Federal Program............................................27

CONCLUSION……………………..…….……………….….……………....28

FRAP 32(a) CERTIFICATE OF COMPLIANCE.……………..……………30

CERTIFICATE OF SERVICE.………………………...………………..…31

# TABLE OF AUTHORITIES

## Cases

AE ex rel. Hernandez v. Cnty. of Tulare, 666 F.3d 631 (9th Cir. 2012)................24

Andrus v. Sierra Club, 442 U.S. 347 (1979) ...........................................................22

Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007) ...........................................23

Bibeau v. Pac. NW Research Found., Inc., 188 F.3d 1105 (9th Cir. 1999) ............25

Braunstein v. Ariz. Dep't of Transp., 683 F.3d 1177 (9th Cir. 2012) .....................17

Cent. Delta Water Agency v. United States, 306 F.3d 938 (9th Cir. 2002) ............10

Columbia Basin Land Prot. Ass'n v. Schlesinger, 643 F.2d 585 (9th Cir. 1981) ...16

Commodity Futures Trading Comm'n v. Co Petro Mktg. Grp., Inc.,
    680 F.2d 573 (9th Cir. 1982)..................................................................................25

Ctr. for Biological Div. v. U.S. Forest Serv., 349 F.3d 1157 (9th Cir. 2003) .........27

Friends of the Clearwater v. Dombeck, 222 F.3d 552 (9th Cir. 2000)..............22, 24

Glanton v. Advance PCS, Inc., 465 F.3d 1123 (9th Cir. 2006)................................7

Hall v. Norton, 266 F.3d 969 (9th Cir. 2001)............................................................4

High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630 (9th Cir. 2004) ...............4, 16

Kal Kan Foods, Inc. v. Iams Co., 197 F. Supp. 2d 1061 (S.D. Ohio 2002)............17

Larson v. Valente, 456 U.S. 228, 244 n.15 (1982)..................................................11

Laub v. U.S. Dep't of Interior, 342 F.3d 1080 (9th Cir. 2003) ........................18, 21

Lemon v. Geren, 514 F.3d 1312 (D.C. Cir. 2008) ....................................................5

Levine v. Vilsack, 587 F.3d 986 (9th Cir. 2009).......................................................6

Los Angeles Haven Hospice, Inc. v. Sebelius, 638 F.3d 644, 655 (9th Cir. 2011).11

Lujan v. Defenders of Wildlife, 504 U.S. 555....................................5, 6, 10, 17, 18

Marsh v. Or. Natural Res. Council, 490 U.S. 360 (1989) ...............23, 24, 25, 26, 27

Massachusetts v. EPA, 549 U.S. 497 (2007)................................................ 11, 14-15

Norton v. S. Utah Wilderness Alliance ("SUWA"), 542 U.S. 55 (2004) .........27, 28

Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n, 457 F.3d 941
   (9th Cir. 2006)...........................................................................................7, 8, 10

Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846 (9th Cir. 2005)....16

Robertson v. Methow Valley Citizens Council, 490 U.S. 332 (1989) .....................5

Safe Air for Everyone v. Meyer, 373 F.3d 1035 (9th Cir. 2004) ...........................18

Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346 (9th Cir. 1994).....16

Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220
   (9th Cir. 2008)..........................................................................................6, 7, 8

Sierra Club v. U.S. Dep't of Transp., 245 F.Supp.2d 1109 (D. Nev. 2003) ...........23

Singleton v. Wulff, 428 U.S. 106 (1976) ...............................................................25

St. John's United Church of Christ v. FAA, 520 F.3d 460 (D.C. Cir. 2008)....5, 6, 8

Town of Babylon v. Fed. Hous. Fin. Agency, 699 F.3d 221 (2d Cir. 2012)............6

United States v. Isaacs, 359 F. App'x 875 (9th Cir. 2009).....................................20

United States v. Rutgard, 116 F.3d 1270 (9th Cir. 1997).......................................19

Valley Cnty., Idaho v. USDA, No. 1:11–CV–233–BLW, 2012 WL 506000
   (D. Idaho Feb. 15, 2012) ...................................................................................17

Wash. Envtl. Council v. Bellon, 732 F.3d 1131 (9th Cir. 2013) ..............................6

Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406 (9th Cir. 1977)......21

**Statutes**

5 U.S.C. § 706(1)..................................................................................................22, 24

5 U.S.C. § 706(2)(A) ................................................................................................22

5 U.S.C. § 706(2)(D) ........................................................22

NEV. REV. STAT. § 503.595 ................................................9

**Rules**

FED. R. CIV. P. 12(b)(6) ...........................................22, 23, 25

FED. R. EVID. 201(d) .........................................................19

FED. R. EVID. 801(c) ..........................................................20

**Regulations**

40 C.F.R. § 1502.9(c)(1) .................................................23, 24

40 C.F.R. § 1508.18(a) ......................................................27

43 C.F.R. § 1601.0-6 .........................................................28

**Federal Register**

46 Fed. Reg. 18,026 (March 23, 1981)...........................24, 26

60 Fed. Reg. 13,399 (March 13, 1995).................................26

**Other Authorities**

115 CONG. REC. 40416 (Dec. 20, 1969) (remarks of Sen. Henry Jackson) ............27

# GLOSSARY

| | |
|---|---|
| Ans.Br. | Answering Brief of Defendant-Appellee |
| APA | Administrative Procedures Act |
| APHIS | Animal and Plant Health Inspection Service |
| CR | Court's Record |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| ER | Excerpts of Record |
| Guardians | Plaintiff-Appellant WildEarth Guardians |
| Mayer Letter | October 28, 2010 letter to Wildlife Services from Kenneth Mayer, Appendix C to the Nevada Environmental Assessment |
| NDOW | Nevada Department of Wildlife |
| NEPA | National Environmental Policy Act |
| Nevada EA | June 2011 Final Environmental Assessment for Predator Damage Management in Nevada |
| NWSP | Nevada Wildlife Services Program |
| Op.Br. | Opening Brief of Plaintiff-Appellant WildEarth Guardians |
| PDM | Predator Damage Management |
| PEIS | 1994/1997 Programmatic Environmental Impact Statement |
| USDA | United States Department of Agriculture |
| Wildlife Services | USDA-APHIS Wildlife Services |
| WS | USDA-APHIS Wildlife Services |
| 1994/1997 PEIS | Final programmatic environmental impact statement for USDA-APHIS Animal Damage Control Program (now "Wildlife Services") |

**INTRODUCTION**

Plaintiff-Appellant WildEarth Guardians ("Guardians") brought this action against the Defendant, United States Department of Agriculture, Animal and Plant Health Inspection Service ("APHIS") (hereinafter "Wildlife Services") for declaratory and injunctive relief challenging the agency's continuing failure to comply with the National Environmental Policy Act ("NEPA"). In 2011, Wildlife Services issued an environmental assessment ("EA") for its program in Nevada. See Excerpts of Record ("ER" at 62). Rather than taking a hard look at new information and using the best available science to analyze issues such as the environmental impacts of Wildlife Services' use of deadly toxicants, traps, and aerial gunning, the EA simply incorporated by reference the analysis in a twenty-year-old programmatic environmental impact statement ("1994/1997 PEIS"). Compl. ¶¶ 175-76 (ER 249).

The analysis in that PEIS, which was first published in 1994, is based primarily on stale science from the 1970's and 1980's. Id. ¶ 4 (ER 216). Since then, significant new information and scientific studies bearing on the environmental impacts of Wildlife Services' program and activities have been published, including new information on: the critical ecological role of carnivores; the risks associated with Wildlife Services' use of trapping, aerial gunning, and toxicants; and the proven ineffectiveness of Wildlife Services' methods of

operation. Id. ¶ 74 (ER 233). Nevertheless, in Nevada and nationwide, Wildlife Services continues to rely on this outdated PEIS in making decisions to implement its "predator damage management" ("PDM") activities, which include killing native carnivores and other wildlife with guns, traps, and poisons.

Wildlife Services' NEPA violations do not end with the PEIS. In its Decision on the Nevada EA, Wildlife Services chose Alternative 5, the proposed action, which was a "continuation of the current [Nevada Wildlife Services Program's ("NWSP")] PDM activities in Nevada . . . with a greater emphasis on protection of game species" and allowed the use of all legal methods for killing native carnivores and ravens, including shooting, aerial gunning, trapping, and M-44s. (ER 6, 70, 71). Although Wildlife Services kills an average of 6,000 coyotes per year in Nevada using traps, helicopters, and poisons on private and public lands, Wildlife Services made a "Finding of No Significant Impact" and unlawfully determined that preparation of an Environmental Impact Statement ("EIS") was unnecessary. (ER 133, 236).

Wildlife Services now attempts to shield its outdated and insufficient NEPA analysis from judicial review. Based on a vague letter from Nevada Department of Wildlife ("NDOW") Director Kenneth Mayer ("Mayer Letter") stating that NDOW will "carry out the management of wildlife" in accordance with its statutory responsibilities should federal involvement cease, Wildlife Services argues that

Guardians' members' injuries are not redressable because somebody else could kill Nevada's wildlife if they don't. That NDOW *might* take over some portions of the killing if Wildlife Services is enjoined from acting cannot insulate Wildlife Services from its obligation to comply with NEPA for the killing that it is, in fact, conducting. Because the Mayer Letter is not dispositive of the redressability issue and because the district court can grant meaningful relief even if Nevada were to carry out PDM activities without Wildlife Services, Guardians' member Dr. Don Molde's injuries are redressable.[1]

## ARGUMENT IN REPLY

### I. GUARDIANS HAS STANDING ON ALL ITS NEPA CLAIMS BECAUSE DR. MOLDE'S INJURIES ARE REDRESSABLE

Wildlife Services argues that Dr. Molde's injuries are not redressable because "NDOW has unequivocally expressed its intention to carry out [PDM] activities in Nevada regardless of [federal] participation." See Wildlife Services' Answering Brief ("Ans.Br.") at 17. Wildlife Services is referring to the language in the Mayer Letter, which simply states that, without Wildlife Services, "NDOW would, by statute, carry out the management of wildlife with existing personnel or contract the work to other capable entities." (ER 213). However, there is no

---

[1] As demonstrated in Guardians' Opening Brief at p. 48-51, Guardians' member George Weurthner also has standing based on his procedural right to protect his recreational interests in areas where Wildlife Services sets its traps, a method authorized by the PEIS.

3

evidence showing that if Wildlife Services mitigated the environmental impacts or reduced the extent of its activities (rather than halting its activities altogether), Nevada would carry out any additional lethal control. Furthermore, there is no evidence as to where or to what extent Nevada could carry out PDM activities in the absence of Wildlife Services, who acknowledges that a state-run Nevada wildlife management program is "currently non-existent." Ans.Br. at 37.

Because the district court may order Wildlife Services to conduct the required NEPA analysis and enjoin Wildlife Services from implementing the Nevada Decision until the agency complies with NEPA, Dr. Molde's injuries are redressable.[2] NEPA accords Dr. Molde a procedural right to protect his concrete interests in recreation and wildlife,[3] which "reduces his burden of proving redressability." Hall v. Norton, 266 F.3d 969, 977 (9th Cir. 2001) (citation omitted). "A plaintiff . . . who asserts inadequacy of a government agency's environmental studies under NEPA need not show that further analysis by the government would result in a different conclusion." Id. This is because the

---

[2]     The Court might also order new NEPA without an injunction, or only enjoin Wildlife Services' use of traps, for example, if it only found its environmental analysis as to traps was deficient. See High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 641 (9th Cir. 2004) (in NEPA case, finding that the district court had "broad latitude in fashioning equitable relief when necessary to remedy an established wrong") (citation omitted).

[3]     Wildlife Services does not dispute whether Dr. Molde has suffered an injury-in-fact, which is described in Guardians' Opening Brief ("Op.Br.") at 20-28.

preparation of new NEPA analysis "will never 'force' an agency to change the course of action it proposes." Lemon v. Geren, 514 F.3d 1312, 1315 (D.C. Cir. 2008). However, "if the agency's eyes are open to the environmental consequences of its actions and if it considers options that entail less environmental damage, it may be persuaded to alter what it proposed." Id. (citing Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 349 (1989)).

A. **Because Dr. Molde's Injury-in-Fact is Caused by Wildlife Services' Actions and its Failure to Comply with NEPA, the Relaxed Redressability Standard Applies**

Wildlife Services argues that Guardians should be held to a more stringent standard because "anticipated nonparty action" is poised to threaten Dr. Molde's concrete interests and that the relaxed redressability standard only applies "when a party challenging an agency's procedural failure cannot 'establish with any certainty' that the *agency* would reach a different decision." St. John's United Church of Christ v. FAA, 520 F.3d 460, 463 (D.C. Cir. 2008) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 573 n.7); see also Ans.Br. at 30-31, 33. Wildlife Services misses the point.

Here, it is Wildlife Services that is doing the trapping, poisoning, and shooting that injures Dr. Molde's concrete interests in wildlife and recreation, and its decision to do so is premised on inadequate NEPA analysis. Conversely, all of the cases cited by Wildlife Services in urging a heightened standard involved a

third party's actions that directly caused plaintiff's harm in the first place.  See,

e.g., St. John's, 520 F.3d at 463 (D.C. Cir. 2008) ("'[I]t is 'entirely conjectural

whether the ***nonagency activity that affects [petitioners]*** will be altered or affected

by the agency activity" – a grant of money – "'they seek to' overturn.") (quoting

Defenders of Wildlife, 504 U.S. at 571) (emphasis added); Wash. Envtl. Council v.

Bellon, 732 F.3d 1131, 1146–47 (9th Cir. 2013) (in substantive challenge under the

Clean Air Act, finding no evidence that Washington's regulation of five oil

refineries would likely reduce the pollution causing plaintiffs' "climate change"

injuries); Town of Babylon v. Fed. Hous. Fin. Agency, 699 F.3d 221, 229 (2d Cir.

2012) (no redressability where plaintiffs could not show that vacating federal

agency-issued directives to banks was likely to impact actions of third party banks

whose lending practices injured plaintiffs); Salmon Spawning & Recovery

Alliance v. Gutierrez, 545 F.3d 1220, 1227-29 (9th Cir. 2008) (finding plaintiff's

injury, overharvesting of endangered fish under Treaty with Canada, was not fairly

traceable to the United States' failure to withdraw from the Treaty and that court

could not "undo the Treaty" that allowed other parties to continue overharvesting).

These cases do not apply to Guardians' claims.  If Guardians were

substantively challenging the federal *regulation* of a state agency that was killing

wildlife, then the heightened redressability standard might apply.  For example, in

Levine v. Vilsack, 587 F.3d 986, 994 (9th Cir. 2009), a *substantive* rights case

cited by Wildlife Services, this Court found the plaintiffs lacked standing to challenge an agency's rule excluding certain animals from the Humane Methods of Slaughter Act because it was unlikely the agency could enforce humane slaughter requirements on third parties (slaughterhouses).  The Court explained that the redressability "standard is altered somewhat when third parties not before the court must change their behavior in order for any injury suffered to be redressed."  Id. Here, the relief Guardians seeks depends on Wildlife Services, not "solely upon independent actors" not before the Court.  See Glanton v. Advance PCS, Inc., 465 F.3d 1123, 1125 (9th Cir. 2006) (relief depended on non-party drug companies changing the drug plan policy).

Moreover, in the only NEPA case Wildlife Services relied on, the Court applied a relaxed redressability standard.  See Nuclear Info. & Res. Serv. v. Nuclear Regulatory Comm'n, 457 F.3d 941, 949 (9th Cir. 2006).  The Court then found that despite relaxed redressability, under the case's unique circumstances, no relief could be afforded.  Because there were two identical rules – with only one before the Court – even if one rule were vacated, the other would continue to control.  Id. at 955.

Similarly, in Salmon Spawning, although the fisheries which were causing injury were not a party to the case, the Court applied the relaxed redressability requirement to plaintiff's claims implicating procedural rights.  545 F.3d at 1228-

29.  The Court also highlighted the difference between plaintiff's substantive and procedural claims, explaining that "a plaintiff alleging procedural violations [] must show only that the procedural right could protect their interest, whereas a plaintiff alleging a substantive violation must demonstrate that its injury would likely be redressed by a favorable court decision." Id. at 1229.

Here, unlike St. John's United Church and Nuclear Info. & Res. Serv., Dr. Molde's injuries are caused by Wildlife Services, not a third party, and this Court can redress those injuries by ordering Wildlife Services to conduct new NEPA analysis.  The remedy here, compliance with NEPA's procedures, rests in the hands of Wildlife Services, and any uncertainty as to whether ordering the government to follow the required procedures will ultimately benefit Dr. Molde "does not undermine" Guardians' standing.  Salmon Spawning, 545 F.3d at 1229.

"Since it is enough that a revised NEPA analysis may redress" Dr. Molde's injuries, redressability is "satisfied here."  Ctr. for Food Safety v. Vilsack, 636 F.3d 1166, 1172 (9th Cir. 2011) (internal quotation and citations omitted).[4]  To hold

---

[4]      In rejecting lack of redressability arguments similar to those made by Wildlife Services here, courts have routinely found that the government may not shield its NEPA violations from judicial review, where further environmental analysis would be meaningful or environmental mitigation measures are possible. See, e.g., Summit Lake Paiute Tribe of Nev. v. BLM, 496 F. App'x 712, 715 (9th Cir. 2012) (although construction of the pipeline was complete, court could still provide effective relief under NEPA because following the required procedures "could lead to further study of the pipeline's impacts and the development of new mitigation measures").

otherwise would inappropriately shield federal NEPA compliance from judicial review. The Court should not allow Wildlife Services' attempted heightening of the redressability standard here to accomplish such an unjust result.

**B.** **Guardians is Not Required to Show that NDOW Would Stop Implementing a Non-Existent State Plan or that it will Refrain from Taking Some Undefined Action; It is Enough that the Court May Afford Some Relief**

Wildlife Services argues that Guardians' injuries are not redressable because NDOW is authorized by statute (NEV. REV. STAT. § 503.595) to control wildlife causing damage to personal property and has stated its intention to carry out "wildlife damage management" if Wildlife Services stops conducting the program. (ER 213). However, the Mayer Letter cannot be interpreted to "unequivocally" mean that NDOW would take over Wildlife Services' entire current program. In fact, under Wildlife Services' chosen alternative, part of the work it conducts in Nevada is not to protect property or the public, but to increase game species, a purpose outside of NDOW's statutory authority. See (ER 71, 83); NEV. REV. STAT. § 503.595 (providing that NDOW may control wildlife to prevent or alleviate damage or threatened damage to land or property).

Wildlife Services takes it one step further, arguing that Guardians must show that through the court's relief, "Nevada would also likely stop any activity that threatens Dr. Molde's enjoyment of ravens and coyotes or causes concern about the presence of traps and M-44s." Ans.Br. at 36. However, NDOW is not

currently taking any action harming Dr. Molde's concrete interests and, consequently, there is no activity on Nevada's part that the relief could "stop." This is not a case where removal of the federal agency would change nothing. <u>See, e.g.</u>, <u>Nuclear Reg. Comm'n</u>, 457 F.3d at 949.

Just as Guardians need not establish "with any certainty" that an EIS will cause Wildlife Services to alter its underlying action, <u>Defenders of Wildlife</u>, 504 U.S. at 572 n.7, neither must Guardians prove that NDOW will not step in to fill the void if Wildlife Services stopped it activities, especially given that a state-run PDM program is "currently non-existent." <u>See</u> Ans.Br. at 37. Wildlife Services' interpretation of the third party actor cases, discussed *supra*, would represent a new and extremely limiting development in standing case law and would improperly shield any case from judicial review where a non-federal action *could* nullify the benefits gained from requiring compliance with federal law. Nevada's future response to wildlife conflicts, which is contingent on many unknowns, should not be relevant to assessing the redressability of Dr. Molde's injury when Wildlife Services is itself setting the traps, poisoning the ravens, and shooting the coyotes. <u>See, e.g.</u>, <u>Cent. Delta Water Agency v. United States</u>, 306 F.3d 938, 950 (9th Cir. 2002) ("the possibility that defendants may change their course of conduct is not the type of contingency [that can defeat standing].")

Here, if the Court requires Wildlife Services to conduct new NEPA analysis,

the result may be that Wildlife Services looks at updated information in a new

NEPA document and then chooses the same program alternative. Or, Wildlife

Services may choose a different alternative that focuses on non-lethal PDM

methods, that eliminates the use of traps and M-44s, or that bans helicopters used

to kill coyotes near the Humboldt National Forest where Dr. Molde recreates.[5]

New NEPA analysis, a changed decision, and/or the inclusion of environmental

mitigation measures resulting from consideration of new information would

redress Dr. Molde's injuries, regardless of whether NDOW were to create and

adopt a plan to kill some coyotes or set some traps in the interim. See Op.Br. at

31-34. As long as the remedy may afford Dr. Molde some relief for injuries

described in his declaration, whether through injunctive and/or declaratory relief,

the redressability requirement is satisfied. See Massachusetts v. EPA, 549 U.S.

497, 525 (2007) (to satisfy the redressability requirement, a plaintiff "need not

show that a favorable decision will relieve his every injury.") (citation omitted);

Los Angeles Haven Hospice, Inc. v. Sebelius, 638 F.3d 644, 655 (9th Cir. 2011)

(same).

---

[5]     See Molde Dec. ¶ 8 (discussing multiple ways that Wildlife Services' use of
aerial gunning reduces his ability to see coyotes); ¶¶ 13, 15 (describing witnessing
aerial gunning of coyotes near Humboldt National Forest and explaining his
recreational enjoyment of the Forest is "hampered by Wildlife Services' activities
there, including aerial gunning and trapping.") (ER 23, 24, 25).

**C.** **The Record Demonstrates that Dr. Molde's Injuries are Redressable, Notwithstanding the Mayer Letter**

Even if Guardians were required to show, based on a heightened burden of proof, that it was "likely" that Dr. Molde's injuries would be redressed by a favorable decision, it has done so here based on undisputed evidence in the record. The record demonstrates that Nevada cannot simply step into the role of Wildlife Services if federal assistance were withdrawn. In fact, we have the benefit of *Wildlife Services' own conclusion*s in the Nevada EA that Nevada would be *unable* to continue the same level of PDM activities. (ER 181-82). In forming those conclusions and determining the effects of a "no federal PDM" alternative, Wildlife Services relied on the Mayer Letter, which was provided as part of the NEPA process. See (ER 182, 213). Wildlife Services now relies on the Mayer Letter to incongruously claim that NDOW can and will fully take over its PDM activities. It is entirely post-hoc rationalization for Wildlife Services to argue, in litigation, that removing federal involvement would have no impact on wildlife or the areas in which Dr. Molde recreates when it made contrary conclusions in its own EA.

In fact, despite NDOW's "pledge" to Wildlife Services in the Mayer Letter, see Ans.Br. at 43, Wildlife Services acknowledged a string of contingencies and could not conclude that it would be business-as-usual, explaining in the EA: "If WS chooses to not provide the PDM services *that NWSP feels are necessary*, the

State would ***likely*** rescind the federal management of that program, and the Nevada Department of Agriculture would ***probably*** handle agriculture related PDM complaints . . ." (ER 115) (emphasis added). Even if Wildlife Services did stop providing services that Nevada considered to be necessary, what action Nevada would take and whether it would kill as many coyotes, set as many traps, or work in Humboldt National Forest where Dr. Molde recreates remains uncertain.

Wildlife Services also admits in the Nevada EA that without federal assistance, raven take in Nevada would likely "substantially decrease." (ER 181). NDOW cannot legally take over the killing of ravens using DRC-1339, which is how the majority of ravens are currently killed in Nevada, because it "is a special restricted use pesticide and can only be used under direct supervision by WS employees." (ER 115, 145). Wildlife Services explained that this decrease will result because the methods available to NDOW, such as shooting, "are likely to be more time consuming and expensive to implement and considerably fewer birds are likely to be taken . . ." (ER 181-82).

Wildlife Services does not contest this point, see Ans.Br. at 41, but states that the number of birds that NDOW is allowed to take is determined by its Migratory Bird Depredation Treaty permit. Ans.Br. at 40-41. Wildlife Services then argues that "[i]t is therefore impossible to know for certain whether NDOW, acting without federal assistance, would take as many ravens as NWSP."

However, Wildlife Services' Migratory Bird permit limits the lethal take of 2,500 ravens "for protection of Sage Grouse and other game (waterfowl, turkey, and pheasant) . . ." See Permit, Dkt. 31 at 5. As explained above and in Guardians' Opening Brief at 42-43, this is a purpose outside of NDOW's statutory authority to prevent or alleviate damage to land or property. See NEV. REV. STAT. § 503.595. Whether NDOW may take *any* ravens under the permit cited by Wildlife Services is questionable, at best. Nevertheless, although nobody knows how many ravens NDOW would take without Wildlife Services, the evidence in this case – Wildlife Services' own conclusions on the issue – demonstrates that raven take in Nevada will substantially decrease without federal assistance. Any other conclusions are not based upon the evidence that was before the district court and are purely speculative.

Wildlife Services also makes a "numbers" argument, asserting that "even if NDOW's take of ravens declined without APHIS participation, that does not mean Dr. Molde's injury would necessarily be redressed[,]" because a large population would remain. Ans.Br. at 41-42. The Supreme Court rejected a similar argument in Massachusetts v. EPA, finding that "[w]hile it may be true that regulating motor-vehicle emissions will not by itself *reverse* global warming, it by no means follows that we lack jurisdiction to decide whether EPA has a duty to take steps to *slow* or *reduce* it." 549 U.S. at 525 (emphasis in original). The fact that

developing countries were "poised to increase greenhouse gas emissions substantially over the next century" was not dispositive of the issue.  Id. at 525-26.  Instead, the Court held that the injury could be redressed because the risk of harm "would be reduced to some extent if petitioners received the relief they [sought]."  Id. at 526.  Moreover, killing 2500 ravens and more than 6000 coyotes cannot be "imperceptible" if there is a point to Wildlife Services' program.  Ans.Br. at 42.

Finally, Dr. Molde is an avid birdwatcher and Wildlife Services' use of DRC-1339, a deadly avian toxin, also reduces his chances of seeing other birds on his trips in and around Humboldt and Elko counties.  Molde Decl. ¶¶ 18, 20 (ER 26-27); see also Op.Br. at 23-24.  As alleged in Guardians' Complaint, the Nevada EA failed to take a hard look at the environmental impacts of DRC-1339, which kills target species such as ravens, but also unintentionally poisons other birds who directly eat the poison, or who eat the poisoned ravens.  See Compl. ¶¶ 71 n.4, 122, 175 (ER 232, 241, 249).  Since state and private actors cannot use DRC-1339, the requested relief will redress injuries to Dr. Molde's recreational interest in birdwatching in the areas where Wildlife Services uses this toxin.

### D.    This Court May Grant Meaningful Relief

Nor would relief here be "meaningless," as Wildlife Services contends.  Ans.Br. at 34.  Dr. Molde's injuries also include the potential environmental impacts of Wildlife Services' uninformed decision-making on issues such as its use

of toxic chemicals and traps, which it hasn't analyzed in twenty years.  See Op.Br. at 21.  "In the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action."  High Sierra Hikers Ass'n v. Blackwell, 390 F.3d 630, 642 (9th Cir. 2004); see also Salmon River Concerned Citizens v. Robertson, 32 F.3d 1346, 1355 (9th Cir. 1994).  That injury is redressable by a court order requiring Wildlife Services to undertake new NEPA analysis in order to better inform itself and the public of the environmental consequences of its decision and of possible measures to mitigate its environmental impact.  See Ocean Advocates v. U.S. Army Corps of Eng'rs, 402 F.3d 846, 860 (9th Cir. 2005) (an injunction in a NEPA case "obviously would alleviate" the plaintiff's injury, but that the "other [procedural] remedy," an EIS studying environmental impacts, "would also redress" plaintiff's injury); Columbia Basin Land Prot. Ass'n v. Schlesinger, 643 F.2d 585, 592 (9th Cir. 1981) ("the preparation of an EIS ensures that other officials, Congress, and the public can evaluate the environmental consequences independently.").  Therefore, Guardians has standing.

## II.    JURISDICTIONAL DISCOVERY WAS WARRANTED

Guardians opposed Wildlife Services' motion to dismiss and asked the court to allow an opportunity for jurisdictional discovery.  Because standing "must be supported in the same way as any other matter on which the plaintiff bears the

burden of proof, *i.e.,* with the manner and degree of evidence required at the

successive stages of the litigation," see <u>Defenders of Wildlife</u>,[6] it is common for

district courts to deny motions to dismiss based on standing where more

jurisdictional facts are needed and to give the plaintiff an opportunity to gather

those facts through discovery.  See, e.g., <u>Braunstein v. Ariz. Dep't of Transp.</u>, 683

F.3d 1177, 1183 (9th Cir. 2012) (noting that district court denied motion to dismiss

for lack of standing, but warned that motion for summary judgment may succeed

after discovery); <u>Valley Cnty., Idaho v. USDA</u>, No. 1:11–CV–233–BLW, 2012

WL 506000, at *3 n.2 (D. Idaho Feb. 15, 2012); <u>Kal Kan Foods, Inc. v. Iams Co.</u>,

197 F. Supp. 2d 1061, 1066 (S.D. Ohio 2002).  Guardians argued that discovery

was warranted in order to meet its burden on standing and that it sought to discover

whether NDOW could and would take over Wildlife Services' PDM activities in

Nevada if federal involvement ceased.[7]  (Clerk's Record ("CR") 25 at 11, 19).

Guardians also filed a Motion for Jurisdictional Discovery, requesting the

opportunity to conduct jurisdictional discovery if the Court needed a more

---

[6]     See <u>Defenders of Wildlife</u>, 504 U.S. at 560-61 ("At the pleading stage,
general factual allegations of injury . . . may suffice, . . . we presume that general
allegations embrace those specific facts that are necessary to support the claim.  In
response to a summary judgment motion, however, the plaintiff … must 'set forth'
by affidavit or other evidence 'specific facts,' . . . which for purposes of the
summary judgment motion will be taken to be true.").

[7]     Guardians also argued that its claims were redressable because NDOW
could not carry out all of the activities authorized by the Nevada Decision and EA,
such as the killing of ravens.  (CR 25 at 18).

satisfactory showing of contested facts to rule on the motion to dismiss. (CR 27 at 1-2). As this Court explained in <u>Laub v. U.S. Dep't of Interior</u>, "discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." 342 F.3d 1080, 1093 (9th Cir. 2003) (quotation marks and citation omitted).

Although Guardians established that contested allegations relating to jurisdictional facts required discovery, the district court refused to follow the standard set forth in <u>Laub</u>, and instead held that NDOW "***undisputedly*** expressed a clear intent to implement the predator management program absent federal involvement" in the Mayer Letter. (ER 15) (emphasis added). As explained *supra*, there was considerable dispute and this conclusion was in error. Therefore, the district court abused its discretion in dismissing Guardians' Complaint without the benefit of discovery.[8]

---

[8] This Court has held that, "[i]n resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment. The court need not presume the truthfulness of the plaintiff's allegations." <u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004). However, it is paradoxical that a factual dispute would preclude the court from granting summary judgment in this case, but that the court may grant Wildlife Services' motion to dismiss without allowing Guardians an opportunity for jurisdictional discovery. This conclusion is at odds with <u>Defenders of Wildlife</u> regarding the plaintiff's burden of proof to demonstrate standing at each stage of the litigation, which assumes that there may be a factual dispute. <u>See</u> 504 U.S. at 560-61.

Wildlife Services contends that the Mayer Letter is dispositive of the redressability issue and that it is "unlikely that discovery would have uncovered any facts to establish standing." Ans.Br. at 19. To the contrary, discovery likely would have shown that NDOW has neither the money nor the manpower to take over the entirety of Wildlife Services' activities in Nevada. See Molde Dec. ¶ 28 (ER 29). In fact, NDOW's recent statements concede as much, demonstrating that discovery would have been fruitful as to these issues.

In an *Associated Press* story, NDOW spokesman Chris Healy admitted that NDOW "wouldn't have the manpower [to carry out Wildlife Services' program in Nevada] . . . [Wildlife Services is] in some wild places in Nevada doing that kind of predator work where [NDOW] ha[s] zero personnel. [NDOW] already ha[s] a full plate." See Scott Sonner, *9th Circuit Asked to Stop USDA Predator Killing*, THE DENVER POST (Oct. 4, 2013, 1:47 pm), http://www.denverpost.com/news/ci_24241209/nv-suit-over-usda-predator-killing-9th-circuit.[9] When asked about the Mayer Letter, Healy said the letter wasn't meant to suggest there would be no impact on PDM in Nevada. Id. Healy said NDOW would continue to carry out some PDM to promote game species with a portion of the limited revenue gleaned

---

[9] Guardians filed a separate motion requesting judicial notice of this newspaper article. See FED. R. EVID. 201(d) ("The court may take judicial notice at any stage of the proceeding."). If the Court declines to take judicial notice of the article then it may still examine it "in the interest of fairness." See United States v. Rutgard, 116 F.3d 1270, 1278 (9th Cir. 1997).

from big game tags, "[b]ut would [NDOW] be able to fill the void? Not the whole

void . . ." Id.

Guardians does not ask the Court to accept the truth of Mr. Healy's

statements, but instead brings the statements of this NDOW public representative

to the Court's attention to demonstrate that discovery would likely have uncovered

additional facts to dispute Wildlife Services' interpretation of the Mayer Letter.

See United States v. Isaacs, 359 F. App'x 875, 877 (9th Cir. 2009) (district court

did not err in taking judicial notice of newspaper article where not offered for the

truth of the matter asserted and was, therefore, not hearsay) (citing FED. R. EVID.

801(c)).

Additionally, Wildlife Services attempts to downplay the importance of the

$1.53 million dollars that NWSP received from the federal government in 2010 by

citing a Nevada Legislative Appropriations Report stating that NDOW's entire

two-year budget during 2010-211 was $103.7 million dollars. See Ans.Br. at 42.

Undercutting Wildlife Service's argument is the fact that in the same paragraph of

the cited budget report, Nevada notes a 37 percent reduction from NDOW's

"General Fund" for that two year period, and states that this reduction "will impact

the agency's ability to respond to reports of dangerous or nuisance wildlife . . ."[10]

---

[10]    See Nevada Legislative Appropriations Report: Fiscal Years 2009-10 and
2010-11, at 308 (October 2009), *available at* https://www.leg.state.nv.us/Division/

Despite these and other contested factual issues, the district court wrongly concluded that the "Defendant would be unduly prejudiced were the Court to allow Plaintiff to engage in jurisdictional discovery ***when no disputed issue of fact [] exists***." (ER 15) (emphasis added).

The court also based its denial of discovery on the fact that extensions had been granted to both parties. However, those extensions and the resulting delay were reasonable where counsel for both Guardians and Wildlife Services sought extensions due to family leave. Wildlife Services filed its Motion to Dismiss Plaintiff's Complaint two days before Guardians' attorney gave birth to her son. (CR 16 at 2, 16-1). Given the circumstances of these extensions and the short period of time – a day short of four months – from Wildlife Services' filing of its Motion to Dismiss and Guardians' filing its Motion for Jurisdictional Discovery, the district court erred in ruling that allowing discovery would have unduly prejudiced Wildlife Services. By accepting the Mayer Letter as dispositive, denying the motion for jurisdictional discovery, and dismissing Guardians' case at the Motion to Dismiss stage, the district court substantially prejudiced Guardians and abused its discretion. See Wells Fargo & Co. v. Wells Fargo Express Co., 556 F.2d 406, 430 n.24 (9th Cir. 1977); Laub, 342 F.3d at 1093.

---

fiscal/Appropriation%20Reports/2009AppropriationsReports/11Infrastructure.pdf (last visited February 13, 2014).

**III. GUARDIANS STATED A LEGALLY COGNIZABLE CLAIM FOR RELIEF THAT WILDLIFE SERVICES' FAILURE TO SUPPLEMENT ITS 1994/1997 PEIS VIOLATES THE APA**

Wildlife Services also asks this Court to affirm the dismissal of Guardians' Claims One and Two for failure to state a claim pursuant to FED. R. CIV. P. 12(b)(6). These claims allege that Wildlife Services violated, and continues to violate, NEPA and NEPA's implementing regulations by failing to supplement its 1994/1997 PEIS or prepare a new EIS for its national wildlife killing program.[11] Guardians' Second Claim properly alleges that Wildlife Services' failure to prepare a new or supplemental EIS is agency action unlawfully withheld or unreasonably delayed under the APA, 5 U.S.C. § 706(1). Compl. ¶¶ 164-69 (ER 247-48). See Friends of the Clearwater v. Dombeck, 222 F.3d 552, 560 (9th Cir. 2000) ([a]n action to compel an agency to prepare" a supplemental EIS is "an action arising under 5 U.S.C. § 706(1)") (citation omitted).

However, to the extent that Wildlife Services *has* made a decision not to supplement its PEIS or prepare a new EIS for its ongoing national program – by refusing Guardian's request for supplementation and/or continuing to incorporate the PEIS in its site-specific decision-making – that decision is arbitrary and capricious, as alleged in Guardians' First Claim. 5 U.S.C. §§ 706(2)(A), (D);

---

[11]     Guardians' Complaint alleges that Wildlife Services is required to either supplement its PEIS *or prepare a new EIS for its program*. See Comp. ¶ 76 (ER 234); Andrus v. Sierra Club, 442 U.S. 347, 363 n.21 (1979) ("'[M]ajor Federal actions' include the 'expansion or revision of ongoing programs.'")

Sierra Club v. U.S. Dep't of Transp., 245 F.Supp.2d 1109, 1119 (D. Nev. 2003) (where agency has made a decision not to prepare a SEIS, that decision is subject to arbitrary and capricious review) (citing Marsh, 490 U.S. at 377–78).  These allegations are set forth in Guardians' Statement of Facts and incorporated by reference in its First Claim for Relief.  Comp. ¶¶ 58, 161, 162 (ER 228, 247).  Guardians alleged "enough facts to state a claim to relief that is plausible on its face."  See Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007); FED. R. CIV. P. 12(b)(6).

A.    **Wildlife Services has a Mandatory Duty to Supplement its PEIS**

Wildlife Services acknowledges that agencies are required to supplement an EIS when "there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(c)(1).  In interpreting this regulation, the Supreme Court held that "[i]f there remains major Federal action to occur, and the new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered, a ***supplemental EIS must be prepared***."  Marsh, 490 U.S. at 374 (emphasis added).  Therefore, when Wildlife Services is faced with new information, such as new studies that have been published over the past twenty years relating to native carnivores and toxicants, the "agency must consider it,

23

evaluate it, and make a reasoned determination whether it is of such significance as to require an SEIS." <u>Dombeck</u>, 222 F.3d at 558 (citation omitted).

Wildlife Services' ongoing wildlife killing program, in Nevada and nationwide, is undoubtedly the type of ongoing program that the CEQ contemplated when it explained: "As a rule of thumb, . . . ***if the EIS concerns an ongoing program***, EISs that are ***more than 5 years old*** should be ***carefully*** reexamined to determine if the criteria in Section 1502.9 compel preparation of an EIS supplement." NEPA's 40 Most Asked Questions, 46 Fed. Reg. 18,026, 18,036 (March 23, 1981) (emphasis added).

Because Guardians states a cognizable claim under the APA, 5 U.S.C. § 706(1), that Wildlife Services must supplement its PEIS, this Court must not affirm the district court's dismissal of Guardians' Second Claim for Relief based on that alternative ground. In fact, Guardians urges this Court to utilize its discretion to resolve the legal question at issue and find that there "remains major Federal action to occur" under the PEIS, in accordance with <u>Marsh</u>, 490 U.S. at 374.[12] <u>See</u>

---

[12] Guardians states detailed allegations in its Complaint that there are significant new circumstances and information relevant to environmental concerns and bearing on Wildlife Services' continued PDM program, requiring supplementation. <u>See</u> Comp. ¶¶ 68, 69-81, 166 [ER 231, 232-35, 248]. When considering Wildlife Services' Motion to Dismiss for failure to state a claim, the Court must accept as true that this new information is sufficient to show that the remaining action will affect the quality of the human environment in a significant manner or to a significant extent not already considered. <u>See</u> <u>AE ex rel. Hernandez v. Cnty. of Tulare</u>, 666 F.3d 631, 636 (9th Cir. 2012). Therefore, if this Court

<u>Singleton v. Wulff</u>, 428 U.S. 106, 121 (1976); <u>Commodity Futures Trading</u>

<u>Comm'n v. Co Petro Mktg. Grp., Inc.</u>, 680 F.2d 573, 581 (9th Cir. 1982) ("It is

well-settled in this circuit that where the new issue is purely a legal one . . . it is

proper to resolve it on appeal.") (citations omitted).  Because the district court's

decision on this issue will likely result in appeal back to this Court, resolving this

legal issue now serves the interest of "judicial economy."  <u>See</u> <u>Bibeau v. Pac. NW</u>

<u>Research Found., Inc.</u>, 188 F.3d 1105, 1111 n.5 (9th Cir. 1999).

## B.    <u>Federal Action Remains to Occur under the PEIS</u>

Wildlife Services argues that it does not have a mandatory duty to

supplement the PEIS because "no federal action remains to occur pursuant to the

PEIS."  Ans. Br. at 57.  To the contrary, because it "addresses ***an ongoing***

***program of wildlife damage management***," in Nevada and nationwide, "there

remains major federal action to occur" that will be based on the PEIS.  <u>See</u> PEIS

Summary at 4 (emphasis added) (ER 41); <u>Marsh</u>, 490 U.S. at 374.

Indeed, the PEIS at issue is a living document that is the heart of an ongoing

national program.  Local and regional Wildlife Services officers continue to use

and rely on the wildlife killing strategies set forth in the PEIS in both site-specific

---

determines that there "remains major Federal action to occur" under <u>Marsh</u>,
Guardians' Second Claim for Relief should survive under the standard set forth in
FED. R. CIV. P. 12(b)(6).

NEPA documents and in carrying out local actions.[13]  See Record of Decision on

the PEIS, 60 Fed. Reg. 13,399 (March 13, 1995).  In the Nevada EA, Wildlife

Services' tiered[14] to the PEIS in considering the environmental impacts of its

ongoing federal action in Nevada and incorporated the PEIS into the Nevada EA

"by reference."  (ER 94).

When additional actions remain, as is the case here, the federal agency has a

"meaningful opportunity" to use the information it gathers through NEPA.  See

Marsh, 490 U.S. at 371-372.  The ongoing federal action in Nevada is an example

of such a meaningful opportunity to use relevant information in its decision-

making.  Instead, however, Wildlife Services ignored that opportunity and relied

on stale information from the PEIS such as: asserting that all PDM methods used

in Nevada are "fully assessed" in the PEIS (ER 131); basing conclusions regarding

the magnitude of impact on the coyote population on the impact model in the PEIS

(ER 138); and relying on the risk assessment in the PEIS to conclude that its use of

deadly toxicants does not pose a risk to the environment or the public (ER 173).

---

[13]     See, e.g., Wildlife Services' October 2012 Montana Wolf EA at p. 49, 109
(explaining that alternatives were developed using the "Methods of Control" and
"Risk Assessment" from "USDA 1997," – the 1994/197 PEIS), available at:
http://www.aphis.usda.gov/regulations/pdfs/nepa/Montana%20Wolf%20EA%20O
ctober_2012.pdf (last viewed February 13, 2014).

[14]     According to the CEQ, tiering allows an agency to incorporate by reference
the "general discussions and relevant specific discussions from an [EIS] of broader
scope . . ."  46 Fed. Reg. at 18,033.

**C.** **Unlike *SUWA*, the PEIS Continues to be Used to Support and Justify an Ongoing Federal Program**

Ongoing federal programs are given special treatment under NEPA and its implementing regulations, which define major federal actions to include "new and continuing activities, including . . . programs . . ." 40 C.F.R. § 1508.18(a). [15] Congress intended for an agency's NEPA obligations to continue when implementation of its federal program is ongoing. See Marsh 490 U.S. at 372 (finding NEPA's procedural requirements, such as the supplementation requirement at issue here, are intended to "ensure that this commitment is 'infused into the ongoing programs and actions of the Federal Government.'") (quoting 115 CONG. REC. 40416 (Dec. 20, 1969) (remarks of Sen. Henry Jackson).

This case presents a different scenario than was at issue in Norton v. S. Utah Wilderness Alliance ("SUWA"), 542 U.S. 55 (2004). In SUWA, the Supreme Court considered if new circumstances required BLM to supplement a land resource management plan. The Court held that because the plan was the "proposed action" and "*approval* of [its] land use plan" was the "'major Federal action' requiring an EIS," there was no major federal action to complete and thus

---

[15] The CEQ regulations "are entitled to substantial deference." Marsh, 490 U.S. at 372. "The procedures prescribed both in NEPA and the implementing regulations are to be strictly interpreted to the fullest extent possible in accord with the policies embodied in the Act." Ctr. for Biological Diversity v. U.S. Forest Serv., 349 F.3d 1157, 1166 (9th Cir. 2003) (internal quotations and citation omitted).

supplementation of the EIS would be pointless.  <u>Id.</u> at 73 (emphasis in original)

(citing 43 C.F.R. § 1601.0-6).

Here, the PEIS was not used to approve a plan.  Rather, the twenty-year old

PEIS continues to be incorporated into each of Wildlife Services' local and

regional NEPA documents used to approve site-specific programs.  The PEIS is, in

essence, a living document, given new life each time Wildlife Services relies on it

in approving a new site-specific program.  Guardians challenged the PEIS in the

context of the Nevada program where Wildlife Services incorporated the analysis

from the PEIS into the new EA and relied on the methods authorized therein.

Where Wildlife Services incorporates the PEIS in its ongoing decisions, there is

continuing major federal action that is based on the PEIS, and supplementation

with new information and current science is required by NEPA.

## <u>CONCLUSION</u>

For the reasons set forth above and in its Opening Brief, Guardians

respectfully requests that this Court reverse the district court and conclude that

Guardians has standing; that dismissal of any of Guardians' claims is improper;

and that federal action remains to occur under the PEIS.

Respectfully submitted February 13, 2014.

/s/ Ashley D. Wilmes
Ashley D. Wilmes
WildEarth Guardians
680 W. Hickory Street
Louisville, CO 80047
Tel. 859-312-4162
awilmes@wildearthguardians.org
Attorney for Plaintiff-Appellant
WildEarth Guardians

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)
### Certificate of Compliance With Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1.     I hereby certify that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 6,930 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.     I further certify that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Times New Roman font.

*/s/ Ashley D. Wilmes*
Ashley D. Wilmes
WildEarth Guardians
680 W. Hickory Street
Louisville, CO 80047
Tel. 859-312-4162
awilmes@wildearthguardians.org
Attorney for Plaintiff-Appellant

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on February 13, 2014, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of this filing to all attorneys of record.

By: *<u>/s/ Ashley D. Wilmes</u>*
      Ashley D. Wilmes